# CORRECTED ORDER

## In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12444

Non-Argument Calendar

_____

STATE OF ALABAMA,
STATE OF FLORIDA,
STATE OF GEORGIA,
STATE OF SOUTH CAROLINA,
INDEPENDENT WOMEN'S NETWORK, et al.,

                                        Plaintiffs-Appellants,

*versus*

U.S. SECRETARY OF EDUCATION,
U.S. DEPARTMENT OF EDUCATION,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:24-cv-00533-ACA

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

BY THE COURT:

On April 29, 2024, the U.S. Department of Education promulgated a new administrative rule "interpreting" Title IX to break new ground in the 52-year history of that landmark statute. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. pt. 106). The rule represents a sea change to the regulations administering Title IX by, among other things, expanding the definition of discrimination on the "basis of sex" to include discrimination based on gender identity—as well as materially altering and expanding the scope of Title IX's sexual-harassment-related regulations.

Before this action, every court to consider the issue across the nation—seven district courts and two courts of appeals[1]—

_____

[1] Notably, since filing the instant appeal, the U.S. Supreme Court denied the Department's request for a partial stay of court orders in two separate district courts—which both preliminarily enjoined enforcement of the rule in the respective plaintiffs' states—pending resolution of the appeals of those orders

preliminarily enjoined enforcement of the rule.[2]  The district court here, by contrast, refused to enjoin the rule a day before it was supposed to go into effect.

---

in the Fifth and Sixth Circuits.  *Dep't of Educ. v. Louisiana*, 603 U.S. ___, 2024 WL 3841071 (2024).  The Court held that "all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Id.* at *1. Four members of the Court dissented as to the scope of the injunction, arguing that the three provisions could be severed from the rule while leaving the rest of the rule intact.  *Id.* at *2–*5 (Sotomayor, J., dissenting). However, the majority held that a rule-wide injunction was appropriate, reasoning that "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Id.* at *1.

Puzzlingly, the dissent argues that the *Louisiana* Court "did not address the merits" or "analyze the parties' merits arguments," but instead "addressed only severability."  As noted previously, the Court unanimously "accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule." *Id.* at *1; *see also id.* at *2 (Sotomayor, J., dissenting) ("Every Member of the Court agrees respondents are entitled to interim relief as to three provisions of that Rule."). And by accepting that the plaintiffs were entitled to preliminary injunctive relief, the Court had to have found that all the requirements for a preliminary injunction were met, including likelihood of success on the merits, irreparable harm, and the balance of the equities.

[2] *See Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) (denying DOE's motion for a partial stay of the district court's preliminary injunction that enjoined enforcement of the rule in Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia); *Louisiana v. DOE*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (denying DOE's motion

Plaintiffs—Alabama, Florida, Georgia, South Carolina, and four private groups—appealed the same day and requested that we grant an administrative stay barring the Department from enforcing the rule in the Plaintiff States until we resolved Plaintiffs' forthcoming motion for injunction pending appeal. We granted the administrative stay, stating that "The Department is enjoined from enforcing the final rule . . . pending further order of this Court." Plaintiffs thereafter promptly filed their motion for an injunction pending appeal. After careful review, and for the reasons that follow, Plaintiffs' motion is GRANTED.

for partial stay of district court's preliminary injunction that enjoined enforcement of the rule in Louisiana, Mississippi, Montana, and Idaho); *Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) (enjoining enforcement in Oklahoma); *Arkansas v. DOE*, No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (enjoining enforcement of the rule in Arkansas, Missouri, Iowa, Nebraska, North Dakota, and South Dakota); *Carroll Indep. Sch. Dist. v. DOE*, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) (partially enjoining enforcement of the rule in a specific school district); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) (enjoining enforcement of the rule against individual plaintiffs and state of Texas); *Kansas v. DOE*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) (enjoining enforcement of the rule in Kansas, Alaska, Utah, Wyoming, and in specific schools); *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) (enjoining enforcement of the rule in Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia); *Louisiana v. DOE*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024) (enjoining enforcement of the rule in Louisiana, Mississippi, Montana, and Idaho).

