# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

STATE OF ALABAMA, et al.,
*Plaintiffs-Appellants,*

v.

U.S. SECRETARY OF EDUCATION, et al.,
*Defendants-Appellees.*

Appeal from the U.S. District Court for the
Northern District of Alabama, No. 7:24-cv-533 (Axon, J.)

## BRIEF OF APPELLANT

Steve Marshall
 *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

Cameron T. Norris
Thomas S. Vaseliou
C'Zar Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

[Additional counsel listed at end]

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellants certify that the following have an

interest in the outcome of this appeal:

1. Alabama, State of, *Plaintiff-Appellant*

2. Alaska, State of, *Amicus*

3. Alliance Defending Freedom, *Attorneys for Amici Christian Educators Association International and Female Athletes United*

4. Arkansas, State of, *Amicus*

5. Attorney General's Office of South Carolina, *Attorneys for Amicus South Carolina*

6. Axon, Annemarie Carney, *U.S. District Court Judge*

7. Bachus Brom & Taylor LLC, *Attorneys for Non-Alabama Plaintiffs-Appellants*

8. Bailey, Andrew, *Attorney for Amicus State of Missouri*

9. Bernstein, C'Zar, *Attorney for Private Plaintiffs-Appellants*

10. Binnall Law Group, *Attorneys for Amicus Citizens Defending Freedom*

11. Binnall, Jesse, *Attorney for Amicus Citizens Defending Freedom*

12. Bird, Brenna, *Attorney for Amicus State of Iowa*

13. Boynton, Brian, *Attorney for Defendants-Appellees*

14. Brown, Lisa, *Attorney for Defendants-Appellees*

15. Bursch, John J., *Attorney for Amici Christian Educators Association International and Female Athletes United*

16. California, State of, *Amicus*

17. Campbell, James A., *Attorney for Amici Christian Educators Association International and Female Athletes United*

18. Cardona, Miguel, in his official capacity as Secretary of Education, *Defendant-Appellee*

19. Carr, Christopher M., *Attorney for Plaintiff-Appellant Georgia*

20. Christian Educators Association International, *Amicus*

21. Consovoy McCarthy PLLC, *Attorneys for Private Plaintiffs-Appellants*

22. Coleman, Russell, *Attorney for Amicus Commonwealth of Kentucky*

23. Citizens Defending Freedom, *Amicus*

24. Davy, Jim, *Attorney for Amici Justice + Joy National Collaborative, Mommies in the D, Generation Hope, The U.S. Breastfeeding Committee, & The National Nurse-Led Care Consortium*

25. Drummond, Genter F., *Attorney for Amicus State of Oklahoma*

26. Female Athletes United, *Amicus*

27. Florida, State of, *Plaintiff-Appellant*

28. Flynn, Shawn M., *Attorney for Amicus Stop Abusive and Violent Environments*

29. Fitch, Lynn, *Attorney for Amicus State of Mississippi*

30. Formella, John M., *Attorney for Amicus State of New Hampshire*

31. Generation Hope, *Amicus*

32. Georgia Department of Law, *Attorneys for Plaintiff-Appellant Georgia*

33. Georgia, State of, *Plaintiff-Appellant*

34. Griffin, Tim, *Attorney for Amicus State of Arkansas*

35. Goldfarb, Jon C., *Attorney for Amici States of New Jersey, California, and Pennsylvania*

36. Hilgers, Michael T., *Attorney for Amicus State of Nebraska*

37. Hill, Bridget, *Attorney for Amicus State of Wyoming*

38. Idaho, State of, *Amicus*

39. Independent Women's Law Center, *Plaintiff-Appellant*

40. Independent Women's Network, *Plaintiff-Appellant*

41. Indiana, State of, *Amicus*

42. Iowa, State of, *Amicus*

43. Jackley, Marty J., *Attorney for Amicus State of South Dakota*

44. Justice + Joy National Collaborative, *Amicus*

45. Kansas, State of, *Amicus*

46. Kentucky, Commonwealth of, *Amicus*

47. Knudsen, Austin, *Attorney for Amicus State of Montana*

48. Kobach, Kris W., *Attorney for Amicus State of Kansas*

49. Kopplin, Rebecca, *Attorney for Defendants-Appellee*

50. Labrador, Raul R., *Attorney for Amicus State of Idaho*

51. Lacour, Jr., Edmund, *Attorney for Plaintiff-Appellant Alabama*

52. Louisiana, State of, *Amicus*

53. Marcus, Stephanie R., *Attorney for Defendants-Appellees*

54. Marshall, Steve, *Attorney for Plaintiff-Appellant Alabama*

55. Matheny, Justin L., *Attorney for Amici State of Mississippi*

56. McKasson, Lindsay R., *Attorney for Amicus Stop Abusive and Violent Environments*

57. Miller, Edward A. R., *Attorney for Amicus Stop Abusive and Violent Environments*

58. Mississippi, State of, *Amicus*

59. Missouri, State of, *Amicus*

60. Miyares, Jason S., *Attorney for Amicus Commonwealth of Virginia*

61. Mommies in the D, *Amicus*

62. Montana, State of, *Amicus*

63. Moody, Ashley, *Attorney for Plaintiff-Appellant Florida*

64. Morrisey, Patrick, *Attorney for Amicus State of West Virginia*

65. Murrill, Liz, *Attorney for Amicus State of Louisiana*

66. Myers, Steven A., *Attorney for Defendants-Appellee*

67. Nebraska, State of, *Amicus*

68. New Hampshire, State of, *Amicus*

69. New Jersey, State of, *Amicus*

70. Norris, Cameron, *Attorney for Private Plaintiffs-Appellants*

71. North, Benjamin F., *Attorney for Amicus Stop Abusive and Violent Environments*

72. North Dakota, State of, *Amicus*

73. Office of the Attorney General of Alabama, *Attorneys for Plaintiff-Appellant Alabama*

74. Office of the Attorney General of Florida, *Attorneys for Plaintiff-Appellant Florida*

75. Ohio, State of, *Amicus*

76. Oklahoma, State of, *Amicus*

77. Parents Defending Education, *Plaintiff-Appellant*

78. Patterson, Melissa N., *Attorney for Defendants-Appellee*

79. Paxton, Ken, *Attorney for Amicus State of Texas*

80. Pennsylvania, State of, *Amicus*

81. Percival II, James H., *Attorney for Plaintiff-Appellant Florida*

82. Peters, David, *Attorney for Defendants-Appellee*

83. Petrany, Stephen J., *Attorney for Plaintiff-Appellant Georgia*

84. Reyes, Sean D., *Attorney for Amicus State of Utah*

85. Rokita, Theodore E., *Attorney for Amicus State of Indiana*

86. Scruggs, Jonathan A., *Attorney for Amici Christian Educators Association International and Female Athletes United*

87. South Carolina, State of, *Plaintiff-Appellant*

88. Spate, Joseph D., *Attorney for Plaintiff-Appellant South Carolina*

89. Speech First, Inc., *Plaintiff-Appellant*

90. Skrmetti, Jonathan, *Attorney for Amicus State of Tennessee*

91. South Dakota, State of, *Amicus*

92. Starcher, Jack, *Attorney for Defendants-Appellee*

93. Stewart, Scott. G., *Attorney for Amici State of Mississippi*

94. Stop Abusive and Violent Environments, *Amicus*

95. Taylor, Bryan McDaniel, *Attorney for Non-Alabama Plaintiffs-Appellants*

96. Taylor, Treg, *Attorney for Amicus State of Alaska*

97. Tennessee, State of, *Amicus*

98. Texas, State of, *Amicus*

99. The Miller Firm, *Attorneys for Amicus Stop Abusive and Violent Environments*

100. The National Nurse-Led Care Consortium, *Amicus*

101. The U.S. Breastfeeding Committee, *Amicus*

102. Thompson, Natalie D., *Attorney for Amici Christian Educators Association International and Female Athletes United*

103. United States Department of Education, *Defendant-Appellee*

104. Utah, State of, *Amicus*

105. Vaseliou, Thomas S., *Attorney for Private Plaintiffs-Appellants*

106. Virginia, Commonwealth of, *Amicus*

107. West Virginia, State of, *Amicus*

108. Whitaker, Henry C., *Attorney for Plaintiff-Appellant Florida*

109. Wiggins Child Pantazis Fisher & Goldfarb, *Attorneys for Amici States of New Jersey, California, & Pennsylvania*

110. Wilson, Alan, *Attorney for Plaintiff-Appellant South Carolina*

111. Wrigley, Drew H., *Attorney for Amicus State of North Dakota*

112. Yost, Dave, *Attorney for Amicus State of Ohio*

Independent Women's Network, Independent Women's Law Center, Parents Defending Education, and Speech First have no parent corporation or corporation that owns 10% or more of their stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Appellants certify that the CIP contained in this motion is complete.

Dated: September 19, 2024

s/ *Cameron T. Norris*
Counsel for Private Plaintiffs

s/ *Edmund G. LaCour Jr.*
Counsel for Alabama

s/ *Henry C. Whitaker*
Counsel for Florida

s/ *Stephen J. Petrany*
Counsel for Georgia

s/ *Joseph D. Spate*
Counsel for South Carolina

# STATEMENT REGARDING ORAL ARGUMENT

This Court scheduled "oral argument during the week of December 16, 2024."

CA11-Doc.56. Plaintiffs agree that oral argument is appropriate.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ..................... C-1

Statement Regarding Oral Argument ....................................................................................i

Table of Citations ................................................................................................................iii

Jurisdictional Statement ......................................................................................................1

Statement of the Issue ..........................................................................................................1

Statement of the Case ...........................................................................................................2

    A. The Department's pre-2024 rules on Title IX do not conflate Title IX with
       Title VII.............................................................................................................................4

    B. The Department finalizes a new rule in April 2024, injecting Title VII standards
       into Title IX, and sets the effective date for August 1 ...........................................5

    C. Nearly a dozen courts agree that the new rule should be preliminarily enjoined,
       including the Supreme Court. ................................................................................. 13

    D. The district court is the sole court to deny a temporary injunction against the
       rule, but this Court enters that relief. ...................................................................... 16

Summary of Argument ...................................................................................................... 19

Argument ............................................................................................................................ 20

    I. Plaintiffs will likely succeed on the merits. .......................................................... 21

       A. The Supreme Court has now established that the rule's three central
          provisions are likely illegal. .............................................................................. 21

       B. The Supreme Court and motions panel were right: The rule likely violates
          the APA. ............................................................................................................. 23

          1. §106.10's definition of sex discrimination and §106.31's de minimis
             provision are likely illegal. ........................................................................ 23

          2. §106.2's definition of harassment is likely illegal. ...................................... 29

       C. These violations undermine the whole rule. .................................................... 33

    II. Plaintiffs satisfy the other preliminary-injunction factors, justifying interim
       relief against the entire rule. ................................................................................... 35

       A. Absent relief, the rule would have irreparably harmed Plaintiffs. ................. 36

       B. The balance of harms and public interest favor Plaintiffs............................. 39

       C. Relief should be rulewide but state specific. .................................................. 40

    III. There is no principled reason to treat these four States differently from the 22
        other States where the rule is preliminarily enjoined. ........................................ 41

Conclusion .......................................................................................................................... 47

Certificate of Compliance ................................................................................................ 49

Certificate of Service .......................................................................................................... 49

# TABLE OF CITATIONS

*primary authority

## Cases

*Abbott v. Perez,*
585 U.S. 579 (2018) ................................................................. 36, 37

*Adams v. Sch. Bd. of St. Johns Cnty.,*
57 F.4th 791 (11th Cir. 2022) ....................... 2, 9, 24, 25, 26, 27

*Alabama v. U.S. Sec'y of Educ.,*
2024 WL 3981994 (11th Cir. Aug. 22) ............ 1, 12, 16, 19-22, 24, 27, 29-44

