No. 24-12444

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

STATE OF ALABAMA, et al.,
*Plaintiffs-Appellants,*

v.

UNITED STATES SECRETARY OF EDUCATION, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District Of Alabama
No. 7:24-cv-533-ACA (Hon. Annemarie Carney Axon)

# BRIEF OF STATUTORY INTERPRETATION AND EQUALITY LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

KATIE EYER
PROFESSOR OF LAW
RUTGERS LAW SCHOOL
217 N. 5th St., E429
Camden, NJ 08102
Telephone: (856) 225-6960
katie.eyer@rutgers.edu

ROBERT NILES-WEED
*Counsel of Record*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8651
robert.niles-weed@weil.com

*Counsel for Amici Curiae*

*Additional Amici Listed on Next Page*

# ADDITIONAL *AMICI CURIAE*

*Amici* submit this brief solely on their own behalf. Institutional affiliations are provided solely for purposes of identification.

**Kevin Barry**
Professor of Law
Quinnipiac University School of Law

**Maxine Eichner**
Graham Kenan Distinguished Professor Law
University of North Carolina School of Law

**Katie Eyer**
Professor of Law
Rutgers Law School

**Holning Lau**
Willie Person Mangum Distinguished Professor of Law
University of North Carolina School of Law

**Naomi Schoenbaum**
William Wallace Kirkpatrick Dean's Research Professor of Law
George Washington University Law School

**Brian Soucek**
Professor of Law and Chancellor's Fellow
University of California, Davis School of Law

**Deborah Widiss**
John F. Kimberling Professor of Law
Indiana University Bloomington, Maurer School of Law

**Ezra Ishmael Young**
Professor of Law
African American Policy Forum

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that *amici curiae* are unaware of any persons with any interest in the outcome of this litigation other than *amici* represented in this brief and their counsel (listed below), and those identified in the party and *amicus* briefs filed, or to be filed, in this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Counsel for *Amici Curiae* in support of Defendants-Appellees

Niles-Weed, Robert, Weil Gotshal & Manges LLP

*Amici Curiae* in support of Defendants-Appellees

Barry, Kevin (Professor of Law, Quinnipiac University School of Law)

Eichner, Maxine (Graham Kenan Distinguished Professor Law, University of North Carolina School of Law)

Eyer, Katie (Professor of Law, Rutgers Law School)

Lau, Holning (Willie Person Mangum Distinguished Professor of Law, University of North Carolina School of Law)

Schoenbaum, Naomi (William Wallace Kirkpatrick Dean's Research Professor of Law, George Washington University Law School)

Soucek, Brian (Professor of Law and Chancellor's Fellow, University of California, Davis School of Law)

Widiss, Deborah (John F. Kimberling Professor of Law, Indiana University Bloomington, Maurer School of Law)

Young, Ezra Ishmael (Professor of Law, African American Policy Forum)

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................1

ARGUMENT.........................................................................................5

    I.      The Text of Title IX Prohibits Discrimination Based on an Individual's Sexual Orientation or Gender Identity..............................5

    II.    None of the Plaintiffs' Grab-Bag of Arguments Offer a Plausible Alternative Reading of Title IX's Text .................................14

CONCLUSION .....................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) ....................................................5, 15, 17, 19, 22

*Alabama v. Cardona*,
No. 7:24-cv-533, 2024 WL 3607492
(N.D. Ala. July 30, 2024) ............................................................................11, 12

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)....................................................................3, 4, 7-10, 13, 16

*Burrage v. United States*,
571 U.S. 204 (2014) .........................................................................................6, 7, 16

*City of Los Angeles v. Manhart*,
435 U.S. 702 (1978) ...............................................................................................11

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
589 U.S. 327 (2020) ..................................................................................6, 7, 16

*Dep't of Educ. v. Louisiana*,
144 S. Ct. 2507 (2024) .....................................................................................3, 12

*Doe v. Purdue Univ.*,
928 F.3d 652 (7th Cir. 2019) ...............................................................................13

*Eknes-Tucker v. Gov'r of Alabama*,
80 F.4th 1205 (11th Cir. 2023)............................................................................23

*Gentry v. E.W. Partners Club Mgmt. Co.*,
816 F.3d 228 (4th Cir. 2016) ...........................................................................6, 7

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) .....................................................................................6, 8, 16

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) ................................................................................................5

*Kansas v. U.S. Dep't of Educ.*,
No. 24:4041-JWB, 2024 WL 3273285
(D. Kan. July 2, 2024),
*appeal filed*, No. 24-3097 (10th Cir. July 11, 2024) ...................................12, 13

*Kingdomware Techs. v. United States*,
579 U.S. 162 (2016) ...........................................................................................5

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ................................................................................19-21

