No. 24-12444

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

STATE OF ALABAMA, *et al.*,
*Plaintiffs-Appellants,*

v.

UNITED STATES SECRETARY OF EDUCATION, *et al.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Alabama
(7:24-cv-00533-ACA)

**BRIEF OF NATIONAL WOMEN'S LAW CENTER, EQUALITY CALIFORNIA, GLSEN, IF/WHEN/HOW: LAWYERING FOR REPRODUCTIVE JUSTICE, NATIONAL NETWORK TO END DOMESTIC VIOLENCE, PEOPLE FOR THE AMERICAN WAY, PLANNED PARENTHOOD FEDERATION OF AMERICA, PUBLIC COUNSEL, SIECUS: SEX ED FOR SOCIAL CHANGE, SISTERREACH TN & SISTERREACH ILLINOIS, THE TREVOR PROJECT, THE WOMXN PROJECT, TOM HOMANN LGBTQ+ LAW ASSOCIATION, WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, AND WOMEN'S LAW PROJECT, AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Anya Marino
Shiwali Patel
Emily Martin
Elizabeth E. Theran
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005

Madeline Gitomer
Kaitlyn Golden
Sunu P. Chandy
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
mgitomer@democracyforward.org

*Counsel for* Amici Curiae

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENTS

Under Federal Rule of Civil Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the undersigned certifies that *amici curiae* are unaware of any persons with any interest in the outcome of this litigation other than *amici curiae* represented in this brief and their counsel listed below, and those identified in the party and *amicus* briefs filed, or to be filed, in this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Counsel for *Amici Curiae* in support of Defendants-Appellees

Chandy, Sunu P.

Gitomer, Madeline

Golden, Kaitlyn

Marino, Anya

Martin, Emily

Patel, Shiwali

Theran, Elizabeth E.

*Amici Curiae* in support of Defendants-Appellees

Equality California

GLSEN

If/When/How: Lawyering for Reproductive Justice

National Network to End Domestic Violence

National Women's Law Center

People For the American Way

Planned Parenthood Federation of America

Public Counsel

SIECUS: Sex Ed for Social Change

SisterReach TN & SisterReach Illinois

The Trevor Project

The Womxn Project

Tom Homann LGBTQ+ Law Association

Women's Bar Association of the District of Columbia

Women's Law Project

The National Women's Law Center, Equality California, GLSEN, If/When/How: Lawyering for Reproductive Justice, National Network to End Domestic Violence, People For The American Way, Planned Parenthood Federation of America, Public Counsel, SIECUS: Sex Ed for Social Change, SisterReach TN & SisterReach Illinois, The Trevor Project, The Womxn Project, Tom Homann LGBTQ+ Law Association,

Women's Bar Association of the District of Columbia, and Women's Law Project are non-profit entities and have no parent corporations. No publicly owned corporation owns 10% or more of the stocks of any of these organizations.

/s/ *Madeline Gitomer*

Attorney of record for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENTS ................................................................. i

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES ................................................................ vi

INTEREST OF AMICI CURIAE ........................................................... 1

STATEMENT OF THE ISSUE ............................................................. 3

SUMMARY OF THE ARGUMENT ....................................................... 3

BACKGROUND .................................................................................. 6

ARGUMENT ...................................................................................... 10

I.      Title IX's Text, Purpose, and Legislative History, Along With
Established Precent, All Support Upholding the Rule ........................... 10

      A.      The district court decision aligns with Title IX's text
and purpose ............................................................................. 10

      B.      The district court decision is consistent with
established precedent in Title IX and analogous case law ..... 13

II.     Barring Transgender Students From Using Facilities Aligned
with Their Gender Identity Harms Transgender Students, and
Policies that Allow Students to Use Gender-Aligned Facilities Do
Not Harm Cisgender Students ............................................................ 21

      A.      Excluding transgender students from school facilities
aligned with their gender identity harms them ..................... 22

      B.      Transgender-inclusive locker and restroom policies
do not harm other students ................................................... 29

CONCLUSION ................................................................................... 34

CERTIFICATE OF COMPLIANCE.......................................................... 35

CERTIFICATE OF SERVICE................................................................. 36

# TABLE OF AUTHORITIES

**Cases**

*A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023)......................................................................................19, 20, 32

*Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) ................................................................... 9, 16

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ..............4, 5, 11, 14, 15, 16

*Corbitt v. Secretary of the Alabama Law Enforcement Agency*, 115 F.4th 1335 (11th Cir. 2024) ............................................................... 18

*Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (2018) .......6, 20, 21, 24, 28

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023) .. 18

*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001) ....................................................................... 15

*Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)............................................................................ 20, 32

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005)...................... 11

*Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243 (2d Cir. 1995) ........ 15

*North Haven Board of Education v. Bell*, 456 U.S. 512 (1982) ................ 10

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) ....................... 11

*Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020). ......................... 21

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020)....................... 6

*Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022) ............... 15

*Sauls v. Pierce Cnty. Sch. Dist.,* 399 F.3d 1279 (11th Cir. 2005) ............. 11

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017).........................................................................19, 20, 24

**Statutes**

20 U.S.C. § 1681(a) ............................................................................ 10, 14

**Rules & Regulations**

34 C.F.R. § 106.44(f)(1) .......................................................................... 25

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024)..............................................3, 4, 6, 7, 8, 26, 33

**Other Authorities**

118 Cong. Rec. 5111 (1972) .................................................... 12

Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf .................................... 31

Amber Jayanth, *Transgender Butler County man says group beat him up over restroom use*, Fox19 (July 8, 2022), https://www.fox19.com/2022/07/08/transgender-butler-county-man-says-group-beat-him-up-using-wrong-restroom ..................................................