# I.      Background

### A.  Title IX

Title IX, enacted in 1972, mandates that, subject to certain exceptions: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "[Title IX's] purpose, as derived from its text, is to prohibit sex discrimination in education." *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816–17 (11th Cir. 2022) (en banc).

Through an appropriation from Congress, the Department provides states with federal funds for education. 20 U.S.C. § 1682. And the Department can terminate or refuse to grant federal funds to schools that fail to comply with the statute. *Id.* Schools can also be held liable through private lawsuits. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (recognizing an implied private right of action against schools under Title IX). The Department is also tasked with "issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute. . . ." 20 U.S.C. § 1682.

After Title IX's enactment in 1972, implementing regulations were adopted, permitting separation based on

biological sex in restrooms, locker rooms, and showers, as well as in sports. *See* Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 45 C.F.R. § 86.33 (1974) ("the 1974 Rule") (restrooms, locker rooms, showers); *id.* § 86.41 (athletics).

### B. *Regulatory Provisions at Issue*

On April 29, 2024, the Department implemented the final rule at issue here, which adds one new regulation and alters twenty-five existing regulations. *See* 89 Fed. Reg. at 33,882–96. Plaintiffs focus on "three central provisions" of the rule that they argue are unlawful.

First, they challenge 34 C.F.R. § 106.10, which broadens Title IX's general ban on discrimination "on the basis of sex," to include "discrimination on the basis of . . . gender identity." 34 C.F.R. § 106.10.

Second, and relatedly, Plaintiffs challenge § 106.31(a)(2), which states that, even in limited circumstances in which Title IX "permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation . . . [that] subject[s] a person to more than de minimis harm[.]"[3] *Id.*

---

[3] The regulation, however, exempts certain statutory carveouts—such as 20 U.S.C. § 1686, which permits schools to "maintain[] separate living facilities for the different sexes"—from the de minimis harm requirement (*i.e.*, schools can provide different treatment or separation on the basis of sex in these situations regardless of whether it causes more than de minimis harm). But

§ 106.31(a)(2). The provision then states that a policy that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm . . . ." *Id.*

And third, Plaintiffs challenge § 106.2, which adopts a broader standard of sex-based harassment. Rather than covering schools that are "deliberately indifferent" to sexual harassment that, "based on the totality of the circumstances," is so "severe, pervasive, *and* objectively offensive" that it "denies" education, the rule now eliminates the deliberate indifference language and covers sexual harassment that is "so severe *or* pervasive" that it "*limits* or denies" education. *Compare* §§ 106.30, 106.44(a) (effective until July 31, 2024), *with* §§ 106.2 (emphasis added), 106.44 (effective August 1, 2024).[4] The rule further explains that

> [s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe or pervasive to limit or deny a student's ability to participate in or benefit from a recipient's

---

these statutory carveouts do not include the Department's previous regulations on separate bathrooms, locker rooms, shower facilities, access to classes and activities, and appearance codes. *See* 89 Fed. Reg. at 33,816.

[4] Below, Plaintiffs also challenged the rule's grievance procedures, which they argued "repeal protections for the accused, like the right to a live hearing with cross-examination and the right to not have a single official investigate, adjudicate, and punish." However, Plaintiffs' objections to these procedures "aren't the focus of this motion."

education program or activity (i.e., creates a hostile environment). Thus, harassing a student—including acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity—can constitute discrimination on the basis of sex under Title IX in certain circumstances.

89 Fed. Reg. at 33,516.

Finally, the rule provides that it preempts all "State or local laws or other requirements" that conflict with its terms, 89 Fed. Reg. at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within the school. *Id.* at 33,886 (to be codified at 34 C.F.R. § 106.11).