*Arkansas v. DOE,*
2024 WL 3518588 (E.D. Mo. July 24) ................................. 14, 29

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ............................................. 35

*Blackmon-Malloy v. U.S. Capitol Police Bd.,*
575 F.3d 699 (D.C. Cir. 2009) .............................................. 44

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ............................. 4-6, 15, 18, 24-26, 44, 46

*Callahan v. HHS,*
939 F.3d 1251 (11th Cir. 2019) .............................................. 21

*Carroll ISD v. DOE,*
2024 WL 3381901 (N.D. Tex. July 11) ................................. 14, 27

*Cate v. Oldham,*
707 F.2d 1176 (11th Cir. 1983) ............................................. 40

*Citizens United v. FEC,*
558 U.S. 310 (2010) ............................................................ 45

*Clark v. Martinez,*
543 U.S. 371 (2005) ............................................................ 30

*Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ............................................................ 26

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ......................... 3, 4, 10, 24, 29, 30, 31

*Dep't of Educ. v. Louisiana,*
144 S.Ct. 2507 (2024) ................... 1, 15,16, 19, 21, 22, 33, 35, 41

*Eknes-Tucker v. Gov'r of Alabama,*
  80 F.4th 1205 (11th Cir. 2023) ................................................................ 20, 24

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................................ 37

*Garcia v. Los Angeles,*
  11 F.4th 1113 (9th Cir. 2021) ......................................................................... 41

*Gateway City Church v. Newsom,*
  141 S.Ct. 1460 (2021) ........................................................................................ 22

*Georgia v. President,*
  46 F.4th 1283 (11th Cir. 2022) ................................................................ 36, 38

*Grove City Coll. v. Bell,*
  465 U.S. 555 (1984) ....................................................................................... 3, 26

*Jackson v. Birmingham BOE,*
  544 U.S. 167 (2005) ....................................................................................... 3, 30

*K Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988) ............................................................................................ 33

*Kansas v. DOE,*
  2024 WL 3273285 (D. Kan. July 2) ......................................... 14, 24, 31, 32

*Kansas v. DOE,*
  2024 WL 3471331 (D. Kan. July 19) .............................................................. 14

*Loper Bright v. Raimondo,*
  144 S.Ct. 2244 (2024) ................................................................................. 26, 30

*Louisiana v. DOE,*
  2024 WL 2978786 (W.D. La. June 13) ................................... 14, 24, 28, 31

*Louisiana v. DOE,*
  2024 WL 3452887 (5th Cir. July 17) ................................ 6, 15, 35, 41, 46

*Louisiana v. DOE,*
  2024 WL 3584382 (W.D. La. July 11) ........................................................... 14

*MediNatura, Inc. v. FDA,*
  998 F.3d 931 (D.C. Cir. 2021) ....................................................................... 21

*Merritte v. Kessel,*
  561 F. App'x 546 (7th Cir. 2014) ................................................................. 46

*N. Haven BOE v. Bell,*
  456 U.S. 512 (1982) ............................................................................................. 3

*New York v. DOE*,
   477 F. Supp. 3d 279 (S.D.N.Y. 2020) .............................................................4

*Odebrecht Const. v. FDOT*,
   715 F.3d 1268 (11th Cir. 2013) ................................................. 39

*Ohio v. EPA*,
   144 S.Ct. 2040 (2024) ..............................................................33, 34

*Oklahoma v. Cardona*,
   2024 WL 3609109 (W.D. Okla. July 31) ...............................14, 29

*Otto v. Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ...........................................36, 39

*Palmer v. Braun*,
   287 F.3d 1325 (11th Cir. 2002) .................................................. 40

*Pennsylvania v. DeVos*,
   480 F. Supp. 3d 47 (D.D.C. 2020)..............................................4

*Randall v. Sorrell*,
   548 U.S. 230 (2006) .................................................................. 34

*Rest. L. Ctr. v. DOL*,
   66 F.4th 593 (5th Cir. 2023) .................................................38, 39

*Rollins v. Home Depot USA*,
   8 F.4th 393 (5th Cir. 2021) ....................................................... 47

*Schwab v. Crosby*,
   451 F.3d 1308 (11th Cir. 2006) ................................................ 23

*Solomon v. Vilsack*,
   763 F.3d 1 (D.C. Cir. 2014) ..................................................... 45

*Speech First v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ....................... 11, 32, 33, 36, 37, 40

*Speech First v. Khator*,
   603 F. Supp. 3d 480 (S.D. Tex. 2022)...................................... 32

*Tennessee v. Cardona*,
   2024 WL 3019146 (E.D. Ky. June 17)................14, 24, 28, 31, 32

*Tennessee v. Cardona*,
   2024 WL 3453880 (6th Cir. July 17) ................ 12, 13, 15, 24, 33-35, 41, 46

*Tennessee v. Cardona*,
   2024 WL 3631032 (E.D. Ky. July 10) ...................................... 14

*Tex. & N.O.R. Co. v. Bhd. of R.R. Trainmen,*
307 F.2d 151 (5th Cir. 1962) ................................................ 40

*Texas v. Cardona,*
2024 WL 3658767 (N.D. Tex. Aug. 5) ..................................... 5

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) ........................................... 38, 39

*Texas v. United States,*
2024 WL 3405342 (N.D. Tex. July 11) ............................... 12, 14

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015) ............................................. 44

*United States v. Campbell,*
26 F.4th 860 (11th Cir. 2022) ............................................ 45

*United States v. Virginia,*
518 U.S. 515 (1996) ...................................................... 26

*United States v. Williams,*
504 U.S. 36 (1992) ....................................................... 44

*W.V. ex rel. Morrisey v. Dep't of Treasury,*
59 F.4th 1124 (11th Cir. 2023) ...................................... 31, 37

*W.V. Univ. Hosps., Inc. v. Casey,*
499 U.S. 83 (1991) ....................................................... 27

*Zurich Am. Ins. v. Arch Ins.,*
20 F.4th 250 (5th Cir. 2021) ............................................ 35

**Statutes**

20 U.S.C. §1681 ....................................................... 2, 8, 25

20 U.S.C. §1686 .................................................... 2, 8, 9, 25

20 U.S.C. §1687 ........................................................... 25

28 U.S.C. §1292 ............................................................. 1

28 U.S.C. §1331 ............................................................. 1

42 U.S.C. §2000e-2 ........................................................ 25

5 U.S.C. §553 ............................................................... 1

5 U.S.C. §701 ............................................................... 1

5 U.S.C. §702 ............................................................... 1

5 U.S.C. §703 ............................................................... 1

5 U.S.C. §704 ........................................................................................1

5 U.S.C. §705 ........................................................................................1

5 U.S.C. §706 ........................................................................................1

88 Stat. 484, 612 (1974) ......................................................................2, 8

Ala. Code §16-1-52 ............................................................................. 17

Ala. Code §16-1-54 .........................................................................17, 36

Ala. Code §16-68-2 .........................................................................17, 37

Ala. Code §26-26-5 ............................................................................. 17

Fla. Stat. §1000.05 ............................................................................. 17

Fla. Stat. §1000.071 ........................................................................... 17

Fla. Stat. §1006.205 ........................................................................... 17

Fla. Stat. §1014.01-06 ........................................................................ 17

Fla. Stat. §553.865 .........................................................................17, 36

Ga. Code §20-2-786 ........................................................................... 17

Ga. Code §20-3-48 .........................................................................17, 37

Ga. Code §20-4-11.1 ......................................................................17, 37

S.C. Code §59-1-500 .......................................................................... 17

**Other Authorities**

118 Cong. Rec. 16,842 (May 11, 1972) ...................................................2

118 Cong. Rec. 6,277 (Mar. 1, 1972) ......................................................2

Exec. Order No. 13,988,
 86 FR 7,023 (Jan. 20, 2021) ...........................................................5

*Memorandum re: Bostock v. Clayton Cnty.*,
 OCR (Jan. 8, 2021), perma.cc/CJE3-GH52 .....................................4

*OCR Announces Resolution of Sex-Based Harassment Investigation of Taft College in California*
 (Oct. 19, 2023), perma.cc/47U8-VP2N ...........................................5

*OCR Resolves Sex-Based Harassment Investigation in Rhinelander School District in Wisconsin*
 (July 6, 2023), perma.cc/79G5-F9T6 ...............................................5

**Regulations**

34 C.F.R. §106.11 .............................................................................. 10

34 C.F.R. §106.30(a)(2) (2020) ........................................................... 10

34 C.F.R. §106.32 ....................................................................................................3

34 C.F.R. §106.33 ...............................................................................................3, 8, 9

34 C.F.R. §106.34 .............................................................................................3, 8, 28

34 C.F.R. §106.40 ...................................................................................................12

34 C.F.R. §106.41 .............................................................................................3, 8, 26

34 C.F.R. §106.44 .............................................................................................10, 12

34 C.F.R. §106.45 ...................................................................................................12

34 C.F.R. §106.46 ...................................................................................................12

34 C.F.R. §106.71 .........................................................................................10, 12, 41

34 C.F.R. §106.8............................................................................................12, 33, 41

Nondiscrimination on the Basis of Sex in Education Programs and Activities
    Receiving or Benefiting from Federal Financial Assistance,
    40 FR 24,128 (June 4, 1975) ....................................................................... 2, 9

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    85 FR 30,026 (May 19, 2020) .............................................................4, 11, 32

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    89 FR 33474 (Apr. 29, 2024) ............................ 3, 6-13, 23-24, 26, 27-28, 29, 32, 34, 39

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs are challenging a final federal rule under the APA, 5 U.S.C. §§553, 701-06. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because Plaintiffs appeal from an order denying a preliminary injunction. The district court entered that order on July 30, 2024, R.58, and Plaintiffs appealed the same day, R.60.

# STATEMENT OF THE ISSUE

The Department of Education issued a Title IX rule that would require virtually all colleges and schools to, among many other things, let males use female restrooms; let males box and wrestle females in P.E. class; and punish students who express "offensive" views on sex-related topics. Twenty-six States challenged the rule, and the rule is temporarily enjoined in all of them. The district court here is the lone court to deny a preliminary injunction. Since then, the Supreme Court held that similar plaintiffs were "entitled to preliminary injunctive relief" against the rule. *Dep't of Educ. v. Louisiana*, 144 S.Ct. 2507, 2509 (2024). And this Court entered that relief here, finding "a substantial likelihood that the district court abused its discretion in denying Plaintiffs' preliminary injunction." *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *4, *6 (11th Cir. Aug. 22). Did the district court abuse its discretion?

# STATEMENT OF THE CASE

Congress passed Title IX in 1972 by large margins (88-6 in the Senate and 275-125 in the House). *See* 118 Cong. Rec. 6,277 (Mar. 1, 1972); 118 Cong. Rec. 16,842 (May 11, 1972). That statute was an exercise of Congress's authority under the Spending Clause. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc). Its core command is only 37 words: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

After that general ban on sex discrimination, Title IX lists a series of sex-based practices that the statute does not forbid. For example, schools can have traditionally sex-separated schools (§1681(a)(5)); fraternities and sororities (§1681(a)(6)); Boys and Girls State (§1681(a)(7)); and scholarships for "beauty" pageants (§1681(a)(9)). Schools can also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." §1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." §1686.

Soon after Title IX was enacted in 1972, Congress passed the so-called Javits Amendment. That statute directed the Department's predecessor to create regulations "implementing … [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts. 40 FR 24,128, 24,141-43 (June 4, 1975). Those 1975

regulations are considered strong evidence of Title IX's original meaning, especially since Congress got the chance to disapprove them before they went into effect. *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven BOE v. Bell*, 456 U.S. 512, 530-35 (1982). One regulation deals with restrooms and clarifies that schools can have sex-separated "toilet, locker room, and shower facilities." 34 C.F.R. §106.33. Another deals with sports and clarifies that schools can have sex-separated teams. §106.41(b). And others deal with housing, contact sports in gym class, and sex-education class, again providing that schools can separate the sexes in these activities. §§106.32, .34. Importantly, the Department concedes that these regulations allow *strict* sex separation, meaning schools have no obligation to create exceptions for students who identify as a gender different from their sex. *See* 89 FR 33474, 33,818-21 (Apr. 29, 2024).