*Louisiana v. U.S. Dep't of Educ.*,
No. 3:24-CV-563, 2024 WL 2978786
(W.D. La. June 13, 2024)...............................................................................11-13

*Muldrow v. City of St. Louis*,
144 S. Ct. 967 (2024) .......................................................................................9

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........................................................................................14

*Oklahoma v. Castro-Huerta*,
597 U.S. 629, 642 (2022) ................................................................................20

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) ......................................................................................4, 13

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) ........................................................................................16

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ...................................................................................2, 6, 16

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ..........................................................................................7

*Tennessee v. Cardona*,
No. 2:24-072-DCR, 2024 WL 3019146,
(E.D. Ky. June 17, 2024),
*appeal filed*, No. 24-5588 (6th Cir. June 26, 2024).....................................12, 13

## Statutes & Regulations

20 U.S.C. § 1681(a).........................................................1, 4, 5, 9, 13-15

20 U.S.C. § 1686 ..........................................................................4

29 U.S.C. § 705(20)(F) ...............................................................18

88 Stat. 484 ...........................................................................15, 19

34 C.F.R. § 106.10.....................................................................6, 11

89 Fed. Reg. 33474 ......................................................................19

## Other Authorities

William N. Eskridge, Jr., et al., *The Meaning of Sex: Dynamic Words, Novel Applications, & Original Public Meaning*, 119 Mich. L. Rev. 1503 (2021) ...............................................................8

Katie R. Eyer, *Title IX in the Age of Textualism*, 86 Ohio St. L.J. __, (forthcoming 2025) ..........................................................17

*Merriam-Webster's Advanced Learner's English Dictionary* (2008) ......7

*Webster's New Collegiate Dictionary* (1975) ..................................2, 8, 9

*Webster's New Int'l Dictionary of the English Language* (2d ed. 1954) .............2, 9

*Webster's New World Dictionary of the Am. Language, 2d Coll. Ed.* (1970) ..........................................................................8

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are law professors who are experts in the area of statutory interpretation and/or equality law. Although *amici* have otherwise diverse views, they agree that a textualist analysis compels the conclusion that discrimination against individuals because of their lesbian, gay, bisexual, or transgender (LGBT) status is "discrimination" "on the basis of sex," 20 U.S.C. § 1681(a), within the meaning of Title IX.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title IX of the Education Amendments of 1972 provides that "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to *discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Discrimination against individuals because of their sexual orientation or gender identity is "discrimination" "on the basis of sex." Because the statute's plain text compels this conclusion, the Court should affirm the District

---

[1] Under Federal Rule of Appellate Procedure 29, *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

Court's opinion declining to grant a Preliminary Injunction as to 34 C.F.R. § 106.10.[2]

"Discrimination" "on the basis of sex" means adverse differential treatment in which a person's sex was a determinative cause. See, *e.g.*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007) ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."); *Webster's New Int'l Dictionary of the English Language* 745 (2d ed. 1954) (defining discriminate as: "To make a difference in treatment or favor (of one as compared with others)"); *Webster's New Collegiate Dictionary* 1062 (1975) (defining "sex" as "organisms distinguished respectively as male or female"). Thus, at a minimum, Title IX proscribes adverse differential treatment that would not have occurred but-for an individual's "biological" sex.[3]

Each and every instance of anti-LGBT discrimination is "discrimination" "on the basis of sex" in precisely this sense: it would not have occurred but-for the

---

[2] This brief addresses only the question of whether anti-LGBT discrimination is "discrimination" "on the basis of sex" under § 1681(a)—the core question presented by Plaintiffs' challenge to 34 C.F.R. § 106.10.

[3] *Amici* have a diversity of views about the meanings of "sex" and "biological sex"— now and in 1972 (when Title IX was enacted). For the purposes of this brief, however, *amici* use as their starting point the definition of "sex" put forward by the Plaintiffs: "biological sex," *i.e.*, the sex an individual is assigned at birth.

individual's biological sex. For example, a transgender girl[4] who is expelled from school for self-identifying as female would not have been expelled but-for her biological sex. If she had been assigned female at birth, the school would have found her self-identification wholly unobjectionable. So, too, a lesbian teacher who is disciplined for putting a picture of her female partner on her desk has been subjected to "discrimination" that would not have occurred but-for her biological sex—since a male teacher would not be disciplined for identical conduct.

Just four years ago, the Supreme Court reached this very conclusion in the context of Title VII's virtually identical statutory language. See *Bostock v. Clayton Cnty.*, 590 U.S. 644, 655-58 (2020) (concluding that anti-LGBT discrimination is necessarily "discriminat[ion] . . . because of . . . sex" under Title VII).[5] There is no sound reason to reach a contrary result here. See, *e.g.*, *id.* at 650, 656 (using the terms "on the basis of" and "because of" as synonymous terms connoting but-for

_____

[4] Throughout this brief, *amici* use the term "transgender girl" or "transgender woman" to refer to transgender people who have a female gender identity, but were assigned the male sex at birth. "Transgender boy" or "transgender man" are used to refer to transgender people who have a male gender identity, but were assigned the female sex at birth.