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y (2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4bd4d27fbbcb.pdf........................................ 30

Jo Yurcaba, *Study Establishes First Causal Link Between Anti-Trans Laws and Suicide Attempts*, NBC News (Sept. 30, 2024), https://www.nbcnews.com/nbc-out/out-news/anti-trans-laws-suicide-attempts-teens-increase-rcna172906 ..................................... 27

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013). .................................... 24

Joseph Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf...............................................................23, 28, 29

Kiara Alfonseca, *Transgender Student Alleges Assault After Using Bathroom, Family Calls For Charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216 ............................ 25

Matt DeRienzo, *Woman mistaken for transgender harassed in Walmart*

*bathroom*, News Times (May 16, 2016); https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php ................................................... 26

Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf ...................................................... 6

Nicolas Suarez et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students – Youth Risk Behavior Survey, United States, 2023*, Morbidity & Mortality Wkly. Rep. (Sept. 10, 2024), https://www.cdc.gov/mmwr/volumes/73/su/su7304a6.htm#:~:text=In%20 2023%2C%203.3%25%20of%20U.S.,and%202.2%25%20identified%20as %20 ................................................................................................ 23, 24

Ryan Watson et al., *LGBTQ State Policies: A Lever for Reducing SGM Youth Substance Use and Bullying*, Drug and Alcohol Dependence (April 1, 2021), https://doi.org/10.1016/j.drugalcdep.2021.108659 .......... 5

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equal. (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ............................................................................................... 24

Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf ........................................................................................ 13

Wilson Lee et al., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, Nature Hum. Behavior (Sept. 26, 2024) .................. 3, 27, 28, 29

# INTEREST OF AMICI CURIAE[1]

This brief is filed by *Amici* National Women's Law Center and 14 additional organizations committed to gender justice, including both the rights of survivors and LGBTQI+ people.

National Women's Law Center (NWLC) is a nonprofit legal organization dedicated to advancing and protecting women's legal rights and the right to be free from sex discrimination. Since 1972, NWLC has worked to secure equal opportunity in education for women and girls through enforcement of Title IX, the Constitution, and other laws. NWLC has led briefs in numerous cases affirming that protections against sex discrimination include protections for LGBTQI+ students. NWLC is committed to ensuring all women and girls, including transgender women and girls, are protected from sexual violence.

Additional *amici* include:

> Equality California
> GLSEN
> If/When/How: Lawyering for Reproductive Justice
> National Network to End Domestic Violence
> People For the American Way

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund this brief, and no person other than *amici curiae*, their members, and their counsel contributed money to fund this brief. All parties have consented to the filing of this brief.

Planned Parenthood Federation of America
Public Counsel
SIECUS: Sex Ed for Social Change
SisterReach TN & SisterReach Illinois
The Trevor Project
The Womxn Project
Tom Homann LGBTQ+ Law Association
Women's Bar Association of the District of Columbia
Women's Law Project

## STATEMENT OF THE ISSUE

The issue before the Court is whether the district court properly exercised its discretion in denying plaintiffs' motion for a preliminary injunction, finding they were unlikely to succeed in demonstrating that the challenged provisions of the April 2024 Title IX regulations were unlawful, and that plaintiffs failed to demonstrate irreparable harm.

## SUMMARY OF THE ARGUMENT

Transgender students in America today are under attack from all directions. At school, they face higher rates of discrimination and harassment, including higher rates of sexual and other forms of violence, than their cisgender counterparts. And despite this reality, state lawmakers, including those in Appellant states, have enacted dozens of laws specifically targeting transgender students that strip them of protections needed to be safe in school, including laws preventing access to gender-aligned bathrooms. These laws have been found to cause an increased risk of harm, including an increased risk of suicide for transgender youth.[2] Simply put, repeated attacks on transgender students

---

[2] Wilson Lee et al., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA,* Nature Hum. Behavior (Sept. 26, 2024).

from a range of fronts—including their own state legislatures—are taking a dangerous and potentially even life-threatening toll on them.

Recognizing the enormous risk of harm to transgender students in school, the Department of Education (the "Department") promulgated the final rule at issue. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024) (the "Rule"). The Rule clarifies the scope of prohibited discrimination under Title IX, recognizing that discrimination because of sex necessarily includes discrimination tied to sexual orientation and gender identity. Among other things, the Rule clarifies that schools cannot discriminate on the basis of sex by treating students in a manner inconsistent with their gender identity. Thus, schools must permit transgender students to use school facilities, such as locker rooms and restrooms, consistent with their gender identity. 89 Fed. Reg. at 33820.