## II.    Discussion

In support of their motion for an injunction pending appeal, Plaintiffs argue that they have shown a substantial likelihood of success on the merits, and that the other factors necessary for such relief—irreparable harm, balance of equities, and public interest—also weigh in favor of granting their motion. They also argue that because the provisions they argue are unlawful are central provisions of the rule, the provisions are not severable and so we

should enjoin the entirety of the rule at this stage.  Each of these arguments will be addressed in turn.[5]

### A. *Injunction Pending Appeal*

For us to grant the extraordinary remedy of an injunction pending appeal, Plaintiffs must show:

> (1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) [that] the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) [that,] if issued, the injunction would not be adverse to the public interest.

*Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1257 (11th Cir. 2019) (quotation omitted).  We will address Plaintiffs' ability to meet each of these four elements in turn.

### 1. Likelihood of Success on the Merits

The first factor we review in determining whether to grant an injunction pending appeal is whether Plaintiffs have shown "a substantial likelihood of success on the merits." *Id.*; *see Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (noting

---

[5] The district court, in addition to holding that Plaintiffs failed to meet the traditional factors for injunctive relief, suggested that Plaintiffs failed to support key issues with arguments and citation to authority.  Based on our review of the record, we are unpersuaded at this stage that Plaintiffs failed to advance and support the key claims they make here.  We therefore proceed to the traditional factors for issuing an injunction pending appeal.

that likelihood of success on the merits is "generally the most important of the four factors" (quotation omitted)).  Because we review a district court's ruling on a preliminary injunction "under the deferential abuse of discretion standard," *Robinson v. Atty. Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020), the question we must answer is whether "it is substantially likely that [Plaintiffs] can demonstrate the district court abused its discretion when it denied the motion for a preliminary injunction," *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1286 (11th Cir. 2021).  And our evaluation of the merits of Plaintiffs' challenge is governed by the Administrative Procedure Act, which requires us to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law . . . [or] in excess of statutory . . . authority."  5 U.S.C. §§ 706(2)(A), (C).  Finally, we note that in ruling on a motion for a preliminary injunction, "we do not conclusively resolve the merits of the [underlying] appeal."  *Robinson*, 957 F.3d at 1177.  Rather, "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."  *Id.* at 1178 (quotation omitted).

*a* .      *Sections 106.10 & 106.31(a)(2)*

Plaintiffs argue that they are likely to succeed on the merits on appeal because § 106.10 broadens sex to include gender identity in violation of *Adams*, and combines with § 106.31(a)(2) to unlawfully "ban[] schools from requiring students to use the

bathroom of their sex, rather than their gender identity." We agree that Plaintiffs have made the requisite showing.

In *Adams*, we addressed, among other matters, whether a Florida school's policy of separating male and female bathrooms on the basis of sex violated Title IX. 57 F.4th at 796, 811–17. To answer this question, we "interpret[ed] the word 'sex' in the context of Title IX and its implementing regulations." *Id.* at 811. We began by considering dictionary definitions of the word "sex" at the time of Title IX's enactment in 1972, which "overwhelming[ly]" defined sex "on the basis of biology and reproductive function[.]" *Id.* at 812. We then determined that defining "sex" in Title IX to include "gender identity" "ignored the overall statutory scheme" because it would render Title IX's many sex-based exceptions meaningless and "would provide more protection against discrimination on the basis of transgender status under the statute and its implementing regulations than it would against discrimination on the basis of sex." *Id.* at 813–14. We thus determined that defining "sex" to include "gender identity" "could not comport with the plain meaning of 'sex' at the time of Title IX's enactment and the purpose of Title IX and its implementing regulations, as derived from their text." *Id.* at 814. Accordingly, we held that the term "sex" in Title IX "unambiguously" referred to "biological sex" and not "gender identity." *Id.* at 814–15. Moreover, we held that "[e]ven if the term 'sex,' as used in Title IX, were unclear," because Title IX was passed under the Spending Clause, the statute needed to incorporate gender identity "unambiguously," which we held it did not. *Id.* at 815–17.