Under Supreme Court precedent, Title IX's ban on sex discrimination also reaches sexual harassment. Under *Davis v. Monroe County Board of Education*, schools can violate Title IX when they fail to stop students from sexually harassing other students. 526 U.S. 629 (1999). But the Court placed "very real limitations" on its definition of actionable harassment in this context: A school must be "deliberately indifferent" to harassment that is "so severe, pervasive, and objectively offensive" that it "denies" its victims an equal education. *Id.* at 650-52. *Davis* "relied on the text of Title IX" when crafting this standard, especially the word "'discrimination.'" *Jackson v. Birmingham BOE*, 544 U.S. 167, 173-74 (2005). And it crafted the standard to avoid constitutional concerns under the Spending Clause and the First Amendment. *See Davis*, 526 U.S. at 649-

50. The Court also refused to adopt the laxer definition of harassment under Title VII, stressing that "schools are unlike the adult workplace." *Id.* at 651.

## A. The Department's pre-2024 rules on Title IX do not conflate Title IX with Title VII.

The Department's currently operative rules, last updated in 2020, carefully distinguish between Title IX and Title VII. *See* 85 FR 30,026 (May 19, 2020). The 2020 rule refuses modern calls to import "gender identity" into Title IX. *Id.* at 30,177. And it "adopt[s]" *Davis*'s definition of sexual harassment "verbatim," finding that broader definitions had "infringed on constitutionally protected speech." *Id.* at 30,036, 30,151-52, 30,162-65 & nn.738-39. Attempts to vacate the 2020 rule through litigation failed. *E.g.*, *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 59-60 & n.11 (D.D.C. 2020); *New York v. DOE*, 477 F. Supp. 3d 279, 287-88 (S.D.N.Y. 2020).

One month after the 2020 rule came out, the Supreme Court decided *Bostock*. The Department published a memo analyzing *Bostock*, which concludes that *Bostock* did not affect its Title IX regulations. *See Memorandum re: Bostock v. Clayton Cnty.*, OCR (Jan. 8, 2021), perma.cc/CJE3-GH52. "Title IX['s] text is very different from Title VII['s]," it explained. *Id.* at 1. Unlike Title VII, Title IX has "statutory and regulatory text permitting or requiring biological sex to be taken into account in an educational setting," and it often treats a "person's biological sex" as "relevant." *Id.* at 6-7.

**B.    The Department finalizes a new rule in April 2024, injecting Title VII standards into Title IX, and sets the effective date for August 1.**

After the 2020 election, the Department started to see things differently. On his first day in office, President Biden directed every agency to adopt the position that, under *Bostock*, all laws that prohibit sex discrimination also "prohibit discrimination on the basis of gender identity." Exec. Order No. 13,988, 86 FR 7,023, 7,023 (Jan. 20, 2021). Those laws include "Title IX." *Id.*

The Department quickly and aggressively implemented its new view of *Bostock*. It first imposed its view through guidance, but courts held that guidance unlawful. *E.g.*, *Texas v. Cardona*, 2024 WL 3658767 (N.D. Tex. Aug. 5). And it still imposes its view through litigation and enforcement. In litigation, it files briefs arguing that Title IX itself, irrespective of the Department's regulations, requires schools to let males play female sports and use female restrooms. *See, e.g.*, Doc.68-1 at 21-27, *B.P.J. v. W.V. Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. Apr. 3, 2023) (sports); Doc.41 at 12, *Roe v. Critchfield*, No. 1:23-cv-315 (D. Idaho Aug. 8, 2023) (bathrooms and locker rooms). And in enforcement actions, it has treated students "misgendering" other students as actionable harassment. *E.g.*, *OCR Announces Resolution of Sex-Based Harassment Investigation of Taft College in California* (Oct. 19, 2023), perma.cc/47U8-VP2N; *OCR Resolves Sex-Based Harassment Investigation in Rhinelander School District in Wisconsin* (July 6, 2023), perma.cc/79G5-F9T6; *May 16, 2023 OCR Compl. in Arlington, Tennessee*, No. 2:23-cv-72, Doc.92-3 (E.D. Ky. June 7, 2024).

The Department eventually proposed a notice-and-comment rule on these issues in July 2022. 87 FR 41,390. The proposed rule was met with significant opposition from both sides of the aisle, numerous faith groups, and generations old and new. In all, the Department received over 240,000 comments. 89 FR 33,477.

After "three years" and "multiple delays," *Louisiana v. DOE*, 2024 WL 3452887, at *3 (5th Cir. July 17), the Department published the final rule, 89 FR 33,474 (Apr. 29, 2024). Though it spans hundreds of pages, imposes a slew of new procedural and training requirements, and came out in late April, the Department set its effective date for August 1, 2024. *Id.* at 33,476. Three of its provisions are most relevant here: §106.10's definition of sex discrimination, §106.31's de minimis provision, and §106.2's definition of harassment.

**Definition of Sex Discrimination (§106.10)**. The rule defines sex discrimination to include, in all circumstances, discrimination based on "gender identity." 34 C.F.R. §106.10. The rule does not define "sex" or dispute that it means "biological sex." The Department instead reasons that, "even assuming 'sex' means 'biological sex,'" Title IX's "prohibition on sex discrimination encompasses … gender identity discrimination" under *Bostock*. 89 FR 33,807.

Though including gender identity raises a host of difficult questions, the rule gives them little attention. The rule never defines "gender identity," except to call it an internal, subjective "sense." *Id.* at 33,809. The rule also prohibits schools from taking any meaningful steps to verify a person's "gender identity." *Id.* at 33,819. At the same

time, the rule dismisses commenters' evidence that eliminating strict sex separation in sensitive spaces would create serious privacy and safety concerns, saying only that it "does not agree." *Id.* at 33,820. And the rule dismisses the costs of building new "gender-neutral or single-occupancy facilities." *Id.* It apparently assumes that schools will comply by letting any male who claims to be transgender (or gender fluid, or agender, or gender questioning) use the existing restrooms for females. *Id.*

**De Minimis Provision (§106.31)**. As explained, Title IX and its regulations have long contained exemptions that allow schools to treat the sexes differently in many contexts, including bathrooms. To get around this problem, §106.31 creates the concept of "de minimis harm." It states that, even when a practice is exempted from Title IX's general ban on sex discrimination, a school can still violate Title IX if it imposes "more than de minimis harm" on any student based on sex. §106.31(a)(2). And preventing someone from participating "consistent with [their] gender identity" *always* imposes "more than de minimis harm." *Id.*

The de minimis provision divides Title IX's exceptions into two classes: those that interpret Title IX's general ban on sex discrimination and those that interpret one of Title IX's statutory exemptions from that general ban. If an exception appears in a regulation that interprets Title IX's general ban on sex discrimination, then schools must allow students to participate consistent with their gender identity. 89 FR 33,821. But if an exception appears in the statute or in a regulation that interprets one of those statutory exceptions, then schools can require students to participate consistent with

their sex. *Id.* at 33,816-17, 33,821. For example, schools must let a male who identifies as female use female restrooms and locker rooms, attend the female sex-education class, room overnight with females, and play contact sports against females in P.E.—since those exceptions are found only in regulations that interpret Title IX's general ban on sex discrimination. *Id.* at 33,816 (discussing 34 C.F.R. §106.33, §106.34). But schools needn't let a male who identifies as female attend Girls State or live in the female dormitory—since those exceptions appear in the statute and the regulations interpreting those statutory exceptions. *Id.* at 33,816-17 (discussing 20 U.S.C. §1681(a)(1)-(9), §1686; 34 C.F.R. §§106.12-.15, .32(b)).

The rule immediately abandons its own internal reasoning, however, by classifying sports on the "statutory" side of the line. As the Department admits, Title IX contains no statutory exception for sports; that exception exists only in a regulation that interprets Title IX's general ban on sex discrimination. 89 FR 33,816-17 (discussing 34 C.F.R. §106.41(b)). But the rule insists that the sports regulation is *like* a statute because—shortly after the passage of Title IX—the Javits Amendment instructed the Department's predecessor to create "proposed regulations" implementing Title IX that "shall include" provisions governing college "sports," 88 Stat. at 612, and then Congress reviewed and did not disapprove the agency's regulation on sports, *see* 89 FR 33,816-17. But, of course, the same goes for the regulatory exemptions for bathrooms, locker rooms, and gym class—regulations that were prompted by the same amendment, drafted at the same time, enacted in the same batch of regulations, and reviewed by

Congress at the same time as the sports regulation. *See* 40 FR 24,141-43. Yet the rule does not give those areas the elevated treatment it gives to sports, or explain why that disconnect is warranted.

The dichotomy drawn by §106.31(a)(2) raises many difficult questions. The Department never explains why a rational Congress would design this scheme. Under the Department's view, Title IX makes schools let males share a hotel room with females but not a dorm room, play contact sports against females in gym class but not after school, and shower in front of females but not attend Girls State. The rule also puts bathrooms on the "nonstatutory" side of the line, despite this Court's holding in *Adams* that the Department's longstanding regulation on bathrooms stems from the *statutory* exemption for "living facilities." *Adams*, 57 F.4th at 811, 814-15 (discussing 34 C.F.R. §106.33 and 20 U.S.C. §1686). In the rulemaking, the Department just resigned itself to losing this issue in the Eleventh Circuit. The rule simply "declines to adopt the Eleventh Circuit's reasoning in *Adams*." 89 FR 33,821; *accord id.* at 33,820 ("in *Adams*, the Eleventh Circuit held … that restrooms are covered by a statutory provision permitting a recipient to maintain 'separate living facilities'"); *id.* ("the Department does not agree with [*Adams'*] interpretation"); *id.* at 33,821 (conceding the rule is "contrary to the reasoning in *Adams*").

**Redefinition of Sexual Harassment (§106.2)**. As explained, the Department's 2020 rule defined hostile-environment harassment by adhering "verbatim" to the Supreme Court's definition in *Davis*: "[u]nwelcome conduct determined by a reasonable

person to be so severe, pervasive, *and* objectively offensive that it effectively *denies* a person equal access to the recipient's education program or activity." 34 C.F.R. §106.30(a)(2) (2020) (emphases added); *accord Davis*, 526 U.S. at 652. The new rule defines harassment more broadly. Under new §106.2, schools can be liable for student-on-student harassment that consists of "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity." (Emphases added.) The rule expands schools' potential liability for harassment to conduct that occurs online, off campus, outside the United States, or even before the relevant individuals attended the school. §106.11; 89 FR 33,527. And it requires schools to prohibit not just harassment, but also "peer retaliation." 34 C.F.R. §106.71.

The Department concedes that this new definition of harassment is "broader" than the Supreme Court's definition in *Davis*. 89 FR 33,498. The rule deletes *Davis*'s requirement that the school be "deliberately indifferent" to the harassment. 34 C.F.R. §106.44(f)(1). And the rule broadens *Davis* by covering harassment that is "severe *or* pervasive," §106.2, rather than "severe *and* pervasive," *Davis*, 526 U.S. at 652-53; and by covering harassment that merely "*limits*" a person's educational opportunities, 34 C.F.R. §106.2, rather than "*denies*" those opportunities, *Davis*, 526 U.S. at 651-53. The "severe or pervasive" language, the Department further clarifies, has no independent effect; §106.2 is satisfied whenever the harassment "limits or denies a person's" education. 89

FR 33,508. And that "limit" occurs whenever the harassment has "some impact." *Id.* at 33,511. By going beyond *Davis* while also incorporating gender identity, the rule appears to make schools punish students who refuse to use other students' "preferred pronouns." *See id.* at 33,516 (agreeing that such speech can be prohibited harassment).