[5] *Bostock* remains binding precedent. The Supreme Court's recent order in *Department of Education v. Louisiana*, 144 S. Ct. 2507 (2024), which declined the government's request to grant interim relief from the injunction in that case, did not purport to overrule *Bostock*, or hold it inapplicable to the Title IX context. As laid out herein, both *Bostock* and the text of Title IX itself mandate the conclusion that Title IX prohibits anti-LGBT discrimination.

causation). Thus, both text and precedent compel the conclusion that sexual orientation and gender identity discrimination are prohibited by Title IX.

It is true that the primary intended *purpose* of Title IX was to address discrimination against women in education. But "it is 'the provisions of our laws rather than the principal concerns of our legislators by which we are governed.'" *Id.* at 664 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). And the *means* that Congress chose to achieve its goal was unmistakably individualized in nature—and extends to men and women alike. See 20 U.S.C. § 1681(a) ("*No person* in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to *discrimination* under any education program or activity receiving Federal financial assistance . . . ." (emphasis added)). LGBT men and women are entitled to those individualized protections, just like all other people.

Finally, while Congress included exceptions to the statute's broad coverage, nothing in Title IX's exceptions purports to carve LGBT people out of the protections of the law. See 20 U.S.C. § 1681(a)(1)-(9); 20 U.S.C. § 1686. Nor do such exceptions purport to alter the plain textual meaning of Title IX's primary anti-discrimination provision. Rather, as this Court recognized in *Adams*, those statutory exceptions are "carve-outs" from Title IX's otherwise operative anti-discrimination provision, exempting what would otherwise be unlawful "discrimination" "on the

basis of sex" from the operation of the law. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022).

In short, the Department of Education ("Department") regulation providing that "[d]iscrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation and gender identity," 34 C.F.R. § 106.10, is not only "consistent with law"—it is compelled by Title IX's text. This Court should therefore affirm the District Court's opinion declining to grant a preliminary injunction as to § 106.10.

## ARGUMENT

### I.     The Text of Title IX Prohibits Discrimination Based on an Individual's Sexual Orientation or Gender Identity.

"In statutory construction, we begin with the language of the statute." *Kingdomware Techs. v. United States*, 579 U.S. 162, 171 (2016). "And where the statutory language provides a clear answer, [we] end[] there as well." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000). This Court's analysis should begin and end with the clear text of Title IX.

Title IX provides that "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to *discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). As set out below, each and every instance of sexual orientation and gender identity discrimination *is* "discrimination" "on the basis of sex"—because it is "discrimination" which would not have occurred

but-for the individual's biological sex. See *Safeco*, 551 U.S. at 63 ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."). Moreover, the text compels this conclusion *even if* the narrowest historical understanding of sex (as "biological sex" or "sex assigned at birth") is applied.

The Department thus properly concluded that—absent a statutory exception—such anti-LGBT discrimination violates Title IX. See 34 C.F.R. § 106.10 ("Discrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation, and gender identity.").

1.     This conclusion—that anti-LGBT discrimination is proscribed by Title IX—follows ineluctably from the statutory language. Title IX's key operative phrase—"on the basis of"—plainly connotes but-for causation. See *Safeco*, 551 U.S. at 63 ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."); *Burrage v. United States*, 571 U.S. 204, 213 (2014) ("based on" connotes "but-for" causation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (indicating that "based on," "because of," "by reason of" and other cognate terms are all plain-language ways of legislating but-for causation); see also *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 335 (2020) (describing the Supreme Court's *own* use of the phrase "on the basis of race" in a 1975 case as "strongly suggestive of a but-for causation standard"); see generally *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 236 (4th Cir. 2016) (defining "'on the basis

of' as . . . [']based on'") (quoting *Merriam-Webster's Advanced Learner's English Dictionary* (2008)).

In fact, "on the basis of" is just one of a host of synonymous causal terms, including "because of," "based on," "by reason of," and "on the grounds of," that the Supreme Court has used interchangeably—all of which it has found to connote "but for" causation. See, *e.g.*, *Bostock*, 590 U.S. at 650, 656 (using "on the basis of . . . sex" as a synonym for "because of . . . sex" and describing both as "incorporat[ing] the simple and traditional standard of but-for causation") (internal quotation marks omitted); *Burrage*, 571 U.S. at 213 ("because of," "based on," "results from" and "by reason of" all connote "but-for" causation); *Comcast*, 589 U.S. at 332, 335 (the phrase "on the basis of," including when used by the courts, connotes but-for causation); see also *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring) ("'on the ground of' . . . means 'because of'" which "invoke[s] the simple and traditional standard of but-for causation") (internal quotation marks omitted).