The Rule aligns with Title IX's statutory text and the statute's history and broad purpose. It also comports with numerous court decisions addressing the scope of sex discrimination under Title IX—decided both before and after the Supreme Court's ruling in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* held that the federal protections against sex

4

discrimination include protections against discrimination based on sexual orientation and gender identity under an analogous workplace civil rights law, Title VII. *Id.* at 693. In promulgating the Rule, the Department thoroughly considered this Supreme Court precedent, other Title IX precedents, the statutory text and history, concerns from commenters, and a lengthy record.

Further, the Rule is critical to ensuring that transgender students are safe from sex discrimination at school. Repeated instances of sex discrimination, including denial of access to gender-aligned restrooms, exposes transgender youth to a range of harms, including negatively impacting their physical and mental health and leading to lower educational outcomes. Research confirms that when transgender students live in states with laws and policies that protect transgender youth, they are less likely to experience bullying.[3] Moreover, no credible evidence suggests that transgender students' use of restrooms or locker rooms consistent with their affirmed gender injures *any* student. Indeed, hundreds of school districts have adopted non-discrimination policies that

---

[3] Ryan Watson et al., *LGBTQ State Policies: A Lever for Reducing SGM Youth Substance Use and Bullying*, Drug and Alcohol Dependence (April 1, 2021), https://doi.org/10.1016/j.drugalcdep.2021.108659.

allow transgender students to use restrooms aligned with their gender identity while maintaining the privacy and safety of all students.[4]

## BACKGROUND

In developing the Rule, the Department carefully evaluated a range of views, including allegations that nondiscrimination policies could impact some students' privacy or safety interests. *See* 89 Fed. Reg. at 33817-18. The Department addressed the comments in depth, including discussion of relevant research and case law. *Id.* at 33818-21. The Department considered Appellants' concerns, explaining in detail why protections against discrimination based on sexual orientation and gender identity fit with Title IX's text and purpose, *see, e.g.*, *id.* at 33804-06, 33809-10. The Department also correctly concluded that "the mere presence of a transgender person in a single-sex space" does not compromise "anyone's legitimate privacy interest" or pose a safety risk to cisgender students. *Id.*

---

[4] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4-5 (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf. Indeed, federal courts of appeal have held that such policies do not conflict with ensuring the privacy and safety of all students. *See, e.g., Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ; *see also Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (3d Cir. 2018).

at 33820.

There is a complete lack of evidence that ensuring transgender students' access to facilities aligning with their gender identity would compromise cisgender students' safety or privacy. *Id.* Nonetheless, the Department identified potential nondiscriminatory measures to address commenters' safety and privacy worries. *Id.* The Department highlighted that sex harassment, including sexual violence, is already illegal and schools can and should take steps to prevent and address harassment for all students. And the Department noted that recipients of federal funds could offer "single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.* The Department also considered comments submitted by sexual-violence-prevention experts urging that, to best safeguard student safety, the Department should confirm that transgender students should not be excluded from school facilities based on their gender identity. *Id.* at 33808-09.

The Department also discussed the evidence of harm to transgender students when exclusionary policies are in place. *Id.* at 33818. The Department evaluated the concerns of commenters "from more than 40 states in all regions" of the country that noted "high levels of sex

discrimination, including sex-based harassment, against LGBTQI+ students and school employees and the negative effects of such discrimination." *Id.* at 33808. Transgender students shared their experiences of being "threatened and physically attacked," and the "lasting anxiety and fear" that these experiences cause. *Id.* at 33480. Commenters explained that the Rule could "alleviate threats, bullying, and harassment that students and employees experience in some schools." *Id.* at 33479, 33801.

Despite the Department's careful consideration of commenters' concerns, and the lack of evidence of any privacy or safety concerns for cisgender students, a group of states and several organizations ("Appellants") challenged the Rule, alleging incorrectly that Title IX's mandate to prevent sex discrimination does not encompass discrimination based on sexual orientation and gender identity. Appellants also asserted that the Rule infringes on the privacy and safety interests of cisgender students. The district court declined to enjoin the Rule, finding that Plaintiffs were "given many opportunities to develop a fulsome record and declined to do so." Dkt. No. 58, at 8.[5] The court also found that Plaintiffs

---

[5] District court documents are cited as "Dkt. No. #, at #," where the page number refers to the CM/ECF pagination of the district court.

did not establish a "substantial likelihood of success on the merits" that the Rule was arbitrary and capricious. *Id.* at 50. Thus, the district court was correct in determining that Plaintiffs "failed to 'clearly' establish that they are entitled to the 'extraordinary and drastic remedy'" of a preliminary injunction. *Id.* at 8.

The district court's decision aligns with years of civil rights precedent, including from the Supreme Court. Before the Rule's promulgation, courts had overwhelmingly concluded both that discrimination against transgender individuals is sex discrimination and that policies permitting transgender students to use facilities aligned with their gender identity do not harm other students. And the district court was correct that *Adams ex rel. Kasper v. School Board of St. Johns County* is not a barrier to upholding the Rule. Dkt. No. 58, at 10-11; *see also* 57 F.4th 791 (11th Cir. 2022) (en banc). Far from breaking new ground, the Rule codified a host of existing judicial opinions, and the district court was right to uphold it.

Following the district court's decision, Appellants filed for an injunction pending appeal, which was granted by a stay panel of this Court. *See* Order Granting Pls.-Appellants' Mot. Admin. Inj. 2.