Given our holding in *Adams* that "sex" in Title IX "unambiguously" refers to "biological sex" and not "gender identity," it is certainly highly likely that the Department's new regulation defining discrimination "on the basis of sex" to include "gender identity" is contrary to law and "in excess of statutory . . . authority." 5 U.S.C. § 706(2); *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266, 2273 (2024) (holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" regardless of whether a statute is ambiguous, and that statutes "have a single, best meaning"). And the Department even acknowledges that the rule is contrary to *Adams*, but "declines to adopt" our reasoning. *See* 89 Fed. Reg. at 33820–21. Thus, the Plaintiffs have demonstrated a substantial likelihood that the district court abused its discretion in denying Plaintiffs' preliminary injunction as it relates to their challenges to §§ 106.10 and 106.31(a)(2). *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1185 (11th Cir. 2010) ("Although the grant [or denial] of . . . injunctive relief is generally reviewed for an abuse of discretion, if the trial court misapplies the law we will review and correct the error without deference to that court's determination." (quotation omitted)).

The Department disagrees, arguing that defining discrimination "on the basis of sex" in Title IX is merely a straightforward application of the Supreme Court's decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). The Department misreads *Bostock* and our precedent. In *Bostock*, the Supreme Court was clear that "[t]he question [wa]sn't just what 'sex' mean[s], but

what Title VII says about it," that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," and that it did not "purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. And in *Adams*, we noted that *Bostock* did not govern Title IX because it "involved employment discrimination under Title VII," while Title IX "is about schools and children—and the school is not the workplace." 57 F.4th at 808; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII . . . is a vastly different statute from Title IX . . . ."). Additionally, we noted that "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811. Thus, if *Bostock* applied, it "would swallow the carve-outs and render them meaningless." *Id.* at 814 n.7. We subsequently reaffirmed, in *Eknes-Tucker v. Governor of Alabama*, that "*Bostock* relied exclusively on the specific text of Title VII" and "bears minimal relevance" to cases involving "a different law . . . and a different factual context." 80 F.4th 1205, 1228–29 (11th Cir. 2023). So *Bostock* does not undermine our conclusion that the Plaintiffs have shown a substantial likelihood of success on the merits as to this claim. Plaintiffs have thus satisfied the first (and most important) factor for obtaining preliminary injunctive relief. *Accord Arkansas*, 2024 WL 3518588, at *14–17; *Oklahoma*, 2024 WL 3609109, at *4–6; *Kansas*, 2024 WL 3273285, at *8–11; *Tennessee*, 2024 WL 3453880, at *2–4; *Louisiana*, 2024 WL 2978786, at *10–12; *Texas*, 2024 WL 3405342, at *5–7; *Tennessee*, 2024 WL 3019146, at *8–13.

*b .     Section 106.2*

Next, Plaintiffs argue that "[t]he rule's redefinition of harassment in § 106.2 is likely illegal," because it is inconsistent with the definition the Supreme Court set out in *Davis*, and conflicts with our First Amendment precedent in *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022).

In *Davis*, the Supreme Court defined what "discrimination" meant in the context of a private damages lawsuit under Title IX against a school board, in which one student alleged that another student had sexually harassed her.  526 U.S. at 632–33.  The Supreme Court held that, student-on-student "sexual harassment" was "discrimination" for purposes of Title IX, and in order for a private plaintiff to bring a suit for damages for such "discrimination," the behavior must be "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect," and the recipient must be "deliberately indifferent."  *Id.* at 650–52.

Section 106.2's new definition of discrimination—which, recall, includes conduct that, "based on the totality of the circumstances . . . is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity"—flies in the face of *Davis*.[6]  *See* §

---

[6] The Department argues that, in the Title VII context, courts have applied a broader "severe or pervasive" standard than the standard set out in *Davis* "without raising any First Amendment concerns."  That cases have adopted a

106.2 (emphasis added). And while the Department points out that *Davis* arose in the context of a private lawsuit rather than an administrative lawsuit, the Supreme Court was nonetheless interpreting the same word in the same statute to address the same legal question: the meaning of "discrimination" under Title IX. It is not clear why a different, and significantly broader, definition of "discrimination" would apply in the administrative context. *See Loper Bright Enters.*, 144 S. Ct. at 2266 (noting that statutes "do—in fact, must—have a single best meaning"); *Clark v. Martinez*, 543 U.S. 371, 380 (2005) ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern.").