The Department says it need not follow the Supreme Court's decision in *Davis*. That case defined harassment for purposes of damages suits under Title IX's implied private right of action, the Department reasons, but the rule defines harassment for purposes of the Department's own administrative enforcement. *Id.* at 33,499, 33,560. Though both *Davis* and the rule define the same words in Title IX, the Department apparently saw no problem with giving those words one meaning for private lawsuits and a different meaning for administrative enforcement.

The Department also dismisses the notion that its broader definition of harassment—which the rule requires all schools (including public universities) to enforce—could violate the First Amendment. It ignores the Department's prior finding that harassment policies exceeding *Davis* have, in fact, chilled students' speech. 85 FR 30,162-65 & nn.738-39. It strains to distinguish cases, like this Court's decision in *Speech First v. Cartwright*, that enjoined similar harassment policies under the First Amendment. *See* 89 FR 33,501, 33,505-06 (discussing 32 F.4th 1110 (11th Cir. 2022)). And it concedes that schools can violate the rule if they fail to punish students for "misgendering" other students, *see* 89 FR 33,516, without grappling with the serious First Amendment concerns.

\* \* \*

The rule contains other innovations,[1] but its heart is §106.10's new definition of sex discrimination, which delimits Title IX's overall "scope." This new definition "'touch[es] every substantive provision'" in the rule. *Alabama*, 2024 WL 3981994, at \*8 (quoting *Tennessee v. Cardona*, 2024 WL 3453880, at \*4 (6th Cir. July 17)). By defining what sex discrimination means, it dictates what schools must train their employees on (34 C.F.R. §106.8); how schools must notify students and keep records (§106.8(f)); how many complaints schools must process (§106.2); what schools must investigate (§§106.2, .40, .44); which cases the grievance procedures cover (§§106.45-.46, .71); and more.

The rule largely justifies its costs by referencing the benefits from §106.10's new definition of sex discrimination and its inclusion of gender identity. *See* 89 FR 33,861-62. The rule's "cost-benefit analyses" do not even "contemplat[e] the idea" of letting

---

[1] The rule contains pregnancy-related provisions that arguably require state-run insurance plans to "cover abortion." *Texas v. United States*, 2024 WL 3405342, at \*9 (N.D. Tex. July 11) (citing 89 FR 33,888; 34 C.F.R. §106.40(b)(4)). One court deemed this provision likely unlawful. *Id.* at \*9-11. The rule also contains new grievance procedures that roll back procedural protections for the accused—including by allowing schools to deny students a live hearing with cross-examination, and to resurrect the "single-investigator model" where a single school official investigates, adjudicates, and punishes students. *See* 34 C.F.R. §§106.45-46. One court has deemed those changes illegal because the Department failed to reasonably address the due-process concerns that were stressed in its prior rule. *Texas*, 2024 WL 3405342, at \*11-16. Though Plaintiffs made similar arguments below, *see* R.58 at 84-108, they will reserve those arguments for summary judgment. Their arguments on appeal are a sufficient reason to preliminarily enjoin the whole rule, including the grievance procedures, as every court has held so far.

the rule "go into effect with a *different* definition of sex discrimination." *Tennessee*, 2024 WL 3453880, at *4.

And those costs are significant. The Department concedes that the rule as a whole, and each of its major provisions, will cost recipients millions. 89 FR 33,851, 33,861. Schools will spend resources on "reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials; and other compliance-based costs." *Id.* at 33,851. The Department estimates that "inclusion of the additional forms of sex discrimination, including sex-based harassment," will "increase" the "number of investigations" schools must conduct by as much as "10 percent." *Id.* at 33,851, 33,858. The Department also "acknowledge[s]" added "costs associated with litigation," since these new provisions could get schools sued. *Id.* at 33,851. Overall, the new rule "increases costs by $14.3 million in the first year" if schools spend just "12 hours" on compliance. *Id.*

## C.   Nearly a dozen courts agree that the new rule should be preliminarily enjoined, including the Supreme Court.

Before the rule went into effect on August 1, it was challenged by 26 States across seven lawsuits. Aside from this case:

- Louisiana plus three States (Mississippi, Montana, Idaho) sued on April 29 and sought a preliminary injunction on May 13. *See* Docket, No. 3:24-cv-563 (W.D. La.).
- Tennessee plus five States (Kentucky, Ohio, Indiana, Virginia, West Virginia) sued on April 30 and sought a preliminary injunction on May 3. *See* Docket, No. 2:24-cv-72 (E.D. Ky.).

- Texas sued on April 29 and sought a preliminary injunction on May 14. *See* Docket, No. 2:24-cv-86 (N.D. Tex.).
- Kansas plus three States (Alaska, Utah, Wyoming) sued on May 14 and sought a preliminary injunction on May 24. *See* Docket, No. 5:24-cv-4041 (D. Kan.).
- Arkansas plus five States (Missouri, Iowa, Nebraska, North Dakota, and South Dakota) sued on May 7 and sought a preliminary injunction on May 21. *See* Docket, No. 4:24-cv-636 (E.D. Mo.).
- Oklahoma sued on May 6 and sought a preliminary injunction on June 28. *See* Docket, No. 5:24-cv-461 (W.D. Okla.).

Only Tennessee's case had an evidentiary hearing. The others relied on legal briefs and declarations, though Oklahoma submitted no declaration from any official.

Six district courts granted preliminary injunctions, temporarily barring enforcement of the whole rule in the States that challenged it. *See Oklahoma v. Cardona*, 2024 WL 3609109 (W.D. Okla. July 31); *Arkansas v. DOE*, 2024 WL 3518588 (E.D. Mo. July 24); *Texas v. United States*, 2024 WL 3405342 (N.D. Tex. July 11); *Kansas v. DOE*, 2024 WL 3273285 (D. Kan. July 2); *Tennessee v. Cardona*, 2024 WL 3019146 (E.D. Ky. June 17); *Louisiana v. DOE*, 2024 WL 2978786 (W.D. La. June 13). A seventh granted a preliminary injunction in a case brought by a school district. *See Carroll ISD v. DOE*, 2024 WL 3381901 (N.D. Tex. July 11). In three of those cases—the ones led by Tennessee, Louisiana, and Kansas—the Department moved for the preliminary injunctions to be partially stayed. It wanted courts to leave enjoined only §106.31's de minimis provision and §106.2's definition of harassment as applied to gender identity. *See, e.g., Tennessee v. Cardona*, 2024 WL 3631032 (E.D. Ky. July 10); *Louisiana v. DOE*, 2024 WL 3584382 (W.D. La. July 11); *Kansas v. DOE*, 2024 WL 3471331 (D. Kan. July 19).

The Fifth and Sixth Circuits denied stays and left the preliminary injunctions intact. (The Tenth Circuit has not yet ruled. *See* No. 24-3097.) In an opinion by Chief Judge Sutton, the Sixth Circuit explained why the rule's "definition of sex discrimination exceeds the Department's authority." *Tennessee*, 2024 WL 3453880, at *2-3. "*Bostock* is a Title VII case" and thus does not extend to Title IX. *Id.* "All three members of the panel" agreed that §106.10, plus §106.31(a)(2) and §106.2's definition of harassment, likely violate the APA. *Id.* at *3. And because these three "central" provisions were likely illegal, the States were entitled to preliminary relief against the whole rule. *Id.* at *3-4. The new definition of sex discrimination in §106.10 likely cannot be severed: It's incorporated in every other substantive provision, and the rule's "cost-benefit analyses" does not contemplate a rule without it. *Id.* A partial rollout of the rule would also exacerbate the irreparable harm to the States by making them quickly and temporarily comply with a confusing, artificial version shortly before the school year begins. *Id.* at *4. And the Sixth Circuit faulted the Department for making no developed argument about severability in the district court, where it gave the point only a few lines of briefing. *Id.* The Fifth Circuit made similar points. *See Louisiana*, 2024 WL 3452887, at *1-2.

The Supreme Court ultimately agreed. In denying the Department's motions for partial stays, "all" nine Justices agreed that the States "are entitled to interim relief as to three provisions of [the] Rule": §106.10, §106.31(a)(2), and §106.2's harassment definition. *Dep't of Educ.*, 144 S.Ct. at 2510 (Sotomayor, J., dissenting in part); *id.* at 2509-10

(majority). The Court was unanimous that the States "were entitled to preliminary injunctive relief," *id.* at 2509, meaning that the States proved these provisions likely violate the APA, irreparable harm, and the other factors, *Alabama*, 2024 WL 3981994, at *1 n.1. And five Justices agreed that the *whole* rule should remain enjoined in the plaintiff States. *Dep't of Educ.*, 144 S.Ct. at 2510 (majority). Neither the "equities" nor the Department's "severability" arguments supported more limited relief. *Id.* Even at the Supreme Court, the Department never "adequately identified which particular provisions, if any, are sufficiently independent of" §106.10. *Id.*

### D. The district court is the sole court to deny a temporary injunction against the rule, but this Court enters that relief.

Plaintiffs are four States and four membership associations who represent students. Plaintiffs filed this suit on the same day the final rule was published. R.1. After digesting that lengthy rule, assembling over a dozen declarations, and drafting a 49-page brief, Plaintiff moved for a preliminary injunction nine days later, on May 8. R.7–R.7-13; R.7-15.

Plaintiffs quickly found the Department's lawyers and negotiated a schedule. In emails, the Department asked to file its opposition in June given the "number of issues" and "need for coordination." Plaintiffs countered with June 5 so the losing party could "seek quick appellate relief." The parties agreed, and the district court approved their joint scheduling motion. R.13. Though neither party requested argument or an evidentiary hearing, R.13, the district court scheduled a hearing on its own, R.18, which was

pushed back five days to accommodate a long-planned family vacation, R.20. All told, Plaintiffs' motion was fully briefed on June 19, R.38, and fully argued on July 1, R.52, giving the district court over a month to reach a decision before the rule became effective on August 1.

Plaintiffs submitted 13 declarations documenting how the rule would irreparably harm States, schools, and students. High-ranking officials explained how the rule would conflict with state laws on bathrooms (Ala. Code §16-1-54(b); Fla. Stat. §553.865(9)); harassment (Ala. Code §16-68-2(4); Ga. Code §§20-3-48(b)(5), 20-4-11.1(a)(5)); parental rights (Ala. Code §26-26-5; Fla. Stat. §1014.01-06; Ga. Code §20-2-786); pronouns (Fla. Stat. §1000.071(1)-(2)); and sports (Ala. Code §16-1-52; Fla. Stat. §§1006.205, 1000.05(3); S.C. Code §59-1-500). *See* R.7-2 ¶14; R.7-3 ¶9; R.7-4 ¶8; R.7-5 ¶7; R.7-6 ¶9; R.7-7 ¶9; R.7-8 ¶9; R.15 ¶9. Officials charged with educating students confirmed that the compliance costs outlined in the rule are both real and understated. *See* R.7-2 ¶¶15-18; R.7-3 ¶¶11-16; R.7-4 ¶¶10-13; R.7-5 ¶¶9-12; R.7-6 ¶¶11-14; R.7-7 ¶¶11-14; R.15 ¶¶11-16; R.7-8 ¶¶12-19; R.7-9 ¶¶10-17; R.7-10 ¶¶13-18. And several declarants explained how the rule will chill speech and threaten the safety and privacy of students currently in school. *E.g.*, R.7-4 ¶15; R.7-7 ¶9; R.15 ¶18; R.7-8 ¶¶18, 20; R.7-11 ¶¶5-23; R.7-12 ¶¶7-27; R.7-13 ¶5, ¶¶7-23. The Department never challenged or rebutted this testimony. And it submitted no testimony or other evidence of its own.