Indeed, the Supreme Court has gone so far as to suggest that the "ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated . . . includ[ing] when it comes to federal antidiscrimination laws." *Comcast*, 589 U.S. at 332. Title IX—which was enacted contemporaneously with statutes that that the

Court has held incorporate the "but for" standard, and which uses synonymous causal language—supplies no reason for deviating from this presumption. See, *e.g.*, *Gross*, 557 U.S. at 176 (Age Discrimination in Employment Act, enacted in 1967); *Bostock*, 590 U.S. at 650, 656 (Title VII, enacted in 1964).

The second key term used by Title IX is "sex." At the time of Title IX's enactment—and today—"sex" was often defined as "either of two divisions of organisms distinguished respectively as male or female." *Webster's New Collegiate Dictionary* 1062 (1975); see *Webster's New World Dictionary of the Am. Language*, *2d Coll. Ed.* 1305 (1970) (defining "sex" as "the character of being male or female"). The common understanding of sex thus connotes at least "biological sex," *i.e.*, an individual's classification as male or female at birth.[6] As set out below, contrary to Plaintiffs' attempts to muddy the waters on this issue, no more expansive understanding of sex is required in order to conclude that anti-LGBT discrimination is proscribed by Title IX.

---

[6] There is some evidence that, at the time that Title IX was adopted, "sex" was understood to include concepts such as sexual orientation and gender identity. See, *e.g.*, William N. Eskridge, Jr., et al., *The Meaning of* Sex*: Dynamic Words, Novel Applications, & Original Public Meaning*, 119 Mich. L. Rev. 1503, 1550-57 (2021). Because nothing turns on adopting such a broader definition, *amici* limit their arguments herein to the Plaintiffs' definition of sex: "biological" sex, *i.e.*, the sex assigned at birth.

Finally, the meaning of "discriminate" is similarly straightforward: "'Discriminate against' means treat worse, here based on sex." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (citing *Bostock*, 590 U.S. at 657-58, 681); see also *Webster's New Int'l Dictionary of the English Language* 745 (2d ed. 1954) (defining discriminate as: *"To make a difference in treatment or favor (of one as compared with others)"); *Webster's New Collegiate Dictionary* 326 (1975) (defining "discriminate" as: "to make a difference in treatment or favor on a basis other than individual merit").

Thus, it violates Title IX's core proscription on "discrimination" "on the basis of sex," 20 U.S.C. § 1681(a), to "make a difference in treatment" or "treat a person worse" than another based on that person's biological sex. Stated otherwise, if the person would have been subjected to more favorable treatment by an educational entity "but for" their biological sex, Title IX has been violated.

2. In each and every instance of anti-LGBT discrimination, an individual has been subjected to "discrimination" (treated worse) "on the basis of" (in a manner that would not have occurred but-for) their "sex" in precisely this sense. As the Supreme Court recognized in *Bostock*, "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex." 590 U.S. at 660. This is because when an entity engages in anti-LGBT discrimination, it "intentionally treats a person worse because of sex—such as by

firing the person for actions or attributes it would tolerate in an individual of another sex." *Id.* at 658.

Thus, for example, a transgender girl who is suspended for wearing a skirt to school has been subjected to discrimination "on the basis of sex," since the school would not have suspended a person assigned female at birth for wearing a skirt to school. So, too, a school that expels a student for self-identifying as a transgender boy has discriminated "on the basis of sex," since all of the actions the school objects to—such as the student's identification as male or their masculine appearance—are actions that the school would not object to in an individual assigned male at birth.

Similarly, students who are subjected to discrimination because of their sexual orientation also necessarily experience discrimination "on the basis of sex." Thus, for example, a school that bars a boy from the prom for attempting to bring a boy as his date has engaged in discrimination "on the basis of sex," since the school would not bar a girl for identical conduct. So, too, a female teacher who is disciplined for putting a picture of her female partner on her desk at school has experienced discrimination "on the basis of sex" since a male teacher would not be disciplined for doing the same thing.

Importantly, the statutory text mandates this conclusion *even if* the narrowest historical definition of sex (biological sex) is used. The Department did not need to—and, in fact, did not—*define* "sex" *to mean* "sexual orientation" or "gender

identity." Rather, it simply recognized that students and other stakeholders who are subjected to anti-LGBT educational discrimination are subjected to discrimination "on the basis of *sex*," as that term was commonly defined at the time of Title IX's enactment. See 34 C.F.R. § 106.10 ("Discrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation, and gender identity."). That is, they are treated differently because of their status as a biological male or biological female.[7]

Thus, under Title IX's plain language, anti-LGBT discrimination is proscribed. When an educational entity discriminates against a person because of that person's sexual orientation or gender identity, the discrimination would not have occurred "but for that person's sex." *City of Los Angeles v. Manhart*, 435 U.S. 702, 711 (1978).