The lower court's decision upholding the Rule correctly aligns with

Title IX's broad promise to protect all persons from sex discrimination. *See* 20 U.S.C. § 1681(a). *Amici* urge this Court to affirm the decision below.

# ARGUMENT

## I. Title IX's Text, Purpose, and Legislative History, Along With Established Precent, All Support Upholding the Rule.

*A. The district court decision aligns with Title IX's text and purpose.*

Appellants' arguments are premised on the mistaken idea that Title IX is a narrow statute that limits protections against sex discrimination to discrimination based on sex as assigned at birth. *See* Appellees' Br. But such a reading of Title IX is unmoored from both its text and intended mission. In fact, the statute provides that "[n]o person" should be subject to sex discrimination in an education program or activity. 20 U.S.C. § 1681. This expansive language has the broad purpose of eradicating all forms of invidious sex discrimination in educational programs.

The Supreme Court has repeatedly recognized the expansive nature of Title IX's text. More than forty years ago, in *North Haven Board of Education v. Bell*, the Court recognized that, to "give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." 456 U.S. 512, 521 (1982) (internal quotation omitted); *see also Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Congress gave the statute a broad reach.").

The Supreme Court has acknowledged that sweeping language in "statutory prohibitions often go[es] beyond the principal evil [that prompted their enactment] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). As Justice Scalia wrote for a unanimous Court, even though "[m]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," Title VII's broad language extended to that "reasonably comparable evil[]." *Id.*; *see also Bostock*, 590 U.S. at 717. Indeed, male students can and do bring claims under Title IX, including in this Circuit. *See, e.g.*, *Sauls v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279 (11th Cir. 2005) (parents of a male student brought Title IX claim against school district). Thus, the "broad reach" of Title IX's proclamation that "[n]o person" be subject to sex discrimination encompasses discrimination against *all* students regardless of their sex, including transgender students. And selective dictionary definitions suggesting the term sex means "biological distinctions" do not compel the conclusion that Title IX follows suit. *See*

*infra* Sec. I.B.2.

The legislative history likewise confirms that Congress intended Title IX to offer sweeping protections. In introducing Title IX, Senator Birch Bayh, its principal sponsor, articulated that the "impact of this amendment" was meant to be "far-reaching," 118 Cong. Rec. 5111, 5808 (1972), as it was "designed to root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education." *Id.* at 5804. Congress was specifically concerned with eradicating pernicious sex stereotyping—Senator Bayh expressly recognized that sex discrimination in education is based on "stereotyped notions," like that of "women as pretty things who go to college to find a husband, . . . marry, have children, and never work again." *Id.* Title IX was therefore necessary to combat the "vicious and reinforcing pattern of discrimination" based on sex stereotypes like these. *Id.*

The sex stereotyping targeted by Congress in Title IX encompasses discrimination against transgender students. Relying on broad generalizations about transgender students to exclude them from school facilities punishes them for their non-conformity with sex stereotypes associated with their sex assigned at birth—and perpetuates the rampant discrimination they already face. Prohibiting discrimination against

12

transgender students thus fits well within Title IX's sweeping protections.

   B.   *The district court decision is consistent with established precedent in Title IX and analogous case law.*

The district court found that the Rule was consistent with Supreme Court case law recognizing that sex discrimination necessarily encompasses discrimination against a person based on their sexual orientation or gender identity. Further, numerous courts have found that preventing a student from using a restroom consistent with their gender identity violates Title IX, often rejecting allegations that "the mere presence of transgender students [i]s invasive and harmful."[6] Courts of appeal have also repeatedly concluded that transgender-inclusive policies in schools do not violate Title IX, nor do they harm other students.

   1. Sex discrimination necessarily includes discrimination because of sexual orientation or gender identity.

The Supreme Court held in *Bostock* that protections against sex

---

[6] Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35, 50 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf. These claims echo the unfounded fears historically used to justify discrimination against other groups; courts have rejected similar arguments in the context of racial segregation. *See, e.g.*, Br. of NAACP Legal Defense & Educational Fund, Inc. and Asian American Legal Defense & Education Fund as *amici curiae* in Supp. of Resp't 4.

discrimination necessarily include protections against discrimination based on sexual orientation and gender identity. 590 U.S. at 651-54. Accordingly, the district court's decision is consistent with *Bostock*'s holding that discrimination against transgender employees was discrimination "because of sex" under Title VII. *Id*. at 655-58; *see also id.* at 669 (Discrimination based on someone's sexual orientation or gender identity "necessarily entails discrimination based on sex; the first cannot happen without the second.").

Title VII is an appropriate analogue for interpreting Title IX because of the similarities in the respective statutes' language and purpose. Both statutes include prohibitions on discrimination because of a person's sex. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity. . . ."); 42 U.S.C. § 2000e–2 ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex[.]"). And when schools do not permit students to use facilities consistent with their gender identity, students are subjected to

discrimination based on their sex. *See Bostock*, 590 U.S. at 660.

Thus, courts typically apply Title VII precedent to Title IX claims involving sex discrimination in the educational context. *See, e.g.*, *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 130 n.22 (4th Cir. 2022) ("Although the Supreme Court in *Bostock* addressed Title VII rather than Title IX, we have used precedent interpreting the antidiscrimination provisions of Title VII in our analysis of comparable provisions in Title IX."); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."); *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII.").