And the new definition also raises First Amendment concerns. Indeed, the *Davis* majority, in responding to the dissent's concerns that holding schools liable for student-on-student conduct might force them to enact policies that violated the First Amendment, pointed to the "very real limitations" in its definition—noting that the standard did not include liability for

---

broader standard in the Title VII context does not undermine the holding in *Davis*. Indeed, the Department's argument overlooks the very different contexts in which Title IX and Title VII apply. *See Davis*, 526 U.S. at 651 ("Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults.").

"teas[ing]," "name-calling," isolated incidents, or "a mere 'decline in grades.'" *Davis*, 526 U.S. at 652. And it warned against courts "impos[ing] *more sweeping liability than we read Title IX to require.*" *Id*. (emphasis added).

To that end, in *Speech First, Inc.*, we addressed, in pertinent part, whether a college's "discriminatory harassment" policy "likely" violated the First Amendment for purposes of obtaining a preliminary injunction. 32 F.4th at 1113. Among other things, the policy prohibited students from "engaging in," "[c]ondoning," "encouraging," or "failing to intervene" in "verbal, physical, electronic or other conduct" that touched on many different characteristics of a person including, for example, "gender identity or expression." *Id*. at 1114–15. The policy also prohibited "Hostile Environment Harassment," which it defined as "[d]iscriminatory harassment that is so severe *or* pervasive that it unreasonably interferes with, *limits*, deprives, or alters the terms or conditions of education . . . employment . . . or participation in a university program or activity . . . ." *Id*. (emphasis added). And the policy stated that a hostile environment could be created by "a single or isolated incident, if sufficiently severe," and would be evaluated based on "the totality of known circumstances." *Id*. We held that this policy likely violated the First Amendment because it "restrict[ed] political advocacy and cover[ed] substantially more speech than the First Amendment permit[ted]," thereby chilling protected speech, and it was also likely "an impermissible content- and viewpoint-based restriction." *Id*. at 1125–27. Here, the Department's new definition of "discrimination" is similar in its

sweep to the "discriminatory harassment" policy in *Cartwright*, and thus raises similar First Amendment concerns.

Ultimately, the Department's regulation contravenes the Supreme Court's construction of Title IX "discrimination" set out in *Davis* and runs headlong into the First Amendment concerns animating decisions like *Davis* and *Cartwright*. Accordingly, it is highly likely that the Department's regulation is contrary to law and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). Thus, Plaintiffs are substantially likely to succeed in showing that the district court abused its discretion in not granting a preliminary injunction as it relates to § 106.2. *Accord Arkansas*, 2024 WL 3518588, at *17–18; *Oklahoma*, 2024 WL 3609109, at *7–8; *Louisiana*, 2024 WL 2978786, at *12; *see also Brown*, 597 F.3d at 1185.

## 2. Other Factors

The other factors—irreparable injury, balance of the equities, and public interest—also favor Plaintiffs. Beginning with irreparable injury, Plaintiffs suffer at least three harms if the rule goes into effect while we resolve the merits of their appeal. First, they face unrecoverable compliance costs in meeting the regulatory burdens imposed by the rule, lest they lose billions of dollars in federal funding for not complying. *See Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (stating that "unrecoverable monetary loss is an irreparable harm"); *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (noting that "money damages cannot adequately compensate the States because the federal government generally

enjoys immunity from suit").[7]  Indeed, representatives from each of the States submitted declarations stating that the schools faced substantial compliance costs in the form of time and money if the rule went into effect; and these costs would be doubled if the regulations are ultimately invalidated and the States have to reimplement their previous policies.  *See Georgia*, 46 F.4th at 1302 (noting that costs included "time and effort" needed to comply with the rule). And the Department acknowledged the rule would lead to increased compliance costs.  *See, e.g.*, 89 Fed. Reg. at 33,861, 33,851, 33,548.