Before the district court issued its decision, eight courts opined that the rule should be preliminarily enjoined. Plaintiffs gave the district court each opinion—either

in their reply brief (for the ones that were already decided) or in notices of supplemental authority (for the ones that were decided later). *See* R.38; R.50-51; R.53-54; R.57. Yet the district court became the first (and now only) court to deny a preliminary injunction. It didn't announce its ruling until the afternoon of July 30—just 36 hours before the rule's effective date. R.58.

The district court concluded that Plaintiffs were not likely to succeed against any part of the rule. It mostly accepted the arguments that appear in the rule itself. It agreed that §106.10 and §106.31(a)(2) are legal because *Bostock*'s reasoning applies to Title IX. R.58 at 36-55. And it agreed that §106.2's harassment definition is legal because *Davis* involved only private lawsuits, R.58 at 69-74, and that the definition presented no First Amendment concerns, R.58 at 74-75. But in many places, the district court appeared to strike out on its own. It suggested that Plaintiffs might have delayed in seeking a preliminary injunction, *see* R.58 at 110-11—an argument that the Department never made. And it suggested that Plaintiffs failed to brief certain claims, *see* R.58 at 15-16—another argument that the Department never made.

With only one day left before the rule's effective date, Plaintiffs immediately sought an emergency administrative injunction from this Court. This Court entered an administrative injunction on July 31, barring the rule's enforcement in the plaintiff States until this Court could rule on an injunction pending appeal. CA11-Doc.6; 2024 WL 4003397 (11th Cir. July 31). Plaintiffs quickly moved for an injunction pending appeal. CA11-Docs.25, 33.

This Court ultimately entered an injunction pending appeal. *See Alabama*, 2024 WL 3981994. In a reasoned opinion for the Court by Judges Branch and Luck, the motions panel found it "highly likely" that the rule's three central provisions are unlawful and inseverable. *Id.* at *4-6, *8-9. Judge Wilson dissented, but he did not disagree on the merits. He focused on irreparable harm, faulting Plaintiffs for not disproving that their compliance costs could be compensated later via "damages." *Id.* at *10. The Department, which enjoys sovereign immunity from damages suits, has never made that argument.

## SUMMARY OF ARGUMENT

Apart from the district court, "every court to consider the issue across the nation—seven district courts and two courts of appeals—preliminarily enjoined enforcement of the rule." *Id.* at *1 (majority). And since the district court's ruling, its decision has only gotten lonelier. This Court undid the district court's denial of Plaintiffs' motion by entering an injunction pending appeal itself. *See id.* at *9. And the Supreme Court *unanimously* held that States in a similar challenge were "entitled to preliminary injunctive relief." *Dep't of Educ.*, 144 S.Ct. at 2509-10.

The district court, after all that, cannot be affirmed. The Department cannot say that all nine Justices were wrong and that, actually, the rule's three central provisions don't likely violate the APA. And the Department knows there's nothing unique about this case that could somehow justify denying relief to these four sovereign States. The

Department never argued forfeiture, delay, or any of the other criticisms that the district court volunteered below; and it knows that these Plaintiffs, if anything, moved faster, submitted more fulsome briefs, and presented more evidence than the other cases challenging the rule. The Department also must overcome circuit precedents like *Adams* and *Cartwright* here, which make the rule's unlawfulness not just likely but "highly likely." *Alabama*, 2024 WL 3981994, at *4, *6. And it would be grossly inequitable to let the rule immediately come back into force in Alabama, Florida, Georgia, and South Carolina—making these four States rush to bring their schools into compliance with a rule that the Supreme Court deemed likely illegal, while the status quo is maintained in the other 22 States who challenged it.

This case needs no more emergency appellate proceedings. This Court should continue maintaining the status quo while the parties litigate cross-motions for summary judgment. It should enter, as it has now entered twice before, a preliminary injunction that enjoins enforcement of the entire rule in the plaintiff States.

# ARGUMENT

Though this Court reviews preliminary-injunction rulings for abuse of discretion, a district court necessarily "abuses its discretion" if it "applies the law in an unreasonable or incorrect manner." *Eknes-Tucker v. Gov'r of Alabama*, 80 F.4th 1205, 1219 (11th Cir. 2023). And a district court's legal conclusions, including whether a rule likely violates the APA, are reviewed de novo. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940 (D.C.

Cir. 2021). Preliminary injunctions, moreover, turn on likely success, irreparable harm, the balance of harms, and the public interest. *Callahan v. HHS*, 939 F.3d 1251, 1257 (11th Cir. 2019). Those same four factors govern injunctions pending appeal. *See Alabama*, 2024 WL 3981994, at *3 (citing *Callahan*). So this Court cannot hold that the district court properly exercised its discretion unless it also holds that two members of the motions panel abused theirs.

Judges Branch and Luck did not abuse their discretion. Nor did the Supreme Court, the Fifth Circuit, the Sixth Circuit, or the half-dozen district courts that temporarily enjoined the rule. All four factors strongly favor that relief. And they favor that relief in this case as much (if not more) than anywhere else.

## I. Plaintiffs will likely succeed on the merits.

The Supreme Court has now decided that the rule's three central provisions likely violate the APA. They do, as virtually every jurist to reach the merits (other than the district court) agrees. And as the motions panel recognized, there is no principled reason to treat this case differently.

### A. The Supreme Court has now established that the rule's three central provisions are likely illegal.

After the district court (but before the motions panel) ruled, the Supreme Court held that "three provisions of the rule" likely violate the APA. *Dep't of Educ.*, 144 S.Ct. at 2509-10. Specifically, it agreed that the plaintiffs in *Tennessee* and *Louisiana* "were entitled to preliminary injunctive relief" on the three provisions they identified as illegal:

§106.10, §106.31(a)(2), and §106.2's definition of harassment. *Id.*; *see id.* at 2510 (Sotomayor, J., dissenting in part) (identifying these provisions). Those plaintiffs were "[e]ntitled to preliminary injunctive relief" because they satisfied all the criteria for a preliminary injunction, including that these three provisions are "likely to be unlawful." *Id.* at 2509-10 (op. of Court); *accord Alabama*, 2024 WL 3981994, at *1 n.1 ("by accepting that the plaintiffs were entitled to preliminary injunctive relief, the Court had to have found that all the requirements for a preliminary injunction were met, including likelihood of success on the merits"). On this point, the nine Justices were unanimous. *See Dep't of Educ.*, 144 S.Ct. at 2509 ("all Members of the Court"); *id.* at 2510 (Sotomayor, J., dissenting in part) ("Every Member of the Court agrees respondents are entitled to interim relief as to three provisions.").

The Supreme Court's decision binds this Court. *Department of Education* is a reasoned opinion of the Court—not a summary denial or a mere concurrence from fewer than five Justices. And it answered the same question presented here: whether the rule should have been preliminarily enjoined because three provisions are likely illegal, including "the central provision that newly defines sex discrimination." *Id.* at 2510 (op. of Court). While this Court's opinions on motions have no *horizontal* precedential effect on other panels, Supreme Court opinions like *Department of Education* have *vertical* precedential effect on this Court. *E.g.*, *Gateway City Church v. Newsom*, 141 S.Ct. 1460 (2021) (faulting the Ninth Circuit for not granting an injunction pending appeal because that relief was "dictated by" a prior Supreme Court opinion granting an injunction pending

appeal). Even if the Supreme Court's opinion weren't technically precedential, *all nine Justices* agreed that three provisions of the rule should be preliminarily enjoined. That unanimous, recent conclusion of the Supreme Court is binding here. *See Schwab v. Crosby*, 451 F.3d 1308, 1325-26 (11th Cir. 2006).

## B. The Supreme Court and motions panel were right: The rule likely violates the APA.

Even if this Court could contradict the Supreme Court, it shouldn't. The three provisions at issue—as all nine Justices and the motions panel agreed—likely violate the APA. The rule's importation of gender identity in §106.10 and §106.31(a)(2) violates Title IX and this Court's en banc decision in *Adams*. The rule's new definition of harassment in §106.2 violates the Supreme Court's decision in *Davis* and the First Amendment. And these core defects doom the rest of the rule.

### 1. §106.10's definition of sex discrimination and §106.31's de minimis provision are likely illegal.

Through a combination of §106.10 and §106.31(a)(2), the rule inserts gender identity throughout Title IX. Section 106.10 changes Title IX's "[s]cope" by defining "[d]iscrimination on the basis of sex" to "includ[e]" discrimination on the basis of "gender identity." 34 C.F.R. §106.10. Section 106.31(a)(2) then gives "examples" of what §106.10 "prohibit[s]." 89 FR 33,528. Below, Plaintiffs thoroughly explained why *Adams* forecloses this move. R.7-1 at 11, 21-26; R.34 at 3-4; R.38 at 8-12. And the Department conceded that "Plaintiffs … challenge" the rule's inclusion of gender identity. R.24 at

24. Though the district court deemed both provisions valid, R.58 at 36-55, it likely "abused its discretion," *Alabama*, 2024 WL 3981994, at *4.

*Adams* forecloses §106.10's interpretation of Title IX. It holds that "'sex' in Title IX 'unambiguously' refers to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4 (quoting *Adams*, 57 F.4th at 814-15). The Department, based solely on *Bostock*, thinks it can sidestep that holding by arguing that, while "sex" does not include "gender identity," "sex discrimination" includes "gender identity discrimination." *See* 89 FR 33,806-07. But *Adams* addresses that argument too (the dissent in *Adams* made the same point) and deems it "of no avail." 57 F.4th at 814 n.7. Like other circuits, this Court has repeatedly held that *Bostock* does not extend to laws other than Title VII. *See Alabama*, 2024 WL 3981994, at *5 (citing *Adams*, 57 F.4th at 811, and *Eknes-Tucker*, 80 F.4th at 1228-29). Under these precedents, it's "certainly highly likely" that §106.10 is "contrary to law." *Alabama*, 2024 WL 3981994, at *4; *accord, e.g., Tennessee*, 2024 WL 3453880, at *2; *Kansas*, 2024 WL 3273285, at *9, 13; *Tennessee*, 2024 WL 3019146, at *13-16; *Louisiana*, 2024 WL 2978786, at *10 & nn.48-49 (all citing *Adams* as support for the same conclusion).

Even if *Adams* hadn't resolved the question already, *Bostock* would not extend to Title IX as an original matter. Title IX is Spending Clause legislation. *Davis*, 526 U.S. at 640. So unlike Title VII, it cannot impose gender-identity obligations on funding recipients unless it does so "'unambiguously.'" *Alabama*, 2024 WL 3981994, at *4 (quoting *Adams*, 57 F.4th at 814-15). And whether Title IX incorporates *Bostock*'s mechanical

reasoning about but-for causation is at least ambiguous. Title VII treats "sex" like "race," *see* 42 U.S.C. §2000e-2, and deems those characteristics "not relevant to employment," *Bostock*, 590 U.S. at 660. But Title IX reaches only sex and applies a single non-discrimination mandate across "any education program or activity." 20 U.S.C. §1681(a); §1687. It thus takes a more nuanced approach to sex discrimination in this critically different context, as illustrated by its many exemptions. *Cf. Adams*, 57 F.4th at 808 ("the school is not the workplace"). Sometimes Title IX allows outright segregation, as in traditionally single-sex schools (§1681(a)(5)), Boys and Girls State (§1681(a)(7)), and greek life (§1681(a)(6)). Other times it allows sex separation so long as males and females are treated equally on a *group* level. *E.g.*, §1681(a)(8) (dances). Other times it says it's not discriminatory to treat males and females differently based on privacy concerns or physical differences. *E.g.*, §1686 (living facilities); §1681(a)(4) (military academies). These exceptions, which have no parallels in Title VII, cannot be squared with *Bostock*'s logic. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020).