3.     As the District Court in this matter recognized, the Plaintiffs do not offer any meaningful *textual* response to the above reasoning. See *Alabama v. Cardona*, 7:24-

---

[7] Some of the arguments made in related matters have appeared to imply that LGBT people have no biological sex at all and thus are not covered by Title IX. See, *e.g.*, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-563, 2024 WL 2978786, at *12 (W.D. La. June 13, 2024) (stating that Title IX prohibits only "discrimination against biological males and females" and treating this as conclusively refuting the possibility that anti-LGBT discrimination is proscribed). This claim is logically bizarre and obviously false. Just like all other people, LGBT people are assigned a sex at birth (what Plaintiffs refer to as "biological sex"). They are protected against "discrimination . . . on the basis of [biological] sex," just like non-LGBT people are.

cv-533, 2024 WL 3607492, at *16 (N.D. Ala. July 30, 2024). But Plaintiffs urge this Court to follow instead *other* lower courts, which have largely ignored Title IX's text, and instead improperly resorted to emphasizing the purpose of Title IX.[8] As such courts have (accurately, but unavailingly) suggested, the purpose of Title IX was to ensure equality for women. See, e.g., *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146, at *3, *13 (E.D. Ky. June 17, 2024), *appeal filed*, No. 24-5588 (6th Cir. June 26, 2024); *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *10-11 (D. Kan. July 2, 2024), *appeal filed*, No. 24-3097 (10th Cir. July 11, 2024); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-563, 2024 WL 2978786, at *12 (W.D. La. June 13, 2024). These courts have drawn on this purpose to imply that the statute requires only *group*-level equality between the sexes, rather than individualized protection from sex-based discrimination, or perhaps extends to the protection of only biological women. See, *e.g.*, *Tennessee*, 2024 WL 3019146,

---

[8] Perhaps recognizing the analytical weakness of the court decisions that they are urging this Court to rely on, Plaintiffs largely do not even describe their reasoning. See, *e.g.,* Pl. Br., Doc. 57 at pgs. 30-31, 35. As set out above, that reasoning—to the extent it exists at all—is inconsistent with modern textualist approaches to statutory interpretation. As noted *supra* note 5, Plaintiffs also misread the ruling of the Supreme Court in *Department of Education v. Louisiana*, which did not purport to rule on the applicability of *Bostock* to Title IX, or to substantively address the meaning of § 1681(a) in the first instance. See generally *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507 (2024).

at \*3, \*13; *Kansas*, 2024 WL 3273285, at \*10-11; *Louisiana*, 2024 WL 2978786, at \*12.

But "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale*, 523 U.S. at 79. And here, Congress unequivocally selected an *individualized* rather than group-based means to remedy sex discrimination—and enacted a statute that protects men and women alike. Thus, Title IX's central anti-discrimination proscription specifies that: "No *person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (emphasis added). This language has an unmistakably individual-level focus, rather than a group-level focus, and protects *all* people (not only "biological women") from discrimination "on the basis of sex." See *Bostock*, 590 U.S. at 658-59 (rejecting virtually identical arguments regarding Title VII, and observing that Congress could have, but did not, use language connoting only group-level equality, or protecting only women); see also *Doe v. Purdue Univ.*, 928 F.3d 652, 669-70 (7th Cir. 2019) (Barrett, J.) (holding that an individual male student who allegedly was treated differently than his female accuser in a sexual assault investigation had stated a Title IX claim).

Thus, Title IX's language adopts an individual guarantee against sex discrimination for all people, rather than group-level protections against inequality for women. See 20 U.S.C. § 1681(a). Its plain language mandates that *all* people— men and women, LGBT people and non-LGBT people alike—are entitled as *individuals* to be free from harmful treatment that would not have occurred but-for their biological sex. And this, as set out above, necessarily entails the conclusion that anti-LGBT discrimination is proscribed.

* * *

The text of Title IX unambiguously prohibits discrimination on the basis of sexual orientation and gender identity. Such discrimination is "discrimination" "on the basis of sex" within the meaning of those terms at the time of Title IX's enactment. 20 U.S.C. § 1681(a). As the Supreme Court has repeatedly reiterated, where the text of a statute is unambiguous, that is the end of the matter, and the courts must follow the words that Congress passed. See, *e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 160, 171-72 (2021). This Court should therefore affirm the District Court's opinion declining to grant a Preliminary Injunction as to § 106.10.