Given these similarities between the two statutes, it stands to reason that schools engage in sex discrimination when they do not permit students to use facilities, such as restrooms, consistent with their gender identity. *See Bostock*, 590 U.S. at 660. But even where a court declines to extend *Bostock's* holding to Title IX, the reasoning employed in *Bostock* as to the

scope of protections against sex discrimination in federal civil rights statutes must logically extend to Title IX. Strikingly, even though the *Bostock* Court "assume[d] that 'sex' means 'biological distinctions between male and female,'" *id.* at 687, as this Court did in its stay, Corrected Order Granting Pls.-Appellants' Mot. Inj. 11, *Bostock* nonetheless concluded that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *See Bostock*, 590 U.S. at 698.

To be sure, this Court held in *Adams by & through Kasper v. School Board of St. Johns County* that a school policy requiring students to use bathrooms corresponding to their sex assigned at birth did not discriminate based on sex or contravene *Bostock*. 57 F.4th 791, 808 (11th Cir. 2022). It is somewhat difficult to square that conclusion with this Court's own observation in *Adams* that it "is not in question" that *Bostock* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex". *Id.* at 808-09. In any event, *Adams* is both an outlier and not on all fours with this case.

As Appellees explain, in *Adams*, this Court determined that a policy that prevented students from accessing restrooms aligned with their

gender identity did not violate Title IX, because it assumed the policy "fit into the statutory carve-out for sex-separate living facilities." Appellees' Br. 14. This assumption was wrong, as school restrooms and locker rooms have historically been covered under a different statutory provision—the statute's general nondiscrimination mandate. *Id.* at 31. Just like the original rule promulgated in 1975, this Rule addresses bathrooms and locker rooms under that authority, determining that "consistent with settled understandings of discrimination . . . sex separation only amounts to prohibited discrimination where it causes cognizable harm." *Id.* at 22 n.5. Thus, the holding in *Adams* turned on this Court's conclusions about a separate statutory provision.[7] This Court—and the district court below— now have the benefit of the Rule's clarification on the correct standard under which to assess harms in this context.

Similarly, neither *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), a case regarding the restriction of gender-affirming care, nor *Corbitt v. Secretary of the Alabama Law Enforcement Agency*, 115

---

[7] The motions panel in this case was therefore incorrect that the holding in *Adams* suggests the Rule is likely in excess of statutory authority. Regardless, an order issued by a motions panel is not binding on a subsequent merits panel. 11th Cir. R. 27-1.

F.4th 1335 (11th Cir. 2024), a case regarding gender marker changes on Alabama driver's licenses, prevent this Court from affirming the district court's decision. *Eknes-Tucker* examines *Bostock*'s applicability to Equal Protection Clause or Substantive Due Process claims, declining to extend protections in that context. *Eknes-Tucker* 80 F.4th at 1219. *Corbitt* does not mention *Bostock* at all, but reaches a conclusion similar to *Eknes-Tucker* with respect to an Equal Protection Claim. *Corbitt* 115 F.4th at 1353. Neither case involves Title IX, and importantly, neither case "indicates that *Bostock*'s reasoning is limited to Title VII." Appellees' Br. 22. Therefore, these cases are not relevant to the Court's determination here.

2. The district court's decision aligns with established Title IX precedent.

Courts across the country have ruled that Title IX protects against discrimination based on gender identity because such discrimination is necessarily discrimination based on sex. The Seventh Circuit has *twice* rejected policies barring transgender students from using gender-identity-aligned bathrooms on grounds the policies violated Title IX. *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

18

858 F.3d 1034, 1052 (7th Cir. 2017). In *Whitaker*, the Seventh Circuit concluded—pre-*Bostock*—that "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049. The court recognized that "a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth," and therefore the plaintiff was likely to prevail on a sex-stereotyping claim under Title IX. *Id.* at 1048.

Six years later, in *A.C.*, the Seventh Circuit had the opportunity to reconsider *Whitaker* following *Bostock*. The court reaffirmed its holding in *Whitaker*, namely that "discrimination against transgender students is a form of sex discrimination." 75 F.4th at 769. The court rejected arguments that *Bostock*'s dicta refraining from addressing "sex-segregated bathrooms, locker rooms, and dress codes" demanded a different result. *Id.* at 769. Applying *Bostock*'s reasoning, the court asked "whether our three plaintiffs are suffering negative consequences . . . for behavior that is being tolerated in male students who are not transgender." *Id.* The answer was yes. *Id.* at 772-73.

In *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir.

2020), the Fourth Circuit likewise found a Title IX violation when a school denied a transgender boy the use of the boys' restroom. *Id.* at 613-14. Although the Fourth Circuit acknowledged that students maintain privacy interests, it stressed that the "bodily privacy of cisgender boys using the boys['] restrooms did not increase" when the plaintiff was prohibited from entering. *Id.* at 614. According to the court, the policy ignored how transgender students use restrooms aligning with their gender identity: "'by entering a stall and closing the door.'" *Id.* at 613 (quoting *Whitaker*, 858 F.3d at 1052).