Second, four of the Plaintiffs are States that have laws governing public institutions of education that would conflict with the rule and would thus be unenforceable.[8]  *See Abbott v. Perez*, 585

---

[7] The dissent argues that the compliance costs are not irreparable because the States could recover damages for their expenditures if the rule was later invalidated.  But the dissent does not specify whom the States could sue to collect these damages.  If the dissent is suggesting that the States could collect from the federal government, that argument is foreclosed by our precedent. *See W. Va. ex rel.*, 59 F.4th at 1149 (noting that "money damages cannot adequately compensate the States because the federal government generally enjoys immunity from suit").

[8] The dissent argues that the States "assert[] without explanation that the Rule conflicts with state statutes."  But far from conclusory statements, each of the States submitted affidavits that cite examples of specific state statutes that would conflict with the rule.  Indeed, as the district court noted, "Alabama Code § 16-1-54(b) (the bathroom statute) and Florida's Safety in Private Spaces Act appear to conflict with § 106.31(a)(2)'s instruction that preventing a person from participating in a program or activity consistent with the person's gender identity subjects the person to more than a de minimis harm . . . ."

U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation omitted)).[9]

And third, irreparable harm flows to the private plaintiffs from the First Amendment concerns raised by the rule.[10]   *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

---

[9] The Department cites *State of Florida v. Department of Health and Human Services*, 19 F.4th 1271, 1291 (11th Cir. 2021), for the proposition that "it is black-letter law that the federal government does not invade[ ] areas of state sovereignty simply because it exercises its authority in a way that preempts conflicting state laws." But that statement was made after we had already decided that the rule at issue in that case was likely lawfully enacted. *Id.* at 1286–90. Thus, that case says nothing about whether a state faces irreparable harm from having to forsake enforcement of their own laws in favor of a regulation that is likely unlawful.

[10] The dissent argues that the States "assert[] without explanation that the Rule . . . requires schools to adopt harassment policies that chill student speech." But as discussed *supra* pp. 15–17, the States raise legitimate First Amendment concerns supported by argument and authority.

Additionally, the balance of the equities and public interest favor Plaintiffs.[11]  As to the balance of the equities, the Department has interpreted "sex" in Title IX to mean biological sex and has allowed schools to have separate bathrooms based on biological sex for five decades. *See, e.g.*, The 1974 Rule, 45 C.F.R. § 86.33.  A preliminary injunction pending appeal maintains that longstanding status quo.  *Robinson*, 957 F.3d at 1178 ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." (quotation omitted)); *see also Oklahoma*, 2024 WL 3609109, at *12 ("Since the current regulations have been in effect for decades, there is little harm in maintaining the status quo through the pendency of this suit.").

On the other hand, as noted above, Plaintiffs face substantial compliance costs if the new rule goes into place and they are deprived of the enforcement of their existing policies and laws in the meantime.  That balance shakes out in favor of the Plaintiffs.  And as to the public interest, the public has no interest in enforcing a regulation that likely violates the APA and raises First Amendment concerns.  *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("It is clear that neither the government nor

---

[11] "Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida*, 19 F.4th at 1293.

the public has any legitimate interest in enforcing an unconstitutional ordinance.").[12]

B. *Scope of the Injunction*

Plaintiffs argue that "the injunction should bar Defendants from enforcing the rule in Alabama, Florida, Georgia, and South Carolina" and that it should "extend to the whole rule, at least for now." The Department argues that only the challenged provisions should be enjoined.

We agree with Plaintiffs and every federal court (including the Supreme Court) to rule on this issue that a rule-wide injunction in the Plaintiff States is called for at this stage. As the Sixth Circuit reasoned, the three provisions that Plaintiffs challenge are "central provisions" that "appear to touch every substantive provision of the Rule," and the Department "never contemplate[d]

---

[12] The dissent's analysis of the equities is singularly focused, arguing hyperbolically that enjoining the rule "harms all students who face sex-based discrimination." Notwithstanding that the injunction would leave in place the numerous sex-based protections from the former rule, the dissent does not even attempt to grapple with the potential harms caused by leaving the rule in place. Indeed, the dissent makes no mention of the privacy rights of biological males and females who have to use restrooms with members of the opposite biological sex. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022) (en banc) ("The protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective.") Nor does the dissent discuss the harm flowing from the likely loss of First Amendment speech rights. *See Cartwright*, 32 F.4th at 1125–27.