But *Bostock* wouldn't justify §106.10 even if that decision governed Title IX. *Bostock* itself refused to "prejudge" whether its analysis governed "bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. It addressed only the firing of employees from jobs where males and females were "similarly situated." *Id.* at 657. Given their real biological differences, males and females are not similarly situated for purposes of bathrooms, locker rooms, overnight rooming arrangements, sex education, or contact sports. *See Adams*, 57 F.4th at 814-17; *United States v. Virginia*, 518 U.S. 515, 551 n.19

(1996); *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring). Yet the rule defines gender-identify discrimination *as* "sex discrimination," §106.10, so a school "necessarily" engages in sex discrimination if it tries to enforce sex separation in these areas against a student who claims a different gender identity, 89 FR 33,802. Because §106.10 is illegal in these contexts (its main, crucial applications), this provision is at least grossly overbroad, even accepting the Department's view of *Bostock*.

More likely, the fact that *Bostock*'s logic breaks down in crucial Title IX contexts like bathrooms and sports means that *Bostock* does not apply to Title IX at all. As *Adams* explains, Title IX could not cover gender-identity discrimination without contradicting the Department's longstanding regulation on sports. 57 F.4th at 816-17. That regulation allows strict sex separation, requiring no exceptions for students who identify as a gender different from their sex. *Id.* The Department agrees. *See* 89 FR 33,817. And because Title IX contains no statutory exception for sports, that regulation necessarily interprets Title IX's "general prohibition against sex discrimination." *Adams*, 57 F.4th at 816. The Department again agrees. *See* 89 FR 33,821; 34 C.F.R. §106.41 (statutory authority). But the Department ignores the takeaway: This longstanding, contemporaneous regulation is considered an *accurate* interpretation of Title IX's original meaning. *See Loper Bright v. Raimondo*, 144 S.Ct. 2244, 2262 (2024); *Grove City*, 465 U.S. at 568. It rejects *Bostock*'s logic precisely because the Congress that passed Title IX (and the Congress that reviewed the 1975 regulations) rejected *Bostock*'s logic.

For similar reasons, the rule's treatment of bathrooms—whether under §106.10, §106.31(a)(2), or both—is obviously illegal under *Adams*. That en banc decision holds that "Title IX … permits separating the sexes when it comes to bathrooms," including when that practice "conflict[s] with a transgender person's gender identity." 57 F.4th at 814-15. Creating exceptions for gender identity would impermissibly create "dual protection under Title IX based on *both* sex and gender identity," forbidding schools from sending a male who identifies as female to the girl's room (sex discrimination) or to the boy's room (gender-identity discrimination). *Id.* at 814; *accord Carroll*, 2024 WL 3381901, at *5-6. And if Title IX required this result, it would violate the Spending Clause's clear-statement rule. *Adams*, 57 F.4th at 815-17. The notion that schools had clear notice that Title IX bans them from "separating male and female bathrooms," *Adams* observes, is "untenable." *Id.* at 816. *Adams* also stresses the Department's longstanding regulation on bathrooms, explains why that regulation allows strict sex separation, and holds that this regulation is validly rooted in Title IX's statutory exception for living facilities. *See id.* at 811-15. The Department agrees that *Adams* holds this, and that it has no authority to override a statutory exception. 89 FR 33,816-21. Yet the district court refused to admit that even *this* part of the rule is likely invalid. It likely "abused its discretion." *Alabama*, 2024 WL 3981994, at *4.

Section 106.31(a)(2) also renders Title IX's exemptions "nonsense." *W.V. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991). Because the rule reads sex discrimination

to mean gender-identity discrimination, it treats Title IX's statutory exemptions as instances where Congress *allowed* discrimination against students whose sex and gender identities differ. *See* 89 FR 33,814-21. Congress allowed anti-transgender discrimination in these areas, the Department reasons, even if that discrimination imposes more than "de minimis" harm. *See Tennessee*, 2024 WL 3019146, at *33. Yet the concept of "de minimis" appears nowhere in the statute. And the Department's reasoning attributes a bizarre intent to Congress. No rational Congress would want to stop males from attending Girls State (a statutory exception) but let them undress and shower with females (not a statutory exception, according to the rule). *See id.* at *33-34. Nor would a rational Congress want to stop males from attending mother-daughter activities (a statutory exception) but let them play contact sports like "wrestling" and "boxing" against females during P.E. (not a statutory exception). 34 C.F.R. §§106.31(a)(2), 106.34(a)(1).

Instead, the statutory exemptions reveal that Title IX has a different understanding from the Department about what sex discrimination means. Under the statute, treating males and females differently based on real differences that are rooted in biology, safety, and privacy is not tolerable discrimination; it's beneficial and sometimes necessary to ensure equal opportunities for women. By requiring schools to treat certain males as female, the rule destroys the very "purpose" of Title IX: to ensure equal opportunities for women while not jeopardizing their privacy, safety, or constitutional rights. *Tennessee*, 2024 WL 3019146, at *33; *Louisiana*, 2024 WL 2978786, at *12.

## 2. §106.2's definition of harassment is likely illegal.

The rule's redefinition of harassment in §106.2 is likely illegal too. Plaintiffs argued below, as the Department understood, that the rule's "harassment definition … is inconsistent with the definition in *Davis*." R.24 at 39; *see* R.7-1 at 36-38, 40-41; R.38 at 17-18. Plaintiffs also argued, as the Department also acknowledged, that this definition "conflicts with the First Amendment" as proven by "*Cartwright*." R.24 at 41-43. Plaintiffs explained, with detailed quotes, why the definition of harassment that the rule makes all schools adopt is no narrower than the definition that *Cartwright* deemed facially unconstitutional. *See* R.7-1 at 38-39, 43-45; R.38 at 18-19. Though the district court disagreed, R.58 at 67-84, it was legally incorrect.

Section 106.2's redefinition of harassment "flies in the face of *Davis*." *Alabama*, 2024 WL 3981994, at *5; *accord Arkansas*, 2024 WL 3518588, at *17-18; *Oklahoma*, 2024 WL 3609109, at *7-8. *Davis* held that recipients are liable for actionable "harassment" under Title IX only when they are "deliberately indifferent" to conduct that is "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to education that Title IX is designed to protect." 526 U.S. at 650-52 (emphases added). These real limitations screen out mere "'teasing,' 'name-calling,' isolated incidents, or 'a mere decline in grades.'" *Alabama*, 2024 WL 3981994, at *6 (cleaned up; quoting *Davis*, 526 U.S. at 652). The Department concedes that its new definition is "broader" than *Davis*. R.58 at 70; 89 FR 33,498. It lowers *Davis*'s "denies" requirement to a "limits" requirement. *Compare* §106.2, *with* 526 U.S. at 652. And it changes *Davis*'s "severe *and*

pervasive" requirement to a "severe *or* pervasive" requirement. *Compare* §106.2, *with* 526 U.S. at 652. Worse, the Department reads the "severe or pervasive" language out, insisting that its definition merely requires the harassment to have "some impact" on the student. 89 FR 33,508, 33,511.

The district court acknowledged those differences but incorrectly restricted *Davis* to "private" lawsuits for damages. R.58 at 70-73. Though "*Davis* arose in the context of a private lawsuit rather than an administrative lawsuit," the Supreme Court was "interpreting the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX." *Alabama*, 2024 WL 3981994, at *5; *accord Jackson*, 544 U.S. at 173 ("*Davis* … relied on the text of Title IX," especially the word "'discrimination.'"). And *Davis* identified that provision's "single, best meaning." *Loper Bright*, 144 S.Ct. at 2266; *see Alabama*, 2024 WL 3981994, at *6 (*Davis* "warned against courts 'imposing *more sweeping liability than we read Title IX to require.*'" (cleaned up; quoting *Davis*, 526 U.S. at 652)). Even if the Court chose that definition of harassment based on concerns unique to private damages lawsuits, its interpretation "must govern" all contexts, even ones where those same concerns "would not" apply. *Clark v. Martinez*, 543 U.S. 371, 380 (2005). A statute is not a "chameleon"; the "same statutory text" cannot have two "different meanings" depending on who's enforcing it. *Id.* at 382, 386.

But for what it's worth, the concerns identified in *Davis* apply to administrative enforcement too. Per *Davis*, the Spending Clause requires Title IX's obligations to appear in the "clear terms of the statute," and only its stringent definition of harassment

provides clear notice to funding recipients. 526 U.S. at 640-42. The Department thus exceeds the federal government's spending authority when it enforces a broader definition, since the Spending Clause's required notice "'must come directly from the statute,'" not from regulations or administrative notices from agencies. *W.V. ex rel. Morrisey v. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023).

So too for the First Amendment concerns that the *Davis* standard was designed to avoid. *See* 526 U.S. at 648-49, 652-53. In dissent, Justice Kennedy argued that, if schools are liable for student-on-student harassment, then they will adopt "speech codes" that "infringe students' First Amendment rights." *Id.* at 682; *accord id.* at 667. In response, the majority explained that its stringent definition accounts for those concerns. *Id.* at 652-53; *see id.* at 649 (explaining that its interpretation would not require universities to risk "liability" via "constitutional … claims"). But administrative enforcement under a less stringent definition recreates the problem. Schools will enforce the Department's new definition of harassment to avoid losing their federal funding—a far scarier prospect than mere private damages suits. And when they do, they will chill their students' speech.

As *Davis* predicts, §106.2's departures from that standard do require schools to enforce a definition of harassment that likely violates the "First Amendment." *Alabama*, 2024 WL 3981994, at *6; *accord, e.g.*, *Tennessee*, 2024 WL 3019146, at *20-27; *Louisiana*, 2024 WL 2978786, at *12-13; *Kansas*, 2024 WL 3273285, at *13-15. The rule did not invent its broader definition of harassment. As the Department previously found, many

schools were using it before the Department adopted *Davis* verbatim in 2020. 85 FR 30,162-65 & nn.738-39. One of those schools was sued in *Cartwright*. This Court held that its harassment policy was "almost certainly unconstitutionally overbroad" on its face and an "impermissible content- and viewpoint-based" restriction on students' speech. 32 F.4th at 1125. Other courts have held the same about similar policies. *E.g.*, *Speech First v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022).

The rule's definition of harassment "is similar in its sweep to the 'discriminatory harassment' policy in *Cartwright*." *Alabama*, 2024 WL 3981994, at *6; *accord, e.g.*, *Kansas*, 2024 WL 3273285, at *15 (citing *Cartwright*). Both contain the same core deviations from *Davis*: changing "severe and pervasive" to "severe or pervasive" and changing "denies" to "limits." *Cartwright*, 32 F.4th at 1114-15; §106.2. And the rule's definition is, if anything, broader. While the policy in *Cartwright* also reached "condoning or encouraging, or even failing to intervene to stop" harassment, 32 F.4th at 1126 (cleaned up), the Department's rule reaches speech that merely "contribut[es] to" harassment, 89 FR 33,501 n.11, 33,530-31. And while the policy in *Cartwright* used the terms "'unreasonably' and 'alter,'" 32 F.4th at 1121 (cleaned up), the rule uses the subjective term "limits" and defines it to require only "some impact," 89 FR 33,511.

In any event, the policies' relative breadth is not the key point. The Department concedes that the rule's definition reaches "speech," *id.* at 33,505, 33,516, 33,493, including controversial speech like repeatedly refusing to use another student's preferred pronouns, *Tennessee*, 2024 WL 3019146, at *23. Under *Cartwright*, harassment policies

that reach speech necessarily impose "viewpoint discriminatory" restrictions on that speech. 32 F.4th at 1126. Such policies are facially unconstitutional "*per se*," *id.*, and the Department has no power to adopt or coerce them. Because "the Department's regulation … runs headlong into the First Amendment concerns animating decisions like *Davis* and *Cartwright*," it's "highly likely that the Department's regulation is contrary to law." *Alabama*, 2024 WL 3981994, at *6.