## II. None of Plaintiffs' Grab-Bag of Arguments Offers a Plausible Alternative Reading of Title IX's Text

Plaintiffs do not offer any meaningful competing argument for how to understand the plain language of Title IX's prohibition on "discrimination" "on the basis of sex." Nor do they seek to deny—nor could they logically—that anti-LGBT

discrimination would not have happened but-for the individual's biological sex. Instead, Plaintiffs rely on a grab-bag of alternative arguments, none of which offer a plausible competing account of Title IX's statutory language.

1. The principal *textual* argument offered by Plaintiffs is that Title IX's statutory *exceptions* demonstrate that Title IX does not "incorporate[] *Bostock*'s mechanical reasoning about but-for causation."[9] See Pl. Br., Doc. 57 at pgs. 40-41. As set out below, this argument both mischaracterizes the source of the but-for principle—which did not originate in *Bostock*—and gets it exactly backwards in terms of the implications of Title IX's statutory exceptions. As set out below, such exceptions are only necessary *because* Title IX's primary anti-discrimination mandate adopts an individualized but-for approach—and the existence of such exceptions thus bolsters, not undermines, this reading of § 1681(a).

As an initial matter, Plaintiffs' argument mischaracterizes the source of the but-for principle, which did not originate in *Bostock*. Rather, as set out in Part I, *supra*, the Supreme Court has recognized over the course of many years that

_____

[9] The statutory exceptions in Title IX are set out primarily at 20 U.S.C. § 1681(a)(1)-(9). This Court has also read § 1686 as a "carve-out" from Title IX's otherwise operative standards. *Adams*, 57 F.4th at 811. Finally, the Javits Amendment expressly provides the Department of Education with authority to adopt "reasonable provisions considering the nature of particular sports." See Education Amendments of 1974 (Title VIII), Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974) (Javits Amendment).

statutory terms "on the basis of," "based on," "because of," and other cognate terms all—by their plain language—connote but-for causation.[10] Indeed, the Court has recognized that this plain meaning ("but for causation") attaches to cognate causal language across a wide array of contexts, ranging from employment discrimination, to criminal law, to credit reporting. See, *e.g.*, *Gross*, 557 U.S. at 176 (Age Discrimination in Employment Act); *Bostock*, 590 U.S. at 650, 656 (Title VII); *Burrage*, 571 U.S. at 213 (Controlled Substances Act); *Safeco*, 551 U.S. at 63 (Fair Credit Reporting Act). It thus should require powerful evidence to conclude that Congress sought to depart from the well-established plain meaning of the term "on the basis of" here. *Cf. Comcast*, 589 U.S. at 332 (stating that the "ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated . . . includ[ing] when it comes to federal antidiscrimination laws").

But Title IX's statutory exceptions offer no such evidence at all. Indeed, to the contrary, such exceptions are necessary only *because* Title IX otherwise entitles

---

[10] For this reason, Plaintiffs' Spending Clause argument also fails. There is nothing ambiguous about Title IX's causation language ("on the basis of"), which plainly adopts a "but for" causation standard. And the further fact that an *application* of that standard might not have been foreseen by the states or Congress "does not demonstrate ambiguity. It demonstrates breadth.'" *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212 (1998) (rejecting a very similar argument about the application of the Americans with Disabilities Act to prisoners).

individuals to be free from differential treatment on the basis of their biological sex—even in contexts that society might otherwise adjudge to be benign. Thus, Congress, over a course of years, felt the need to adopt a series of exceptions— addressing everything from sex-separated living facilities, to sex-based admissions at private colleges, to mother-daughter/father-son events—precisely *because* such activities by regulated entities would otherwise be prohibited by Title IX's primary anti-discrimination mandate. See, *e.g.*, Katie R. Eyer, *Title IX in the Age of Textualism*, 86 Ohio St. L.J. __, at 8 (forthcoming 2025), available at https://ssrn.com/abstract=4941559 (observing that "[g]radually, a variety of areas that Congress perceived as harmless or benign sex discrimination were carved out of the scope of the law—ensuring that some areas of sex separation in American education could remain lawful").

Indeed, this Court has already recognized, in *Adams*, that such exceptions are "carve-outs" from § 1681(a)'s otherwise operative scope—they do not define the scope of § 1681(a)'s anti-discrimination mandate in the first instance. See *Adams*, 57 F.4th at 811. Thus, this Court in *Adams* stated that "*[n]otwithstanding* Title IX's general prohibition on sex discrimination [in § 1681(a)], the statute provides an express *carve-out* with respect to living facilities [in § 1686]." *Id.* (emphasis added). On Plaintiffs' (irrational) reasoning, such a discussion of § 1686 would be wholly unnecessary, since § 1681(a) would not apply in the first instance.

Thus, the argument that Title IX's statutory exceptions compel the conclusion that *§ 1681(a)* does not reach various forms of sex differentiation, see Pl. Br., Doc. 57 at pg. 41, gets it exactly backwards. Such statutory exceptions were needed *only because* § 1681(a) would otherwise prohibit such institutional conduct.