Relatedly, in *Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (3d Cir. 2018), addressing purported privacy concerns, the Third Circuit found that a policy allowing all students to use gender-identity-aligned facilities did not discriminate based on sex, and "therefore does not offend Title IX." *Id.* at 535. The court determined that "the presence of transgender students in the locker and restrooms is no more offensive to constitutional or [state] law privacy interests than the presence of the other students who are not transgender. Nor does their presence infringe on the plaintiffs' rights under Title IX." *Id.* at 521. Rather, the Third Circuit noted, it was actually "its own form of discrimination" to require "transgender students to use single-user or birth-sex-aligned facilities." *Id.* at 530.

The Ninth Circuit also found that a policy allowing transgender students to use restrooms and locker rooms consistent with their gender identity did not violate Title IX, nor did it violate cisgender students' Fourteenth Amendment privacy rights. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 (9th Cir. 2020). The court recognized that Title IX's *allowance* of sex-segregated facilities did not mean such facilities "*must* be segregated based only on biological sex and cannot accommodate gender identity." *Id.* at 1227 (emphasis added). And, the court held, "the use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender." *Id.* at 1229.

Here, the district court ruled in accordance with years of relevant Title IX precedents finding that transgender students should be permitted to use facilities aligned with their gender identity. There have been no intervening changes that justify a different result.

## II. Barring Transgender Students From Using Facilities Aligned with Their Gender Identity Harms Transgender Students, and Policies that Allow Students to Use Gender-Aligned Facilities Do Not Harm Cisgender Students.

The Department in part proposed the Rule to ameliorate the intense and documented harms transgender students can experience when forced to use restrooms and locker rooms inconsistent with their gender identity.

Indeed, barring transgender students from facilities aligned with their gender identity has potentially catastrophic consequences for their physical safety and mental health. There is abundant data, including through lived experiences of students, confirming that policies permitting transgender individuals to use gender-identity-aligned school facilities serve to protect them, while not harming other students.

### A. Excluding transgender students from school facilities aligned with their gender identity harms them.

Transgender students suffer significant harms when barred from using facilities aligned with their gender identity. These harms can have long-lasting impacts on students' health and educational outcomes. Because of transgender students' heightened risk of experiencing sex-based discrimination, the Department's changes to the Rule are critical for three reasons.

*First*, a majority of transgender students report having avoided school facilities because of safety concerns. A recent CDC study reported that approximately one fourth of transgender and questioning students missed school because of feeling unsafe in the past month.[8] One survey of K-12

---

[8] Nicolas Suarez et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts*

students shows 82.1% of transgender students avoid using the restroom and 69.1% of transgender students avoid using the locker room because they felt unsafe or uncomfortable.[9]  Research also shows that when schools exclude transgender students from restrooms matching their gender identity, they avoid using the restroom altogether while at school, leading to serious health risks, including kidney damage and urinary tract infections.[10]  Some transgender students also avoid drinking or eating throughout the school day to avoid having to use the restroom.[11]  These

_and Behaviors Among Transgender and Cisgender High School Students – Youth Risk Behavior Survey, United States, 2023_, Morbidity & Mortality Wkly. Rep. (Sept. 10, 2024), https://www.cdc.gov/mmwr/volumes/73/su/su7304a6.htm#:~:text=In%202023%2C%203.3%25%20of%20U.S.,and%202.2%25%20identified%20as%20 [hereinafter CDC Study].

[9] Joseph Kosciw et al., _The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools_, GLSEN, at 97 (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf.

[10] Sandy James et al., _The Report of the 2015 U.S. Transgender Survey,_ Nat'l Ctr. for Transgender Equal. 224-30 (2016) ("2015 Survey"), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (citing Jody L. Herman, _Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives_, 19 J. Pub. Mgmt. & Soc. Pol'y, 65, 75 (2013)).  _See also Grimm_, 972 F.3d at 593 (transgender student plaintiff developed urinary tract infections due to bathroom avoidance).

[11] _See, e.g., Doe_, 897 F.3d at 523 (forcing transgender students to use restrooms that do not match their gender identity causes students to "avoid

absences, illnesses, hunger, dehydration, and fear all create immense harms and ultimately impede these students' ability to fully access education based on transgender status.

*Second*, non-cisgender students are more susceptible to violence in these settings and "at risk of physical, verbal, or sexual assault from other students or adults."[12] About forty percent of non-cisgender students were bullied at school, and these students experience "more violence" and "less school connectedness" than their cisgender peers.[13] For example, cisgender boys broke seventeen-year-old nonbinary student Cobalt Sovereign's jaw after Cobalt used the restroom aligned with their sex assigned at birth.[14]

---

going to the bathroom by fasting, dehydrating, or otherwise forcing themselves not to use the restroom throughout the day"); *Whitaker*, 858 F.3d at 1041 (transgender student denied restroom access "restricted his water intake to ensure that he did not have to utilize the restroom at school"); 2015 Survey, *supra* note 10, at 229 (nearly 32% of transgender adult responders avoided eating or drinking to avoid using the restroom).

[12] Ryan Thoreson, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools*, Hum. Rts. Watch (Sept. 14, 2016), www.hrw.org/report/2016/09/15/shut-out/restrictions-bathroom-and-locker-room-access-transgender-youth-us.*; see also* CDC Study, *supra* note 8.

[13] CDC Study, *supra* note 8.