enforcement of the [r]ule without *any* of the core provisions."
*Tennessee*, 2024 WL 3453880, at *3–4 (emphasis in original); *accord
Oklahoma*, 2024 WL 3609109, at *12 (explaining why enjoining the
new rule in its entirety is appropriate); *Kansas*, 2024 WL 3273285,
at *18 (same); *Arkansas*, 2024 WL 3518588, at *20–*22 (same); *see
also, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 262 (2006) ("To sever
provisions to avoid constitutional objection here would require us
to write words into the statute . . . , or to leave gaping loopholes . .
. , or to foresee which of many different possible ways the
legislature might respond to the constitutional objections we have
found.").  And the Supreme Court agreed with the Sixth Circuit
that it was not clear "which particular provisions, if any, are
sufficiently independent of the enjoined definitional provision and
thus might be able to remain in effect." *Louisiana*, 2024 WL 3841071
at *3.

Moreover, the Sixth Circuit's points on the practical
concerns accompanying a partial injunction here are also well
taken.  The court noted that "it is hard to see how all of the schools
covered by Title IX could comply with this wide swath of new
obligations if the Rule's definition of sex discrimination remains
enjoined," and it questioned "how the schools could properly train
their teachers on compliance in this unusual setting with so little
time before the start of the new school year." *Tennessee*, 2024 WL
3453880, at *4. Similarly, we find persuasive the Fifth Circuit's
reasoning that anything less than a rule-wide injunction "would
involve this court in making predictions without record support
from the [Department] about the interrelated effects of the

remainder of the Rule on thousands of covered educational entities," and that this lack of guidance is especially damning given "the historical purpose of a preliminary injunction . . . is to maintain the status quo pending litigation." *Louisiana*, 2024 WL 3452887, at *2.

The Department argues that the severability provisions in the new rule foreclose a rule-wide injunction where, as here, only individual provisions are likely unlawful. Each subpart (A through F) of the rule has its own severability provision stating that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." *See, e.g.*, 34 C.F.R. § 106.9. These provisions say nothing about the situation we face here, where provisions in multiple different subparts may well be invalidated simultaneously.[13] The difficulty with severing the relevant provisions is further underscored here because, as the Sixth Circuit reasoned, the Department "did not contemplate enforcement of the Rule without *any* of the core provisions." *Tennessee*, 2024 WL 3453880, at *4.

For these reasons, we grant Plaintiffs' request for a rule-wide injunction pending appeal in Alabama, Florida, Georgia, and South Carolina. In granting injunctive relief, we maintain the status quo along with every other federal court (including the Supreme

---

[13] Section 106.2 is included in subpart A, § 106.10 is included in subpart B, and § 106.31 is included in subpart D.

Court) to rule on this issue.  More specific questions about scope can be answered at a later stage.

* * *

For all the reasons discussed, Plaintiffs' Motion for Injunction Pending Appeal is **GRANTED.**  We DIRECT the Clerk to expedite the appeal of the district court's order and place it on the next available argument calendar.

WILSON, Circuit Judge, dissenting from the order granting an injunction pending appeal:

Pursuant to Title XI, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a). The Department of Education is "authorized and directed to effectuate to the provisions" of Title IX, and may do so by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." *Id*. at § 1682. Consistent with its statutory directive, the Department promulgated an administrative rule entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 89 Fed. Reg. 33474 (Apr. 29, 2024).

Plaintiffs—Alabama, Florida, Georgia, South Carolina, and four private organizations—filed suit to block enforcement of the Rule, which was set to take effect on August 1, 2024. In a thorough and well-reasoned 109-page opinion, the district court denied their motion for preliminary injunction. On the same day, it denied their emergency motion for injunction pending appeal or administrative injunction. Before this court, Plaintiffs moved for an administrative injunction, which we granted to allow for fulsome review on the merits. The Department is administratively enjoined from enforcement, and Plaintiffs now seek an injunction pending appeal.