### C.    These violations undermine the whole rule.

Because the rule's three central provisions violate the APA, the whole rule will likely be enjoined. Severance is likely unavailable because removing these core provisions would "impair the function of the … whole" rule. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Section 106.10's new definition of sex discrimination alone "is intertwined with and affects many other provisions of the new rule." *Dep't of Educ.*, 144 S.Ct. at 2510. As at least five courts have now held, this illegal definition touches "'every substantive provision of the Rule.'" *Alabama*, 2024 WL 3981994, at *8 (collecting cases). Without §106.10, schools cannot even train their employees on the "scope of conduct that constitutes sex discrimination under" the rule. 34 C.F.R. §106.8(d)(1)(ii). So too for the rule's "remaining provisions," as Chief Judge Sutton observed provision-by-provision. *Tennessee*, 2024 WL 3453880, at *3.

Severance also wouldn't work because, without these central provisions, the rest of the rule could not satisfy the APA. *Ohio v. EPA*, 144 S.Ct. 2040, 2054-55 (2024).

There is no "evidence that" the Department "contemplated, during the rulemaking process, how the remainder of the Rule would apply without any of its core provisions." *Tennessee*, 2024 WL 3453880, at *4. At best, the Department asserted that "the potential invalidity of one provision should not affect the other provisions." 89 FR 33,848. That assertion shows neither that the Department "contemplate[d] enforcement of the Rule without *any* of the core provisions" nor that "the cost-benefit analyses underlying the Rule contemplated the idea of allowing these provisions to go into effect with a *different* definition of sex discrimination." *Tennessee*, 2024 WL 3453880, at *4.

The rule's severability clauses don't change the answer. *See Ohio*, 144 S.Ct. at 2054-55. The parts of the rule discussed above are its "Major Provisions," and they feature prominently in the Department's description of the rule's purpose. 89 FR 33,476-77. Though the rule insists that each "provision" is individually severable, 34 C.F.R. §106.9; §106.16; §106.48, those severability clauses "say nothing about the situation we face here": the invalidity of the rule's "'central'" provisions in three "different subparts." *Alabama*, 2024 WL 3981994, at *8. Plus, it's not "possible to sever" §106.10, §106.31(a)(2), and §106.2's harassment definition without "leav[ing] gaping" holes in the rule, or trying to "foresee which of many different possible ways" the Department "might respond to" that ruling. *Randall v. Sorrell*, 548 U.S. 230, 262 (2006). A court thus would likely enjoin enforcement of the entire thing.

The Department, both below and at the Supreme Court, never "adequately identified which particular provisions, if any, are sufficiently independent" of §106.10 "to

remain in effect." *Dep't of Educ.*, 144 S.Ct. at 2510; *Tennessee*, 2024 WL 3453880, at \*4. Contra the district court, the burden was on the Department. Though Plaintiffs had the burden to prove they were likely to succeed on the merits, they discharged that burden by challenging the "entire rule," R.7-1 at 46, 48; R.38 at 15, by explaining why its central provisions are invalid, R.7-1 at 20-27, 36-39, 46-55, and by arguing that the appropriate remedy would be rulewide relief, R.7-1 at 57-59. The burden was then on the Department to raise and adequately brief its partial defense of severability. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 n.16 (10th Cir. 2012) (government "'waived'" the "issue of severability" because "argument consisted of one sentence"). Even though the Department failed by addressing severability in only "two conclusory sentences," *Louisiana*, 2024 WL 3452887, at \*1; *Tennessee*, 2024 WL 3453880, at \*4; *see* R.24 at 69, Plaintiffs thoroughly argued nonseverability in their reply, *see* R.38 at 35-37. Nothing required them to "'anticipatorily rebut'" this potential defense in their opening brief. *Zurich Am. Ins. v. Arch Ins.*, 20 F.4th 250, 257 n.3 (5th Cir. 2021). Tellingly, *none* of the plaintiffs in the cases where district courts enjoined the rule argued severability in their opening briefs.

## II. Plaintiffs satisfy the other preliminary-injunction factors, justifying interim relief against the entire rule.

Having erred on the likely merits—"the first (and most important) factor for obtaining preliminary injunctive relief"—the district court cannot be affirmed. *Alabama*, 2024 WL 3981994, at \*5. Instead, Plaintiffs' likelihood of success on the merits means that the "other factors—irreparable injury, balance of the equities, and public interest—

also favor Plaintiffs." *Id.* at *6. The last two factors are "consolidated" here and point in the same direction. *Otto v. Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). And the preliminary injunction, like the injunction pending appeal, should be "rule-wide." *Alabama*, 2024 WL 3981994, at *8-9.

## A. Absent relief, the rule would have irreparably harmed Plaintiffs.

Plaintiffs proved "at least three [irreparable] harms if the rule goes into effect." *Id.* at *6. Sovereign harms because the rule conflicts with the States' statutes. *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018). Constitutional harms because the rule requires schools to adopt harassment policies that chill students' speech. *Cartwright*, 32 F.4th at 1128. And compliance harms because the rule imposes regulatory burdens on the States' schools, losses that can't be compensated by damages because the federal government has sovereign immunity. *Georgia v. President*, 46 F.4th 1283, 1302-03 (11th Cir. 2022). Though the district court expressed "doubts" about Plaintiffs' "evidence," it did not rule that Plaintiffs lacked irreparable harm *even if* the rule was likely illegal. R.58 at 111-12. It assumed, incorrectly, that Plaintiffs were unlikely to succeed on the merits.

The district court agreed that, if Plaintiffs were likely to succeed on the merits, then the States faced irreparable sovereign harm. It acknowledged that the rule conflicts with Alabama and Florida's laws separating school bathrooms based on biological sex. R.58 at 119; *see* Ala. Code §16-1-54(b); Fla. Stat. §553.865(9). And while it said "only" Alabama has a law that "conflicts with" §106.2's definition of harassment, R.58 at 120-

21 (citing Ala. Code §16-68-2(4)), Georgia does too, *see* Ga. Code §§20-3-48(b)(5), 20-4-11.1(a)(5). Plaintiffs pointed all this out, repeatedly. *E.g.*, R.7-2 ¶14; R.7-3 ¶9; R.7-4 ¶8; R.15 ¶9; R.1 ¶96; R.7-1 at 55. And the Department never denied the conflicts between the rule and any of these state laws. *See, e.g.*, 34 C.F.R. §106.6(b) (preemption). Though the Department said these sovereign harms don't count when a federal rule is likely lawful, R.24 at 63, this rule is likely unlawful. Its illegal attempt to preempt state statutes thus threatened irreparable harm. *Abbott*, 585 U.S. at 603 n.17; *Morrisey*, 59 F.4th at 1149; *Alabama*, 2024 WL 3981994, at *7.

The district court also never denied that, if the rule likely violates the Constitution, then it irreparably harms the students that Plaintiffs represent. "[I]rreparable harm flows … from the First Amendment concerns raised by the rule," *id.*, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The district court didn't and couldn't deny that unquestionable principle. R.58 at 113. Though it said Plaintiffs had briefed their constitutional harms in a "single sentence," R.58 at 112, Plaintiffs explained at length why the rule's harassment definition chills students' speech, *see* R.7-1 at 36-46; R.38 at 17-20. And they didn't need more than a sentence to invoke the settled principle that chilled speech is irreparable. R.7-1 at 56; R.38 at 31. This Court likewise used one sentence in *Cartwright*, 32 F.4th at 1128, and again here, *Alabama*, 2024 WL 3981994, at *7.

Though the district court had "doubts" about the evidence of Plaintiffs' compliance harms, R.58 at 112, it ultimately rejected those harms because it thought Plaintiffs were unlikely to "succe[ed] on the merits," R.58 at 121-22. Acting on those doubts would have been reversible error.

Plaintiffs submitted substantial evidence of compliance harms. They presented "declarations" from multiple "representatives from each of the States," detailing what the compliance costs will be. *Alabama*, 2024 WL 3981994, at *6. Those costs include the time and money needed to review the rule, conform policies, approve policies, train employees, enforce new obligations, and defend against litigation. *See* R.7-2 ¶¶16-18; R.7-3 ¶¶11-16; R.7-4 ¶¶10-14; R.7-5 ¶¶9-13; R.7-6 ¶¶11-16; R.7-7 ¶¶11-16; R.7-8 ¶¶12-19; R.15 ¶¶11-19; R.7-9 ¶¶10-17; R.7-10 ¶¶13-18. The Department could have, but did not, dispute any of this testimony or put on any evidence of its own. *See* R.24 at 64 (conceding that the rule will cost the States unrecoverable "'time and money'"). And Plaintiffs didn't need to "convert each allegation of harm into a specific dollar amount." *Rest. L. Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023). For compliance costs, "'it is not so much the magnitude but the irreparability that counts.'" *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016). Even "'[o]rdinary" compliance costs like "'time and effort'" are irreparable given the federal government's sovereign immunity from damages. *Georgia*, 46 F.4th at 1302.

Plaintiffs also could have proved irreparable compliance harms with zero evidence. The obvious notion that major federal regulations, which impose new regulatory

obligations directly on the States and their schools, impose unrecoverable compliance costs needs no elaborate proof. *Texas v. EPA*, 829 F.3d at 433-34. And Plaintiffs could have simply pointed to the rule itself, where the Department specifies the various types of compliance costs and quantifies the millions of dollars that the States must spend. 89 FR 33,850-51, 33,548-49, 33,861-62, 33,483, 33,492, 33,868-69; *see Alabama*, 2024 WL 3981994, at *6. "Curiously, the district court did not acknowledge the Department's concession" of compliance costs in the rulemaking itself. *Rest. L. Ctr.*, 66 F.4th at 598.

### B.    The balance of harms and public interest favor Plaintiffs.

Plaintiffs easily win the remaining factors. They "face substantial compliance costs if the new rule goes into place" and "are deprived of the enforcement of their existing policies and laws in the meantime." *Alabama*, 2024 WL 3981994, at *7. These harms "far outweig[h]" the Department's "more nebulous" ones. *Odebrecht Const. v. FDOT*, 715 F.3d 1268, 1289 (11th Cir. 2013). The Department can still enforce its existing rules on Title IX, after all. *Alabama*, 2024 WL 3981994, at *7. And it has "no interest in enforcing a regulation that likely violates the APA and raises First Amendment concerns." *Id.* (citing *Otto*, 981 F.3d at 870). Even the district court agreed that any harm to the Department from a preliminary injunction would be minimal. *See* R.58 at 119-20.

### C.    Relief should be rulewide but state specific.

Because the district court should have entered a preliminary injunction, this Court should reverse. When it does, this Court can either reverse with instructions for the district court to enter a preliminary injunction, *e.g.*, *Cartwright*, 32 F.4th at 1129, or simply enter a preliminary injunction itself, *e.g.*, *Cate v. Oldham*, 707 F.2d 1176, 1185, 1190 (11th Cir. 1983). Plaintiffs respectfully ask for the latter. That approach would prevent any possible confusion about the status of the rule (which became effective on August 1) during the gap between this Court's issuance of the mandate and the district court's entry of a preliminary injunction. *See Palmer v. Braun*, 287 F.3d 1325, 1335 n.4 (11th Cir. 2002) (explaining that injunctions pending appeal expire when this Court issues the mandate); *Tex. & N.O.R. Co. v. Bhd. of R.R. Trainmen*, 307 F.2d 151, 163 (5th Cir. 1962) (same).

A preliminary injunction should bar enforcement of the whole rule, but only in the plaintiff States. Though Plaintiffs sought broader relief below, they alternatively sought a state-specific, rulewide injunction. *See, e.g.*, R.7 at 1-2; R.7-1 at 58; R.7-14. That relief is what "every federal court (including the Supreme Court)" has said "is called for" against the rule. *Alabama*, 2024 WL 3981994, at *8. The consensus is right for two main reasons.