Moreover, plaintiffs have offered no explanation at all of how their exception-based understanding is a plausible reading of *§ 1681(a)*'s text. As set out above, that text is clear and unambiguous and indeed adopts an individualized "but for" approach to sex discrimination under the law. The separate exceptions do not alter that unambiguous text. Thus, Plaintiffs' arguments based on Title IX's statutory exceptions lack merit.[11]

2. Plaintiffs also seek to rely on Title IX's *regulatory* exceptions (*i.e.*, those exceptions in the regulations which lack any clear statutory counterpart) to argue that such regulatory exceptions should inform the Court's understanding of § 1681(a)'s primary anti-discrimination mandate.[12] See Pl. Br., Doc. 57 at pgs. 18-

---

[11] Importantly, where Congress wished to adopt a statutory exception to exclude LGBT people from coverage, it knew how to do so. Cf. 29 U.S.C. § 705(20)(F) (specifying that *Rehabilitation Act's* anti-discrimination mandate "does not include . . . gender identity disorders not resulting from physical impairments"). Congress did not adopt such an exclusion in Title IX, and thus LGBT people are entitled to the same protections against "discrimination" "on the basis of sex"—and subject to the same limited exceptions—as all others.

[12] In making this argument, Plaintiffs attempt to group the regulatory exceptions for sex-separated athletic teams, and those dealing with sex-separated restrooms, with

19, 42. Thus, Plaintiffs suggest that the regulatory exceptions, which in their historic form allow certain types of differential treatment and/or sex separation of boys and girls, define the scope of § 1681(a)'s primary anti-discrimination mandate. *Id.* But this again gets things exactly backwards. As the Supreme Court recently held in *Loper Bright Enterprises v. Raimondo*, "statutes . . . have a single, best meaning," which *courts*, not agencies must define. 144 S. Ct. 2244, 2266 (2024). It is that "single best meaning" *of the statute* which must control the permissible regulations, not the other way around. *Id.*

As laid out above, it is not only the *best* interpretation but the *only* plausible reading of § 1681(a) that it adopts an individualized protection ("no person") against adverse differential treatment ("discrimination") that would not have occurred "but for" ("on the basis of") sex. Thus, regulatory exceptions that do not meet this

---

those lacking any statutory basis. See Pl. Br., Doc. 57 at pg. 42. But this Court has already held in *Adams* that the statute itself (§ 1686) excludes sex-separated restrooms from Title IX's "general prohibition on sex discrimination." *Adams*, 57 F.4th at 811. And the Javits Amendment to Title IX provides explicit statutory authorization for the agency to adopt "reasonable provisions considering the nature of particular sports"—authority the agency relied on to leave existing athletics regulations entirely untouched in the current rulemaking. See Javits Amendment, § 844, 88 Stat. 484 (1974); *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474, 33817 (Apr. 29, 2024) (codified at 34 C.F.R. pt. 106). Thus, Plaintiffs' extensive reliance on the new rule's purported impact on athletics and restrooms is misdirection. Neither athletics (by the plain terms of the rule itself) nor restrooms (under *Adams*) will be affected in this Circuit.

standard are inconsistent with the statute—not the other way around. The fact that the agency may have once ignored clear statutory text—and even if Congress itself may have acceded in this practice—cannot supersede the only thing that is the law: *i.e.*, the language of Title IX. See, *e.g., Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("The Court may not 'replace the actual text with speculation as to Congress' intent.'"). Plaintiffs' reliance on regulations that may be inconsistent with the statutory language to *redefine the statutory language* is an impermissible attempt to have the tail wag the dog.

One need go no further than this specific case to reject Plaintiffs' clearly erroneous regulation-based argument. But it is worth observing that such an argument would, if adopted by this Court, *also* have wide-ranging implications for numerous other contexts, and would lead to perverse results. Rather than asking in the first instance what a statute means according to its text—and measuring a regulation's validity against that statutory meaning—Plaintiffs would have this court look to the *agency*'s interpretation to define what the *statute* means. See Pl. Br., Doc. 57 at pgs. 18-19, 42. Under such an approach, the agency's interpretation—even where facially inconsistent with statutory text—would be entitled not only to deference but to controlling weight in understanding what the statute required. *Id.* This goes beyond even what *Chevron* once allowed, and is exactly the type of abdication of judicial responsibility that *Loper Bright* now forbids. See *Loper Bright*,

144 S. Ct. at 2257 (overruling *Chevron* and reiterating that "it is emphatically the province and duty of the *judicial department* to say what the law is") (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

3. Plaintiffs' final argument seeks to rely on this Court's precedents to argue that—regardless of its consistency with § 1681(a)'s plain text—§ 106.10 must be enjoined as a matter of Circuit precedent. Thus, Plaintiffs argue that "*Adams* forecloses § 106.10's interpretation of Title IX." Elsewhere, they suggest that "this Court has repeatedly held that *Bostock* does not extend to laws other than Title VII"—implying that this requires that the Department lose this case. Pl. Br., Doc. 57 at pg. 40. But nothing in *Adams* contravenes the conclusion that anti-LGBT discrimination is "discrimination" "on the basis of sex." And Plaintiffs both mischaracterize this Court's treatment of *Bostock*, as well as misunderstand the implications even if *Bostock* does not apply.