[14] Kiara Alfonseca, *Transgender Student Alleges Assault After Using Bathroom, Family Calls For Charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216; *see also* Amber Jayanth, *Transgender Butler County Man Says Group Beat Him Up Over*

The assault occurred after a *cisgender* boy violated Cobalt's privacy and peered over Cobalt's stall while they were using the facility.[15]

Further, transgender students who are not permitted to use facilities that align with their gender identity are significantly more likely to experience sexual assault than those students who do not.[16] One study showed that 25.9% of transgender and nonbinary U.S. adolescents experience sexual assault—substantially higher than rates of 15% for cisgender high school girls and 4% for cisgender boys.[17] However, transgender and nonbinary youth subjected to locker or restroom restrictions experienced an even higher prevalence of sexual assault: 36%.[18]

Notably, locker and restroom policies that deny transgender students access to bathrooms that align with their gender identity also harm

---

*Restroom Use*, Fox News 19 (July 8, 2022), https://www.fox19.com/2022/07/08/transgender-butler-county-man-says-group-beat-him-up-using-wrong-restroom (noting a group of cisgender men battered Noah Ruiz after a campground owner forced him to use the women's restroom).

[15] *Id.*

[16] Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8849575/.

[17] *Id.* at 7.

[18] *Id.* at 6.

cisgender girls. Specifically, cisgender girls who do not conform to rigid femininity standards are often targeted, as such policies lead to enforcement of sex-based stereotypes to determine who is a "real" girl. There are numerous examples of gender-nonconforming cisgender women being harassed or ejected from women's restrooms, an experience that is both humiliating and harmful.[19] For example, one twenty-four-year-old cisgender woman who had cut her hair very short reported being harassed in a women's restroom.[20] While in a stall, a stranger asserted that she was transgender and said she "better not come out of there."[21] Enjoining the Rule will increase this sort of harassment of cisgender women and girls through increased gender policing, which would contribute to greater emotional or physical harm in school facilities.

*Third*, policies preventing transgender students from using gender-

---

[19] *See, e.g.*, Melanie Springer Mock, *I'm a Woman Who Got Kicked Out of Women's Bathrooms*, Christianity Today Int'l (June 7, 2016), https://www.christianitytoday.com/2016/06/im-woman-who-got-kicked-out-of-womens-bathrooms/ ; Matt DeRienzo, *Woman Mistaken for Transgender Harassed in Walmart Bathroom*, News Times (May 16, 2016); https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php;
[20] Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (updated May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom.
[21] *Id.*

identity-aligned restrooms and locker rooms also cause psychological harm—which can lead to serious physical harm, or even death. Many of these policies are created following the enactment of anti-transgender state laws. A recent *Nature Human Behavior* study evaluated the impact of these laws, which included laws that limited access to bathrooms. It found that these laws "*directly caused* an increase in suicide attempts" among transgender and nonbinary people.[22] The results are clear: "young people in states where anti-transgender laws were enacted experienced statistically significant increases in both the number of past-year suicide attempts and the reporting [of] at least 1 past-year suicide attempt, especially 1 and 2 years after anti-transgender law enactment."[23] And the study found a clear *causal* relationship between the enactments of these laws and increased risk of suicide.[24] As a co-author of the study noted, the "causation is the key aspect. . . not associated with, not linked to—we can say very confidently" that these laws caused increased harm to

---

[22] Jo Yurcaba, *Study Establishes First Causal Link Between Anti-Trans Laws and Suicide Attempts*, NBC News (Sept. 30, 2024), https://www.nbcnews.com/nbc-out/out-news/anti-trans-laws-suicide-attempts-teens-increase-rcna172906 (emphasis added).
[23] Lee et al., *supra* note 2, at 5.
[24] *Id.*

transgender youth.[25]

"When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Doe*, 897 F.3d at 529. The pervasive discrimination that too many transgender students experience at school often results in adverse mental health outcomes. LGBTQI+ students who encounter hostility and discrimination in K-12 educational settings—such as verbal harassment, sexual assault, or other physical attacks—report higher levels of depression and lower levels of self-esteem than students who have not experienced victimization.[26] More severe experiences of victimization are tied to higher levels of depression and lower self-esteem.[27] The consequences of discrimination can be catastrophic: transgender students who encounter verbal or physical harassment, including violence, have a "higher prevalence of lifetime and past-year suicide thoughts and attempts" than respondents who did not have such experiences.[28]

---

[25] Yurcaba, *supra* note 22.
[26] Kosciw, *supra* note 9, at 52-54.
[26] *Id.*
[28] Jody L. Herman et al., *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey*, Williams Inst., UCLA Sch. of L., at 22 (Sept. 2019), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf.