An injunction pending appeal is an "extraordinary remedy," *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000), which "requires the exercise of our judicial discretion," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir 2019).  We are unable to grant this drastic remedy unless Plaintiffs clearly establish: "(1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury . . . unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *Touchston*, 234 F.3d at 1132.  In evaluating whether Plaintiffs meet their heavy burden, we are directed to "examine the district court's decision to deny a preliminary injunction for an abuse of discretion." *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021).

The district court rejected Plaintiffs' preliminary injunction motion, finding no likelihood of success on the merits and independently, an insufficient showing of irreparable harm.  But this court need not reach the merits to resolve this appeal; instead, we are directed to reject Plaintiffs' motion for injunction pending appeal because they have still not shown irreparable injury.[1]  *See Siegel v. LePore*, 234 F.3d 1163, 1175–76 (11th Cir. 2000) (en banc).

_____

[1] The Supreme Court did not address the merits when it denied the Department's motion for stay in this case's companions—filed in district courts in the Fifth and Sixth Circuits.  *Dep't of Educ. v. Louisiana*, 603 U.S. ___, 2024 WL 3841071 (2024).  It addressed only severability and did not analyze the parties' merits arguments.  We should not base an extraordinary remedy

Plaintiffs insist that if the Rule becomes effective, they will suffer three irreparable harms: sovereign, constitutional, and compliance harms. As an initial matter, they make only a conclusory statement—both before the district court and here— that they have suffered sovereign and constitutional harms, asserting without explanation that the Rule conflicts with state statutes and requires schools to adopt harassment policies that chill student speech. This is insufficient to meet their heavy burden of "clearly establishing" an imminent and irreparable injury. *See id.* at 1176.

Turning to compliance harms, Plaintiffs argue that the Rule imposes regulatory burdens on schools that damages cannot compensate. Namely, they assert that schools will require time and money to review the Rule, conform their poilicies to the Rule, approve these policies, train employees, and litigate. While this circuit has recognized that unrecoverable monetary loss can amount to irreparable harm, *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013), "[t]he key word in this consideration is *irreparable,*" *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (emphasis added and internal quotation omitted). An injury is only irreparable "if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). "Mere injuries, however, substantial, in terms of money, time, and

---

on these shaky grounds when the injury prong provides a sufficient basis for denying Plaintiffs' motion.

energy necessarily expanded . . . are not enough." The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S at 90. This court does not doubt that there will be compliance costs associated with implementing the Rule, but Plaintiffs fail to substantiate their claim that damages could not compensate them for their expenditures. At bottom, nothing in the record supports a finding of *irreparable* injury.

Moreover, the remaining injunction factors strongly favor a denial of Plaintiffs' motion. *See Touchston*, 234 F.3d at 1132; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–26 (2008). The challenged provisions largely pertain to transgender students, who remain at risk of substantial harm in the face of discrimination the Rule aims to eliminate. And enjoining the Rule as a whole—which includes other provisions not challenged here and independent from Plaintiffs' gender-identity-based concerns[2]—certainly harms the public because it harms all students who face sex-based discrimination.

It bears repeating that the remedy Plaintiffs seek is not to be granted unless they clearly establish their burden of persuasion as

---

[2] In its application for a partial stay before the Supreme Court, the Department of Justice explains that "[m]ost of the Rule does not address gender identity." For example, it strengthens protections for postpartum students and employees by requiring lactation spaces and reasonable modifications for pregnant students.

to each prerequisite.  *See Siegel*, 234 F.3d at 1176; *see also Touchston*, 234 F.3d at 1132.  They have not provided us with a sufficient basis to disturb the district court's conclusion that they failed to sustain their burden, and I dissent from the majority's lack of discretion in granting this "extraordinary and drastic" remedy in Plaintiffs' favor.  *See Siegel*, 234 F.3d at 1176.