First, as explained above, the rule's central provisions likely violate the APA and cannot be severed. *Supra* I.C. Because Plaintiffs will likely win nonseverability at the end of this case, they are entitled to preliminary relief that mirrors that outcome in the

meantime. *See Dep't of Educ.*, 144 S.Ct. at 2510; *Garcia v. Los Angeles*, 11 F.4th 1113, 1124 (9th Cir. 2021).

Second, rulewide relief is the only equitable approach. Absent that relief, Plaintiffs will suffer compliance costs from the rule's training, recordkeeping, notice, and other mandates. *E.g.*, 34 C.F.R. §106.8(a), (c) & (f); §106.2; §106.71. And partial relief would "doubl[e]" their costs—either because they must go back to the old rules once this rule is "ultimately invalidated," *Alabama*, 2024 WL 3981994, at *6, or because they must figure out how to comply with a "partial" version of the rule that the Department never contemplated, *see Tennessee*, 2024 WL 3453880, at *4; *Louisiana*, 2024 WL 3452887, at *2, or both. Rulewide relief would not meaningfully harm the Department, however. It would simply "maintain the status quo" that this Court's injunction pending appeal preserved in the plaintiff States. *Alabama*, 2024 WL 3981994, at *9. And it would be temporary, lasting only until cross-motions for summary judgment—the next step after this "expedited" appeal—are briefed and decided on remand. *Dep't of Educ.*, 144 S.Ct. at 2510.

## III.  There is no principled reason to treat these four States differently from the 22 other States where the rule is preliminarily enjoined.

Now that the Supreme Court has ruled that the plaintiffs in *Tennessee* and *Louisiana* are "entitled to preliminary injunctive relief," *Dep't of Educ.*, 144 S.Ct. at 2509, the Department must prove that the plaintiffs here are somehow entitled to *nothing*. That

task is tall. Because it's so tall, the Department might get desperate and parrot the district court's bewildering asides about this case's timing, record, or briefs. Those arguments won't be sincere: The Department did not argue "delay" or "forfeiture" below; and it has not asked the Supreme Court to stay this Court's injunction pending appeal, which it presumably would if this case were truly different from *Tennessee* and *Louisiana*. The motions panel, moreover, was rightly "unpersuaded" by the district court's non-merits "suggest[ions]." *Alabama*, 2024 WL 3981994, at *3 n.5. Those suggestions are unpersuasive—and certainly not enough to perversely make four out of 26 States suddenly come into compliance with a rule that the Supreme Court has deemed likely invalid.

Supposed "delay" is not a reason to treat Plaintiffs differently. Though the district court remarked that delay "call[ed] into question" Plaintiffs' need for a preliminary injunction, R.58 at 110-11, it did not *rule* that delay was an independent reason to deny Plaintiffs' motion. It also raised this concern sua sponte. The Department never argued "delay" below (or on appeal to the motions panel). That argument would have been bold, since its lawyers negotiated this schedule because *they* needed more time to file their opposition. Plaintiffs' willingness to compromise was basic professionalism, not punishable delay.

Any ruling on delay would have been reversible error. Plaintiffs did not delay. They took zero days to sue (faster than five of the seven cases where courts *granted* relief), nine days to seek a preliminary injunction (faster than six of those cases), and

negotiated a schedule that had the motion fully briefed by June 19 (faster than four of those cases).[2] Even if that breakneck speed could be considered delay, it would not be the kind of delay that undermines Plaintiffs' need for a preliminary injunction. Plaintiffs needed relief before the rule's effective date of August 1. That day is when their laws would be preempted, their students' rights to speech and privacy would be infringed, and when all but their initial compliance costs would start accruing. Plaintiffs thus negotiated a schedule where their motion would be fully briefed by June 19 and fully argued by July 1, giving the district court a whole month to rule before August 1. No case suggests anything like what happened here is a form of delay that could defeat a preliminary injunction.

The "record" is not a reason to treat Plaintiffs differently either. As explained, Plaintiffs submitted nine declarations from top educational officials in each of the four States, who testified that the rule would cost their schools time and money and conflict with their laws. *See* R.7-2–R.7-9; R.15. The plaintiffs in the other cases relied on similar declarations. And the plaintiffs in *Oklahoma* won a preliminary injunction without submitting any declaration from a state official. *See* Docket, No. 5:24-cv-461 (W.D. Okla.).

---

[2] Plaintiffs' motion was fully briefed on the same day that briefing ended in *Kansas*, two days faster than *Arkansas*, nine days faster than the two cases in Texas, and nearly a month faster than the case in *Oklahoma*. *Compare* R.38 (reply brief filed June 19), *with Kansas*, No. 5:24-cv-4041, Doc.43 (D. Kan.) (June 19); *Arkansas*, No. 4:24-cv-636, Doc.21 (E.D. Mo.) (June 21); *Texas*, No. 2:24-cv-86, Doc.46 (N.D. Tex.) (June 28); *Carroll*, No. 4:24-cv-461, Doc.36 (N.D. Tex.) (June 28); *and Oklahoma*, No. 5:24-cv-461, Doc.43 (W.D. Okla.) (July 18).

Though one of those cases held an evidentiary hearing (*Tennessee*), four had no hearing of any kind (*Oklahoma*, *Arkansas*, *Texas*, and *Louisiana*). No hearing was needed in an APA case like this one. Plaintiffs' motion turns on whether the rule likely exceeds the Department's authority (a pure question of law), and the compliance costs detailed in Plaintiffs' declarations appear in the rule itself. The Department cannot suddenly invoke "the record" now—when it never disputed Plaintiffs' testimony, never submitted any evidence or testimony of its own, and affirmatively denied that it wanted an evidentiary hearing. *Texas v. United States*, 809 F.3d 134, 175-76 (5th Cir. 2015).

Finally, and perhaps least persuasive of all, is the notion that Plaintiffs' briefs in the district court were somehow inadequate. The district court, again, did not rule that its criticisms of Plaintiffs' briefs were a *sufficient* basis to deny a preliminary injunction. It "suggested" the briefing was inadequate, but its "holding" was that "Plaintiffs failed to meet the traditional factors for injunctive relief." *Alabama*, 2024 WL 3981994, at *3 n.5. The district court understood, and addressed on the merits, every major claim that Plaintiffs are making now. *See, e.g.*, R.58 at 40-45 (*Bostock*), 49-50 (bathrooms), 69-76 (*Davis* and *Cartwright*), 109-22 (irreparable harm). Those "passed upon" issues are thus fully preserved for this appeal. *United States v. Williams*, 504 U.S. 36, 41 (1992); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707-08 (D.C. Cir. 2009).

Even the "suggestion" that Plaintiffs' briefs were inadequate is thoroughly "un-persua[sive]." *Alabama*, 2024 WL 3981994, at *3 n.5; *accord id.* at *7 n.8. Though Plaintiffs had to digest and brief a complex rule in mere days, their more than 80 pages of

briefing were of the highest quality. *See* R.7-1; R.38. Plaintiffs would hold their briefs up against any briefs filed in any of these cases. (Some of those other briefs even borrow from Plaintiffs' briefs, which Plaintiffs take as a compliment. *Compare, e.g.*, R.7-1 at 15-16, 38-39, 45-55, *with, e.g.*, Doc.16 at 38-41, 44-47, No. 2:24-cv-86 (N.D. Tex. May 14, 2024); *and, e.g.*, Doc.12 at 28-31, 39, No. 4:24-cv-636 (E.D. Mo. May 22, 2024).) Plaintiffs were especially surprised to see the district court's criticisms of their briefs, since the parties had a 2.5-hour oral argument where the court voiced no concerns about preservation and sought no clarification on any argument. *See* R.52. In all events, waiver and forfeiture apply to "claims," not "arguments" in support of claims. *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010). Plaintiffs clearly and thoroughly briefed, with numerous arguments and citations, every major claim that they're now raising on appeal. *See, e.g.*, R.7-1 at 14, 21-25, R.38 at 8-12, 16, and R.34 (§106.10 and §106.31(a)(2) violate *Adams*); R.7-1 at 36-46 and R.38 at 17-20 (§106.2 violates *Davis* and *Cartwright*).

Had the district court deemed any of Plaintiffs' key claims forfeited, it would have abused its discretion. Forfeiture enforces the principle of party presentation, *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc), but the district court did not honor that principle. It volunteered arguments about delay and forfeiture that the Department never raised. *E.g.*, R.58 at 15-16, 110-11. And party presentation means that forfeiture can itself be forfeited. *Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014). The Department not only forfeited forfeiture below, but it *conceded* that Plaintiffs raised every key claim. Per the Department:

- "Plaintiffs argue that the Department's interpretation of Title IX" in §106.10 "is inconsistent with the statutory text," and "Plaintiffs rely on" *Adams* and other circuit precedents "to argue that *Bostock*'s reasoning does not apply to Title IX." R.24 at 17-24.

- "Plaintiffs also challenge … §106.31(a)(2)" but that provision "follows naturally from the operative text." R.24 at 24-28.

- "Plaintiffs … argue that the Final Rule's harassment definition" is "inconsistent with the definition in *Davis*" and "conflicts with the First Amendment" under "*Cartwright*." R.24 at 38-43.

Plaintiffs did not forfeit claims that the Department clearly understood and addressed at length. *See, e.g.*, *Merritte v. Kessel*, 561 F. App'x 546, 548 & n.1 (7th Cir. 2014) (district court abused its discretion by giving plaintiff's submissions a "cramped reading" where the government "'waived waiver' by not arguing it").

Further departing from party presentation, the district court's approach to briefing was regrettably one-sided. To name a few examples: When *the Department* failed to adequately brief a claim in its opposition—the lawfulness of §106.31(a)(2) under *Adams*—the district court did not suggest forfeiture; it asked the parties for supplemental briefing. *See* R.24 at 24-28; R.27. The district court also faulted *Plaintiffs* for not preemptively raising and defeating severability in their "initial brief." R.58 at 30. But when the Department's opposition raised severability in only two conclusory sentences, the district court deemed its defense "clearly raised." R.58 at 36. It did so even after the Fifth and Sixth Circuits deemed that same two-sentence analysis a forfeiture *by the Department*. *Louisiana*, 2024 WL 3452887, at *1; *Tennessee*, 2024 WL 3453880, at *4. Applying forfeiture more stringently to the losing party, in the hopes of insulating an outlier decision

46

on appeal, would be an abuse—not a use—of discretion. *See Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

## CONCLUSION

This Court should reverse the district court and enter a preliminary injunction prohibiting Defendants from enforcing the rule in the plaintiff States.

Dated: September 19, 2024

Steve Marshall
  Attorney General
s/  *Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
  Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Alabama*

Ashley Moody
  Attorney General
s/ *Henry C. Whitaker*
Henry C. Whitaker
  Solicitor General
James H. Percival
  Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com

*Counsel for Florida*

Respectfully submitted,

*/s/ Cameron T. Norris*
Cameron T. Norris
Thomas S. Vaseliou
C'Zar Bernstein
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
cam@consovoymccarthy.com
tvaseliou@consovoymccarthy.com
czar@consovoymccarthy.com

*Counsel for Private Plaintiffs*

Christopher M. Carr
  Attorney General
s/ *Stephen J. Petrany*
Stephen J. Petrany
  Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Georgia*

Alan Wilson
  Attorney General
s/ *Joseph D. Spate*
Joseph D. Spate
  Assistant Deputy Solicitor General
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for South Carolina*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,104 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font (with 16-point and 15-point headings).

Dated: September 19, 2024                    */s/ Cameron T. Norris*

## CERTIFICATE OF SERVICE

I e-filed this brief, which will email everyone requiring notice.

Dated: September 19, 2024                    */s/ Cameron T. Norris*