As an initial matter, nothing in *Adams* conflicts with the conclusion that anti-LGBT discrimination is "discrimination" "on the basis of sex"—the only legal principle set out in § 106.10. Indeed, the Department (like *amici* herein) proceeded on the assumption that "'sex' in Title IX 'unambiguously' refers to 'biological sex' and not 'gender identity,'" exactly as *Adams* provides. Nonetheless, as set out above, it *is* "discrimination" "on the basis of [biological] sex" to engage in anti-LGBT discrimination.

*Adams* does not contradict this. Rather, *Adams* dealt, in this Court's words, with one of Title IX's "carve-outs," i.e., places where "Title IX's general prohibition on sex discrimination" did *not* apply. *Adams*, 57 F.4th at 811. But § 106.10 does not affect anything about the operation of Title IX's carveouts.  Rather, the Department expressly *disclaimed* any changes to Title IX's *statutory* carveouts (continuing to allow such carveouts to operate on the basis of "biological" sex). And with respect to Title IX's regulatory carveouts, the Department's changes were effectuated via § 106.31(a)(2) (which deals with regulatory exceptions), *not* § 106.10 (which deals with the primary anti-discrimination standard that applies in the absence of an exception).

As to Plaintiffs' second statement that "this Court has repeatedly held that *Bostock* does not extend to laws other than Title VII," this statement is both overstated and, in any event, largely irrelevant. This Court found *Bostock* to be inapplicable in *Adams not* because *Bostock*'s reasoning does not apply to Title IX at all but because "[t]his appeal centers on the converse of [the *Bostock* situation]— whether discrimination based on biological sex necessarily entails discrimination based on transgender status." *Adams*, 57 F.4th at 809. Again, this holding may be relevant to the operation of Title IX's exceptions, but it is not relevant to the interpretation of Title IX's primary anti-discrimination provision.

Finally, this Court's decision in *Eknes-Tucker did* hold *Bostock*'s reasoning inapplicable to the Equal Protection context. *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023). But the Equal Protection clause is a legal provision with entirely distinctive wording from either Title VII *or* Title IX—and one that predated both provisions by close to a century. In contrast, the primary operative provisions of Title IX and Title VII have virtually identical wording—and were enacted less than a decade apart.[13]

But perhaps more importantly, Plaintiffs misapprehend the significance of *Bostock* to this case. Even had *Bostock* never been decided, Title IX's statutory language *on its own* would compel the conclusion that anti-LGBT discrimination is proscribed. The meaning of the words "No person," "discrimination," and "on the basis of sex" are all plain and largely undisputed. Indeed, Plaintiffs have offered no plausible account of what these words could mean *other* than an individual protection against differential treatment that would not have occurred "but for" a student or stakeholder's sex.

The further conclusion that results—that anti-LGBT discrimination is proscribed—arises simply from basic logic, with or without *Bostock*. LGBT students

---

[13] It is true that Title IX has a greater number of "carveouts" that permit sex separation or sex differentiation than Title VII. But as described *supra* those "carveouts" are necessary only because § 1681(a) otherwise *prohibits* such separation or differentiation.

and stakeholders *are* treated differently based on their biological sex when they are subject to anti-LGBT discrimination. This can be seen simply by considering the counterfactual in which they were to do the *very same thing* (for example, date a boy, wear a skirt, or use a female name) but with a different sex assigned at birth. It takes no judicial precedent to see that in each of those instances, "discrimination" "on the basis of [biological] sex" occurs.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's denial of an award of a Preliminary Injunction as to § 106.10.

Respectfully Submitted,

Dated:  October 25, 2024

*/s/ Robert Niles-Weed*
Robert Niles-Weed

Katie Eyer
Professor of Law
RUTGERS LAW SCHOOL
217 N. 5th St., E429
Camden, NJ 08102
Telephone: (856) 225-3960
katie.eyer@rutgers.edu

Robert Niles-Weed
*Counsel of Record*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8651
robert.niles-weed@weil.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 5,934 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

Dated: October 25, 2024       */s/ Robert Niles-Weed*
Robert Niles-Weed

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: October 25, 2024

*/s/ Robert Niles-Weed*
Robert Niles-Weed

*Counsel for Amici Curiae*