Devastatingly, one in four transgender youth attempted suicide in the past year—with ten percent of those requiring medical treatment following the attempt.[29]

Discrimination in schools—including verbal or physical harassment—can negatively impact transgender students' attendance, academic achievement, and educational aspirations.[30]  When students experience harassment or other hostility at school, they may be less likely to attend to avoid hurtful experiences.[31]  In one national survey of LGBTQ students, they "were nearly three times as likely to have missed school in the past month" if the student had experienced a "higher level[] of victimization" because of their sexual orientation or gender identity.[32] LGBTQ students experiencing victimization also report lower GPAs and lower aspirations for secondary education than those not being victimized.[33]

B.    *Transgender-inclusive locker and restroom policies do not harm other students.*

Research confirms that stated "fears of increased safety and privacy

---

[29] *Id.*
[30] *See* Lee et al., *supra* note 2.
[31] Kosciw, *supra* note 9, at 48.
[32] *Id.*
[33] *Id.*

violations as a result of nondiscrimination laws" protecting transgender people's access to restrooms and locker rooms "are not empirically grounded."[34]  Indeed, it is "exceedingly rare" that criminal incidents take place in public restrooms, locker rooms, and changing rooms.[35] Specifically, results from a 2018 study revealed "the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces."[36]

Data from cities and states with nondiscrimination policies that protect transgender individuals provide evidence to highlight how these stated worries are baseless.  Specifically, law enforcement officials in two jurisdictions with nondiscrimination policies "could not identify a single case in which a transgender person ha[d] been charged with assaulting or

---

[34] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 81 (2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e 92d7f24b6c89dbd4bd4d27fbbcb.pdf; *see also* Julie Moreau, *No Link Between Trans-Inclusive Policies and Bathroom Safety, Study Finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policies-bathroom-safety-study-finds-n911106.
[35] Hasenbush et al., *supra* note 34, at 79.
[36] *Id.* at 81.

harassing women in a public bathroom."[37]  A report from Human Rights Watch also found no evidence that transgender students' use of restroom or locker room facilities "correspond[ing] to their gender identity puts other students at risk."[38]  As the American Medical Association explained in one report, "no evidence exists" to support claims that those engaging in sexual violence "will take advantage of public accommodation laws" to target women and children.[39]

Despite the evidence that permitting transgender students to use restrooms that align with their gender identity does not create any privacy or safety concern for cisgender students, it is important to highlight that the Rule also implements Title IX's requirement that schools maintain safe educational environments.  Specifically, the Rule clarifies that schools must promptly investigate of reports of sex harassment, take steps to end harassment, prevent its recurrence, and remedy its effects.  34 C.F.R. § 106.44(f)(1).  *Amici* include advocates and service providers for all

---

[37]  Lou Chibbaro Jr., *Predictions of Trans Bathroom Harassment Unfounded*, Washington Blade (March 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/.

[38]  Thoreson, *supra* note 12.

[39]  Am. Med. Ass'n & GLMA, *Transgender Individuals' Access to Public Facilities* (March 1, 2019), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf.

survivors of sexual violence, including student survivors, and their support of the Rule and its protections for transgender students is based on their certainty that the Rule will reduce risk of sexual assault or harassment in schools. Indeed, experts who are advocates for survivors of sexual assault, like *amici*, routinely support transgender-inclusive locker and restroom policies precisely because there is no evidence supporting Appellants' claims that such policies harm others.[40]

Appellants also consistently fail to acknowledge the range of available or existing mitigating measures in connection with their asserted concerns. For example, restroom stalls enable all students to use facilities discreetly and privately. *A.C.*, 75 F.4th at 773 (observing that a student's presence behind the door of a restroom stall does not threaten student privacy). Schools can also install privacy strips and screens. *See, e.g.*, *Grimm*, 972 F.3d at 614. And cisgender students may use available single-

---

[40] Nat'l Task Force to End Sexual & Domestic Violence Against Women, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community* (updated Apr. 29, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/statement-of-anti-sexual-assault-and-domestic-violence-organizations-in-support-of-equal-access-for-the-transgender-community.pdf.

occupancy facilities, as the Rule states.[41] *See, e.g.*, *Parents for Priv.*, 949 F.3d at 1225 (holding alleged privacy violation mitigated by "alternative options and privacy protections" for those who did not want to share a facility with a transgender student, even if alternatives "appear[ed] inferior or less convenient").

In promulgating the Rule, the Department engaged in a thorough consideration of the factual record—including Appellants' concerns—and correctly concluded that the Rule would not infringe on the privacy and safety rights of cisgender students. *See* 89 Fed. Reg. at 33820. As set forth above, the social science data confirms that transgender-inclusive policies create no actual harms to cisgender students. Arguments to the contrary come at a cost—a cost too often measured in the health, wellbeing, and lives of transgender students. The district court was correct to reject such arguments and uphold the Rule protecting all students from sex

---

[41] The Rule ensures the privacy of all students, whether cisgender, transgender, or nonbinary, by allowing students to choose whether to use sex-separated restrooms that match their gender identity or to use a single-user restroom if they prefer. 89 Fed. Reg. at 33820. No student is forced to use a sex-separated restroom that does not match their gender identity or a single-user restroom, which ensures every student can pick the facility where they feel safest. *Id.* ("[N]othing in Title IX or the final regulations prevents a recipient from offering single occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason.").

discrimination.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision

below.

Respectfully submitted,

*/s/ Madeline Gitomer*
Madeline Gitomer
Kaitlyn Golden
Sunu P. Chandy
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
mgitomer@democracyforward.org


Anya Marino
Shiwali Patel
Emily Martin
Elizabeth E. Theran
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005


*Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 6,486 words according to the word count function of Microsoft Word 365.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Madeline Gitomer*

Date: October 28, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, a true and accurate copy of the foregoing proposed brief was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

*/s/ Madeline Gitomer*

Date: October 28, 2024