# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

―――――――――――

STATE OF ALABAMA et al.,

PLAINTIFFS-APPELLANTS,

v.

UNITED STATES SECRETARY OF EDUCATION et al.,

DEFENDANTS-APPELLEES.

―――――――――――

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 7:24-cv-533-ACA

―――――――――――

## BRIEF OF AMICI CURIAE NEW JERSEY, CALIFORNIA, PENNSYLVANIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

―――――――――――

ROB BONTA
  *Attorney General of California*

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

MICHELLE A. HENRY
  *Attorney General of Pennsylvania*

LAURA L. FAER
  *Supervising Deputy Attorney General*
EDWARD NUGENT
CHRISTINA RIEHL
  *Deputy Attorneys General*
1515 Clay Street, Suite 200
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov

*Attorneys for Amici Curiae States*

*[additional counsel listed on signature page]*

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, the Amici states certify that the following have an interest in the outcome of this appeal:

Alabama, State of

Alaska, State of

Arkansas, State of

Attorney General's Office of South Carolina

Axon, Annemarie Carney

Bachus Brom & Taylor LLC

Bailey, Andrew

Binnall Law Group

Binnall, Jesse

Bird, Brenna

Boynton, Brian

Brown, Lisa

California, State of

Cardona, Miguel

Citizens Defending Freedom

Coleman, Russell

Colorado, State of

Connecticut, State of

Consovoy McCarthy PLLC

Delaware, State of

District of Columbia

Drummond, Gentner F.

Florida, State of

Flynn, Shawn M.

Fitch, Lynn

Formella,John M.

Georgia Department of Law

Georgia, State of

Griffin, Tim

Goldfarb, Jon C.

Hawaii, State of

Hilgers, Michael T.

Hill, Bridget

Idaho, State of

Illinois, State of

Independent Women's Law Center

Independent Women's Network

Indiana, State of

Iowa, State of

Jackley, Marty J.

Kansas, State of

Kentucky, Commonwealth of

Knudsen, Austin

Kobach, Kris W.

Kopplin, Rebecca

Labrador, Raul R.

LaCour,Jr., Edmund Gerard

Louisiana, State of

Maine, State of

Marshall, Steve

Maryland, State of

Massachusetts, State of

Matheny, Justin L.

McKasson, Lindsay R.

Michigan, State of

Miller, Edward A. R.

Minnesota, State of

Mississippi, State of

Missouri, State of

Miyares, Jason S.

Montana, State of

Morrisey, Patrick

Murrill, Liz

Myers, Steven A.

Nebraska, State of

Nevada, State of

New Hampshire, State of

New Jersey, State of

New York, State of

Norris, Cameron Thomas

North, Benjamin F.

North Dakota, State of

Office of the Attorney General of Alabama

Office of the Attorney General of Florida

Ohio, State of

Oklahoma, State of

Oregon, State of

Parents Defending Education

Patterson, Melissa N.

Paxton, Ken

Pennsylvania, State of

Percival II, James H.

Peters, David L.

Petrany, Stephen J.

Reyes, Sean D.

Rhode Island, State of

Rokita, Theodore E.

South Carolina, State of

Spate, Joseph D.

Speech First, Inc.

Skrmetti, Jonathan

South Dakota, State of

Starcher, Jack

Stewart, Scott G.

Stop Abusive and Violent Environments

Taylor, Bryan McDaniel

Taylor, Treg

Tennessee, State of

Texas, State of

The Miller Firm

U.S. Department of Education

Utah, State of

Vaseliou, Thomas S.

Vermont, State of

Virginia, Commonwealth of

Washington, State of

West Virginia, State of

Wiggins Child Pantazis Fisher & Goldfarb

Wrigley, Drew H.

Wyoming, State of

Yost, Dave

# TABLE OF CONTENTS

**Page**

Interests of Amici Curiae ........................................................1

Statement of Issues..............................................................3

Summary of Argument ..........................................................3

Argument..........................................................................4

I. AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL
RULE WILL YIELD BENEFITS WITHOUT COMPROMISING
STUDENT PRIVACY OR SAFETY, OR IMPOSING
SIGNIFICANT COSTS..................................................4

    A. The Final Rule Will Foster Positive Health Outcomes for
Students. ....................................................................4

    B. The Final Rule's Benefits Will Not Compromise Student
Privacy or Safety. ........................................................9

    C. The Final Rule Will Not Impose Significant Compliance Costs........13

II. THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-
BASED DISCRIMINATION AND HARASSMENT IS
CONSISTENT WITH TITLE IX. .....................................15

    A. The Final Rule's Understanding of Sex Discrimination Aligns
with the Plain Text and Judicial Interpretations of Title IX. ..............15

    B. The Prohibition of "Severe or Pervasive" Harassment
Effectuates Title IX's Plain Text Without Burdening or
Surprising States....................................................20

III. APPELLANTS' SPENDING CLAUSE ARGUMENTS ARE
INCONSISTENT WITH AMICI STATES' EXPERIENCE.......................24

IV. THE FINAL RULE'S GRIEVANCE PROCEDURE SECTIONS DO
NOT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT...............25

Conclusion ......................................................................27

# TABLE OF CITATIONS

**Page**

<span style="font-variant: small-caps;">CASES</span>

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*
    75 F.4th 760 (7th Cir. 2023) ................................................................18

*Adams v. School Board of St. Johns County*
    57 F.4th 791 (11th Cir. 2022) .............................................................16

*Bostock v. Clayton County*
    590 U.S. 644 (2020)............................................................. 14, 17-19

*Brown v. Bd. of Educ.*
    347 U.S. 483 (1954)........................................................................9, 13

*Davis v. Monroe Cnty. Bd. of Educ.*
    526 U.S. 629 (1999).........................................................................21

*Dodds v. U.S. Dep't of Educ.*
    845 F.3d 217 (6th Cir. 2016) ...........................................................18

*Doe v. Boyertown Area Sch. Dist.*
    897 F.3d 518 (3d Cir. 2018) .......................................................18, 19

*Eknes-Tucker v. Governor of Alabama*
    80 F.4th 1205 (11th Cir. 2023) .........................................................16

*Encino Motorcars, LLC v. Navarro*
    579 U.S. 211 (2016).........................................................................25

*Feminist Majority Found. v. Hurley*
    911 F.3d 674 (4th Cir. 2018) ...........................................................21

*Fennell v. Marion Indep. Sch. Dist.*
    804 F.3d 398 (5th Cir. 2015) ...........................................................20

*Franklin v. Gwinnett Cnty. Pub. Schs.*
    503 U.S. 60 (1992)...........................................................................22

*Gebser v. Lago Vista Indep. Sch. Dist.*
  524 U.S. 274 (1998)................................................................21

*Grabowski v. Ariz. Bd. of Regents*
  69 F.4th 1110 (9th Cir. 2023) ...............................................18

*Grace v. Bd. of Trs.*
  85 F.4th 1 (1st Cir. 2023)......................................................18

*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) ...........................................18, 19

*Jackson v. Birmingham Bd. of Educ.*
  544 U.S. 167 (2005)......................................................17, 19, 26

*Mahanoy Area Sch. Dist. v. B.L.*
  594 U.S. 180 (2021).................................................................4

*Meritor Sav. Bank, FSB v. Vinson*
  477 U.S. 57 (1986)................................................................22

*Olmstead v. L.C. ex rel. Zimring*
  527 U.S. 581 (1999)..............................................................17

*Oncale v. Sundowner Offshore Servs.*
  523 U.S. 75 (1998)................................................................24

*Price Waterhouse v. Hopkins*
  490 U.S. 228 (1989)..............................................................20

*Roberts v. U.S. Jaycees*
  468 U.S. 609 (1984)..............................................................13

*Runyon v. McCrary*
  427 U.S. 160 (1976)..............................................................24

*Soule v. Conn. Ass'n of Schs., Inc.*
  57 F.4th 43 (2d Cir. 2022) ....................................................18

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*
  858 F.3d 1034 (7th Cir. 2017) .....................................................10, 19

**FEDERAL STATUTES**

20 U.S.C.
  § 1681..................................................................................... 1, 17-21
  § 1682...........................................................................................21
  § 1686...........................................................................................13

**FEDERAL REGULATORY MATERIALS**

*Comment on Proposed Rule Regarding Nondiscrimination on the
  Basis of Sex in Education Programs or Activities Receiving
  Federal Financial Assistance 19 (2022)*............................................26

*Nondiscrimination on the Basis of Sex in Education Programs or
  Activities Receiving Federal Financial Assistance*, 85 Fed. Reg.
  30,026 (May 19, 2020) ............................................2, 15, 19, 23, 27

*Nondiscrimination on the Basis of Sex in Education Programs or
  Activities Receiving Federal Financial Assistance*, 89 Fed. Reg.
  33,474 (Apr. 29, 2024)........................................2, 14, 19, 20, 26, 27

Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe &
  Supportive Schools*
  (August 28, 2024) ...........................................................................11

Racial Incidents and Harassment Against Students at Educ. Insts.;
  Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10,
  1994) .............................................................................................22

Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear
  Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) .............22

S. Rep. No. 100-64 (1987) ......................................................................17

Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ...............................................................................................22, 24

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* 1 (Sept. 2017, rescinded Aug. 2020).................................................................22

U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017)........................................................22

U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001, rescinded Aug. 2020)..........................................20, 22

U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* 5 (Oct. 2020) .............................................15

**STATE STATUTES AND REGULATORY MATERIALS**

Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools 19-21 (2020) ..............................................................12

Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013) ......................................10

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014) ..............................................................................12

Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.) ...........12

Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012)..............................................................................................12

D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance 9 (2015) ...........................................................................13

Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to
Protection of Transgender, Nonbinary, and Gender Nonconforming
Students Under the Illinois Human Rights Act 6-7 (2021) ...............................12

Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting
Transgender, Nonbinary and Gender Nonconforming Students 10-
11 (2020) ..........................................................................................................12

Iowa Code
§ 216.2(10) ...................................................................................................14
§ 216.6 ..........................................................................................................14
§ 216.7 ..........................................................................................................14
§ 216.8 ..........................................................................................................14
§ 216.9 ..........................................................................................................14

Mass. Dep't of Elementary & Secondary Educ., Guidance for
Massachusetts Public Schools: Creating a Safe and Supportive
School Environment (Oct. 28, 2021) ...................................................................12

Md. State Dep't of Educ., Providing Safe Spaces for Transgender and
Gender Non-Conforming Youth: Guidelines for Gender Identity
Non-Discrimination 13-14 (2015) .......................................................................12

Mich. Dep't of Educ., State Board of Education Statement and
Guidance on Safe and Supportive Learning Environments for
Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ)
Students 5-6 (2016) ............................................................................................12

Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive
Schools for Transgender and Gender Nonconforming Students 10
(2017) ................................................................................................................12

N.J. State Dep't of Educ., Transgender Student Guidance for School
Districts 7 (2018) ...............................................................................................12

N.M. Stat. Ann.
§ 28-1-2(Q) .................................................................14
§ 28-1-7(A) .................................................................14
§ 28-1-7(F) .................................................................14
§ 28-1-7-(G) ...............................................................14

N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming
School Environment for Transgender and Gender Expansive
Students: 2023 Legal Update and Best Practices 22-24 (June 2023).................12

Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance
for Schools 24-26 (2023) .........................................................12

R.I. Dep't of Educ., Guidance for Rhode Island Schools on
Transgender and Gender Nonconforming Students 8-9 (2016) ........................12

Utah Code Ann.
§ 34A-5-106 ...............................................................14
§ 57-21-5 .................................................................14

Vt. Agency of Educ., Continuing Best Practices for Schools
Regarding Transgender and Gender Nonconforming Students 6, 8
(2017).................................................................. 12-13

OTHER AUTHORITIES

Alberto Arenas et al., *7 Reasons for Accommodating Transgender
Students at School*, Phi Delta Kappa (Sept. 1, 2016) .........................................11

Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex.
Trib. (June 14, 2016).........................................................10

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms:
The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar.
31, 2021) .........................................................11

Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in
Supp. of Resp't, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*
580 U.S. 1168 (2017)....................................................................................9, 11

Christy Mallory et al., Williams Inst., *The Impact of Stigma and
Discrimination Against LGBT People in Michigan* 56 (2019)..........................15

Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and
Transgender Discrimination in the Public Sector: Why It's a
Problem for State and Local Governments, Employees, and
Taxpayers* 18 (2012) ........................................................................................15

Ctrs. For Disease Control, Youth Risk Behavior Survey: Data
Summary & Trends Rep. 2011-2021 72 (2023) .................................................23

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of
Transgender Youth in Our Nation's Schools* 25-27 (2009)..................................7

Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023) ......................5

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and
Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020)...........................23

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate
Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender,
and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49,
xx-xxi (2016) .................................................................................................7, 8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate
Survey: The Experiences of LGBTQ+ Youth in Our Nation's
Schools* xv-xvi, 83, 93, xviii-xix, 36 (2022)....................................................5, 7

Kristina R. Olson et al., *Mental Health of Transgender Children Who
Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7
(Mar. 2016) .....................................................................................................8, 9

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 97-98, 102 (Feb. 17, 2019) ..................................................................5, 9, 23

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students-19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019) ...............................................................................6

Movement Advancement Project, *Local Nondiscrimination Ordinances* .....................................................................................14

Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbls. 203.40, 235.20, 304.15 (2023).....................................................................1

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017)........................................................................................23

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-35 (Dec. 2016) ...................................6

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017) .....................................6

Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018).........................8

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012).................................................................................12

Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022)................................................................................24-25

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 16 (2023)..............................................................6, 10

The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020) .................................................................8

Wilson Y. Lee et al., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, Nature Human Behavior (Sept. 26, 2024) .............................................................................................................8

World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022) ..............................8

## INTERESTS OF AMICI CURIAE

Amici States have compelling governmental interests in the robust enforcement of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, to ensure that our schools operate free from sex discrimination. As sovereign jurisdictions charged with enforcing state antidiscrimination laws and shaping school policies that foster safe and supportive environments for all students, Amici States take the implementation of Title IX regulations seriously. Amici States, which all accept federal funding subject to Title IX, are home to tens of millions of students attending tens of thousands of public elementary, secondary, and postsecondary schools.[1] Amici States also have numerous private and charter schools, vocational and technical training programs, and private postsecondary institutions that may accept federal educational funding. Amici States thus have concrete, compelling interests in Title IX's prompt and full enforcement.

Sex discrimination and harassment based on sexual orientation or gender identity cause direct economic, physical, and emotional harm to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone

---

[1] *See* Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 235.20 (2023), https://tinyurl.com/43aaxkz4; *id.*, tbl. 203.40, https://tinyurl.com/2p95z9s9; *id.*, tbl. 304.15, https://tinyurl.com/48raka46.

of the same sex. In clarifying that sex discrimination includes discrimination based on sexual orientation or gender identity, the U.S. Department of Education's ("ED") new final rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"), advances Amici States' ability to protect students from sex discrimination and harassment.

As Amici States' experience confirms, preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities for all students confer broad benefits, without imposing substantial costs on schools or compromising student privacy or safety. The same is true under the Final Rule, which includes explicit protections for LGBTQ students and rectifies the harm caused to our schools and communities through ED's prior rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule"). The 2020 Rule undermined Title IX's nondiscrimination mandate by arbitrarily narrowing Title IX's sexual harassment protections. A return to the 2020 Rule would reduce protections for students and reintroduce the harms associated with its implementation.

Amici States submit this brief to demonstrate, in our sovereign states' unique experience, how gender-inclusive policies in schools produce significant benefits for

our students, our states, and society as a whole; how failing to protect LGBTQ students from discrimination at school results in severe and irreparable harms; and that the balance of equities and public interest cut against the extraordinary relief the district court correctly denied to Appellants.

## STATEMENT OF ISSUES

The issue presented is whether the district court erred by denying Appellants' motion for preliminary injunction. Because Appellants are not likely to succeed on the merits, and because the balance of harms and the public interest do not favor an injunction, this Court should affirm.

## SUMMARY OF ARGUMENT

Amici States urge the Court to affirm the district court's denial of a preliminary injunction for five reasons. First, the Final Rule will promote students' health and well-being, without compromising privacy or safety, and without requiring significant compliance costs. Second, the Final Rule is consistent with the plain text and judicial interpretations of Title IX. Third, the Final Rule's definition of sex-based harassment better protects students by correctly returning to longstanding ED policy and practice. Fourth, Appellants' Spending Clause arguments are inconsistent with Amici States' experience, as it is no surprise that Title IX's protection against sex discrimination covers students who do not conform to gender or sex stereotypes, are attracted to a member of the same sex, or identify as a sex different from the one assigned at birth. Finally, the Final Rule's return to more flexible grievance

procedures—which appropriately account for the economic and staffing realities of K-12 school districts and colleges of all sizes, while ensuring sufficient due process protections—does not violate the Administrative Procedure Act.

## ARGUMENT

### I. AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS.

States' responsibility to provide public education encompasses a concomitant duty to protect students from harm. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189 (2021); *id.* at 201 (Alito, J., concurring) (noting that "the school has a duty to protect students while in school"). The Final Rule promotes states' efforts to protect students from harms of all kinds—in part by clarifying that Title IX protections against sex discrimination bar discrimination or harassment based on sexual orientation or gender identity—and will thus provide broad, significant benefits to students nationwide. As Amici States' experiences establish, the Final Rule achieves those benefits without compromising student privacy or safety, and without imposing substantial costs on schools.

### A. The Final Rule Will Foster Positive Health Outcomes for Students.

The equities and public interest advanced by the Final Rule are clear: the Final Rule protects students from discrimination based on sexual orientation or gender identity, in turn protecting their well-being and health.

Extensive research provides significant evidence of these benefits. There can be no serious dispute that LGBTQ students suffer concrete harms when they are denied Title IX's protections against discrimination and harassment—including a greater risk of mental health issues and worse educational outcomes. A child's social, emotional, and academic development is closely related to their educational environment, and the negative effects of discrimination and harassment can impede a child's cognitive development, disrupt the learning process, and endanger psychological well-being.[2]

The numbers are stark. In a recent study, almost 90% of LGBTQ students reported hearing homophobic slurs from their peers, while more than 68% reported feeling unsafe in schools due to their gender identity, gender expression, or sexual orientation.[3] In a 2022 survey, 56.9% of LGBTQ youth reported being verbally or physically harassed at least once in the past thirty days.[4] Of students known or perceived to be transgender, 77% reported negative experiences at school, including

---

[2] Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 97-98 (Feb. 17, 2019), https://tinyurl.com/5f97nkbx [hereinafter Darling-Hammond].

[3] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xv-xvi, 83, 93 (2022), https://tinyurl.com/2aabcfe4 [hereinafter Kosciw 2021].

[4] Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://tinyurl.com/2zrnav26.

harassment and physical assault.[5] And as many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[6] As a group, transgender students are up to five times more likely than cisgender students to report being bullied at school, threatened or injured with a weapon at school, and sexually assaulted.[7] Another 2022 survey found that 64% of transgender and nonbinary youth reported being discriminated against because of their gender identity.[8] In the largest survey of transgender people to date, 17% of respondents reported that they left K-12 school because of the mistreatment they suffered as a result of their gender expression.[9] And a 2009 study found that 40% of students who experienced frequent verbal harassment because of their gender

---

[5] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016), https://tinyurl.com/46fkp2th [hereinafter James].

[6] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017), https://tinyurl.com/ukvkv8tf.

[7] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019), https://tinyurl.com/5bpxzvfy.

[8] The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 16 (2023), https://tinyurl.com/mvbmabrw [hereinafter Trevor Project 2023 National Survey].

[9] James, *supra* note 5, at 135.

expression did not plan to continue on to college.[10]

Policies have a direct impact on those statistics. The evidence shows that discriminatory policies cause LGBTQ students to feel less connected to their schools and fellow students, and exacerbate harms to their education.[11] For example, one 2021 survey showed that LGBTQ students who experienced discrimination in their schools were almost three times as likely (43.3% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.[12] Those students who experienced discriminatory policies and practices had lower grades, lower levels of educational achievement and aspiration, lower self-esteem, and higher levels of depression than other students who had not encountered such discrimination.[13] Tragically, discriminatory policies are also linked to stark increases (as high as 72%) in suicide

---

[10] Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009), https://tinyurl.com/3bpt9py5.

[11] Kosciw 2021, *supra* note 3, at xviii-xix, 36.

[12] *Id.* at 36.

[13] *Id.* at 35-36, 41-45; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://tinyurl.com/5av274d3 [hereinafter Kosciw 2015].

attempts by transgender and gender non-binary youth, as a 2024 study demonstrated.[14]

Conversely, the evidence further shows that LGBTQ students who are supported by school staff are less likely to feel unsafe, miss school, or say that they may not graduate school because of their sexual orientation or gender expression, and are more likely to have higher grades and feel a greater sense of belonging to their school community. [15] When transgender youth are protected from discrimination on the basis of their gender identity, their mental health outcomes mirror those of their cisgender peers: they experience reduced suicidal ideation, fewer suicide attempts, and enhanced well-being and functioning.[16]

---

[14] *See generally* Wilson Y. Lee et al., *State-Level Anti-Transgender Laws Increase Past-Year Suicide Attempts Among Transgender and Non-Binary Young People in the USA*, Nature Human Behavior (Sept. 26, 2024), https://tinyurl.com/4hm7ytan.

[15] Kosciw 2015, *supra* note 13, at xx-xxi.

[16] Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), https://tinyurl.com/47fuas7h [hereinafter Olson]; *see also* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022), https://tinyurl.com/y86j5jnp; Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018), https://tinyurl.com/465z8reh; The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020), https://tinyurl.com/2c2p7zkf.

While discriminatory environments that cause fear and anxiety weaken a child's cognitive capacity and disrupt effective learning, safe and supportive school environments allow students to develop positive relationships, regulate their emotions and behavior, and maintain their physical, psychological, and academic well-being.[17] Accordingly, transgender students, when allowed to use the facilities consistent with their gender identity, experience better mental health outcomes that are more comparable to their cisgender peers.[18] Put differently, providing a non-discriminatory school environment and equal access to school, including facilities that align with one's gender identity—in accordance with the Final Rule—directly promotes these positive outcomes and helps reduce the harms that LGBTQ students otherwise face. This, in turn, benefits society as a whole, since equal education better prepares students to contribute to society, both culturally and economically. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

## B. The Final Rule's Benefits Will Not Compromise Student Privacy or Safety.

Although Appellants argue that the Final Rule must still be preliminarily enjoined because it undermines the privacy and safety of other students and imposes costs on the states, *e.g.*, Appellants' Opening Br. 17, 36, 38-39, Appellants are

---

[17] *See* Darling-Hammond, *supra* note 2, at 97-98, 102.

[18] *See* Olson, *supra* note 16, at 5-7; Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't [hereinafter Br. of Amici Curiae Sch. Adm'rs] at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 1168 (2017).

incorrect—research and Amici States' own experiences show otherwise. Appellants focus principally on the Final Rule's treatment of sex-separated facilities—just one piece of Title IX's and the Final Rule's overall protections against sex discrimination and harassment. But even accepting their narrow focus, research shows that policies that allow transgender students to use facilities consistent with their gender identity significantly benefit those students without risking the privacy or safety of others. For example, allowing students to use the bathrooms consistent with their gender identity helps to safeguard against harms common to transgender students, such as forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying.[19] *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017) (discussing severe harms to student when denied access to facilities consistent with student's gender identity).

Research also indicates that allowing transgender students to access facilities that correspond with their gender identity does not result in increased privacy or safety concerns in public schools, or any reported instances of transgender students

---

[19] *See* Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013); Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst; *see also* Trevor Project 2023 National Survey, *supra* note 8, at 5 (noting that approximately half of transgender and nonbinary youth reported in 2023 having seriously considered suicide in the past twelve months).

harassing cisgender students when using restrooms or locker rooms consistent with their gender identity.[20] The documented experience of school administrators in thirty-one states and the District of Columbia instead demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[21]

The Final Rule also affords ample flexibility for schools to implement policies that address privacy concerns, and Amici States have increased privacy options for all students in a cost-effective manner without singling out students. For example, schools in Washington must provide any student "who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom," "a reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing

---

[20] *See* Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4; Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t.

[21] *See* Br. of Amici Curiae Sch. Adm'rs, *supra* note 18, at 14-16; Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (August 28, 2024), https://tinyurl.com/yv397h94.

schedule."[22] At least thirteen other states and the District of Columbia offer comparable guidance to ensure that school districts can comply with nondiscrimination policies and address privacy concerns.[23] Solutions range from

---

[22] *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96.

[23] *See, e.g.*, **California**: Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014). **Colorado**: Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.). **Connecticut**: Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012). **Illinois**: Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act 6-7 (2021); Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students 10-11 (2020); Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools 19-21 (2020). **Maryland**: Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination 13-14 (2015). **Massachusetts**: Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). **Michigan**: Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016). **Minnesota**: Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students 10 (2017). **New Jersey**: N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018). **New York**: N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023). **Oregon**: Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools 24-26 (2023). **Rhode Island**: R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students 8-9 (2016). **Vermont**: Vt. Agency of Educ., Continuing

offering privacy curtains to separate restroom and changing rooms to all who so desire, none of which requires costly construction or remodeling.

Maintaining sex-separated spaces while allowing transgender students to use facilities that align with their gender identity results in positive educational and health outcomes for students and promotes Amici States' compelling interest in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). Ensuring equal access to facilities that align with gender identity is consistent with not only Title IX's provision for sex-separated facilities, 20 U.S.C. § 1686, but also the constitutional guarantee that education be "made available to all on equal terms," *Brown*, 347 U.S. at 493. And as Amici States' experiences show, it does not harm other students in the process.

### C.    The Final Rule Will Not Impose Significant Compliance Costs.

While Appellants argue that the costs of compliance with the Final Rule will inflict irreparable harm on the States and their school systems, *e.g.*, Appellants' Opening Br. 36, 38-39, Amici States' experience confirms that the alleged harm is unfounded. Every state must already prohibit discrimination based on sexual orientation or gender identity for all employees in its school districts, including

Best Practices for Schools Regarding Transgender and Gender Nonconforming Students 6, 8 (2017). **District of Columbia**: D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance 9 (2015).

student employees, under Title VII. *See Bostock v. Clayton County*, 590 U.S. 644, 659-62 (2020). Training staff members and implementing policies to ensure that those same protections extend to all students at risk of sex discrimination or sexual harassment under Title IX is not a "significant expenditure[]," and would not require any "construction of new facilities or creation of new programs." Final Rule, 89 Fed. Reg. at 33,876; *see also id.* at 33,862-77 (in any event, benefits "far outweigh" costs). Further, at least twenty-three states and the District of Columbia, and at least 374 municipalities,[24] already offer express protections against discrimination based on sexual orientation or gender identity in areas such as education, housing, public accommodations, and employment—all demonstrating that the Final Rule's protections are entirely feasible.

By contrast, a return to the 2020 Rule's regulatory scheme would result in tens of thousands of student complaints of sexual harassment going unaddressed each year—by ED's own estimation at the time, a shocking 50% fewer complaints would

---

[24] *See, e.g.*, Iowa Code § 216.2(10) (definition); *id.* § 216.6 (employment); *id.* § 216.7 (public accommodations); *id.* § 216.8 (housing); *id.* § 216.9 (education); N.M. Stat. Ann. § 28-1-2(Q) (definition); *id.* § 28-1-7(A) (employment); *id.* § 28-1-7(F) (public accommodations); *id.* § 28-1-(G) (housing); Utah Code Ann. § 34A-5-106 (employment); *id.* § 57-21-5 (housing); Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (accessed Aug. 22, 2024).

be investigated in K-12 schools alone.[25] When students experience unremedied discrimination and harassment, the costs are steep. Students denied protections under Title IX are likely to experience absenteeism, dropout, lost income, unemployment, and increased healthcare needs; Amici States who serve them face lost revenue and added costs of healthcare services.[26] *See* 2020 Rule, 85 Fed. Reg. at 30,538-48 (acknowledging harms and declining to include them in regulatory impact analyses). The Final Rule remedies the 2020 Rule's flaws without requiring significant implementation costs for states—and in fact avoids other profound costs for states in the process.

## II. THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-BASED DISCRIMINATION AND HARASSMENT IS CONSISTENT WITH TITLE IX.

### A. The Final Rule's Understanding of Sex Discrimination Aligns with the Plain Text and Judicial Interpretations of Title IX.

The district court correctly concluded that Appellants are unlikely to prevail on their claim that ED exceeded its statutory authority by clarifying that discrimination

---

[25] 85 Fed. Reg. at 30,551-52, 30,565-68; *see also* U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* 5 (Oct. 2020), https://tinyurl.com/2s3p7had.

[26] Discrimination against LGBTQ individuals directly threatens the interests of states. *See, e.g.*, Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Michigan* 56 (2019), https://tinyurl.com/mt9tfvtv; Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* 18 (2012), https://tinyurl.com/22knbxuh.

"on the basis of sex" includes discrimination against a student based on sexual orientation or gender identity. R.58 at 36-48. Indeed, the Final Rule is consistent with Title IX's plain text, Supreme Court precedent, and the decisions of at least seven circuits.

The district court concluded that *Adams v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), did not foreclose a holding that Title IX prohibits discrimination based on sexual orientation or gender identity. R.58 at 42-44. While *Adams* held that "sex" in Title IX "refers only to biological sex," R.58 at 37 (citing 57 F.4th at 812, 815), the district court held that *Adams* did not limit the Supreme Court's holding in *Bostock* to Title VII, and reaffirmed that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex," *id.* at 42-44 (quoting 57 F.4th at 808-09); *see also* 57 F.4th at 813 (observing that *Bostock* assumed "sex" in Title VII means "*biological* distinctions between male and female"). Thus, the district court determined that a prohibition of discrimination on the basis of (biological) sex fairly includes discrimination based on gender identity.[27]

---

[27] The district court also distinguished *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023). *See* R.58 at 44-45. *Eknes-Tucker* declined to apply *Bostock* to the Equal Protection Clause given the differences in text and historical context between the Fourteenth Amendment and Title VII. 80 F.4th at 1228-29. It nowhere mentions Title IX or the application of *Bostock* to Title IX. *See generally id.*

That conclusion is consistent with the text and purpose of Title IX, as well as the weight of authority. Congress intended Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), to "be broadly interpreted to provide effective remedies against discrimination," S. Rep. No. 100-64 (1987). The Supreme Court has consistently reaffirmed the "broad reach" of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005). The Final Rule's prohibition of discrimination based on sexual orientation or gender identity effectuates that intended reach of Title IX's plain text.

The Supreme Court "look[s] to its Title VII interpretations of discrimination" when interpreting Title IX. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). That link between Title IX and Title VII is instructive here. In *Bostock*, through "the straightforward application of legal terms with plain and settled meanings," the Supreme Court held that Title VII's protections against sex discrimination cover discrimination based on sexual orientation or gender identity, because such discrimination necessarily "intentionally discriminate[s] against individual men and women in part because of sex" by penalizing "traits or actions" that would be "tolerate[d]" in someone of the opposite biological sex. 590 U.S. at 660, 662; *see also id.* at 660 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual

based on sex."). The same textual result is thus compelled here: protections "on the basis of sex" (Title IX) or "because of sex" (Title VII) encompass protections based on sexual orientation and gender identity.[28]

Numerous circuit cases—in a majority of the federal courts of appeal—support the conclusion that Title IX's prohibition on sex discrimination covers discrimination based on sexual orientation or gender identity. *E.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 55-56 (2d Cir. 2022), *rev'd on other grounds by* 90 F.4th 34 (2d Cir. 2023) (en banc); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769-70 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *cf. Grace v. Bd. of Trs.*, 85 F.4th 1, 5-7, 10-14 (1st Cir. 2023) (allowing Title IX harassment claim based on perception of student as "gay" or "transgender" to proceed to trial); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-36 (3d Cir. 2018) (citing *Whitaker*, 858 F.3d at 1050), *cert. denied*, 139 S. Ct. 2636 (2019).

---

[28] Indeed, *Bostock* uses both Title VII's phrase "because of sex" and Title IX's "on the basis of sex" interchangeably. *E.g.*, 590 U.S. at 650 ("Congress outlawed discrimination in the workplace *on the basis of* . . . sex . . . ." (emphasis added)); *id.* at 680 ("[E]mployers are prohibited from firing employees *on the basis of* homosexuality or transgender status . . . ." (emphasis added)).

References to "one sex," "the other sex," and "both sexes" in Title IX do not exclude transgender students from Title IX's protections. The Final Rule simply provides that transgender students may access sex-separate bathrooms, activities, and organizations consistent with their gender identity, if denying access would cause more than "de minimis" harm (and when no other statutory exception applies). 89 Fed. Reg. at 33,814-16; *accord Grimm*, 972 F.3d at 617-19 (holding exclusion "from the sex-separated restroom matching [the student's] gender identity" violated Title IX); *Whitaker*, 858 F.3d at 1045, 1049-50 (same); *Boyertown*, 897 F.3d at 529-30 ("When transgender students face discrimination in schools, the risk to their wellbeing . . . can be life threatening."). Title IX covers all types of sex discrimination. *Jackson*, 544 U.S. at 174-175 (emphasizing Supreme Court's "repeated holdings construing 'discrimination' under Title IX broadly"). And as the Supreme Court has held, discrimination based on transgender identity is necessarily a form of sex discrimination. *Bostock*, 590 U.S. at 660, 662. Title IX's protections thus extend to transgender students. *E.g.*, *Grimm*, 972 F.3d at 618.

Appellants' position is further belied by the fact that the 2020 Rule already prohibits gender-based harassment. 85 Fed. Reg. at 30,146 (explaining that 2020 Rule covered "gender harassment"); *id.* at 30,179 ("These [2020] regulations include sexual harassment as unwelcome conduct . . . [which] includes but is not limited to unwelcome conduct of a sexual nature, and may consist of unwelcome conduct

based on sex or sex stereotyping. [ED] will not tolerate sexual harassment as defined in § 106.30 against any student, including LGBTQ students."). So too have decades of ED's policy and practice. *E.g.*, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001, rescinded Aug. 2020) [hereinafter 2001 Guidance], at v; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239-40 (1989) (plurality opinion) (Title VII forbids gender-based discrimination). Rather than exceeding ED's authority, the Final Rule comports with longstanding Title IX protections against gender-based discrimination.

### B. The Prohibition of "Severe or Pervasive" Harassment Effectuates Title IX's Plain Text Without Burdening or Surprising States.

The Final Rule's definition of sex-based harassment as conduct that "is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity," 89 Fed. Reg. at 33,884, comports with the text and purpose of Title IX. Sex-based harassment need not be severe *and* pervasive to create tangible injury to a student's education. For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be "severe," but could be so pervasive that a student feels unsafe and avoids classes, and is thereby effectively excluded from education. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (noting that "offensive remarks made every few months over three years" raised genuine dispute regarding

Title VII hostile environment); *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018) (holding that a series of harassing social media posts sent over campus wireless network could support Title IX harassment claim).

By covering both severe *or* pervasive forms of harassment, the Final Rule also effectuates the breadth of 20 U.S.C. § 1681(a), and advances Congress' objectives, because "the scope of the behavior that Title IX proscribes" is not limited to "severe, pervasive, and objectively offensive" conduct. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639, 652 (1999). Congress established an administrative scheme authorizing ED "to give effect to" Title IX. *Id.* at 638-39; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998); 20 U.S.C. § 1682.[29] The Final Rule does so because it protects students from both severe incidents of harassment, as well as a series of lesser, unwelcome incidents that become pervasive.

Amici States' experience also reflects that no sovereign jurisdiction would be burdened or surprised by the Final Rule's return to the "severe or pervasive" standard. For more than thirty years, ED defined harassment as conduct that was "sufficiently severe, pervasive or persistent" to *interfere with, limit, or adversely affect*, rather

---

[29] Appellants mistakenly rely on *Davis* to argue that harassment must be "severe, pervasive, *and* objectively offensive." Appellants' Opening Br. 29. But *Davis* makes clear that its rule applies only to private damages claims, 526 U.S. at 652; *see also Gebser*, 524 U.S. at 283-84, 287, and does not otherwise limit ED's regulatory authority, *see Gebser*, 524 U.S. at 292.

than *deny*, a student's ability to participate in or benefit from an education program or activity, and consistently applied this definition to address harassment under Title IX and Title VI.[30] Amici States have long understood that this definition applies to their schools, and the Final Rule correctly returns to ED's longstanding definition and provides appropriate baseline protections against sexual harassment in our schools. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (protecting employees, including student employees, from sexual harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment'"); *Franklin*, 503 U.S. at 75 (holding that sexual harassment constitutes discrimination).

Finally, a definition of harassment that encompasses both severe harassment and pervasive forms of harassment is essential to ensure the safety that students need

---

[30] *See, e.g.*, Racial Incidents and Harassment Against Students at Educ. Insts.; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("[S]exual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education"); 2001 Guidance, at v, 6 (noting that harassment must "deny or limit" student's education, and single "sufficiently severe" incident of sexual harassment can create hostile environment); Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ("The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment . . . ."); U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (same); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* 1 (Sept. 2017, rescinded Aug. 2020) (applying "severe, persistent, or pervasive" and "deny or limit" standards).

to learn and thrive. Students who experience safe and supportive school climates see improvements in academic achievement and healthy development, and such schools are more effective at preventing violence and retaining teachers.[31] On the other hand, ED itself estimated that the 2020 Rule's narrow interpretation of Title IX's protections would reduce investigations of sexual harassment by 50% in K-12 schools,[32] exacerbating the effects of severe underreporting shown by research finding that sexual harassment and assault occur at alarming rates. For example, more than 20% of girls between the ages of fourteen and eighteen have been kissed or touched without their consent, but no more than 3% reported the incidents to police or school administrators.[33] The Final Rule's definition of harassment rightly protects students from the devastating impacts that severe or pervasive sexual

---

[31] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020); Darling-Hammond, *supra* note 2*,* at 97-98; *see also* Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Rep. 2011-2021 72 (2023), https://tinyurl.com/2p6w6yrv.

[32] 85 Fed. Reg. at 30,551-52, 30,565-68.

[33] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017), https://tinyurl.com/u53eawk2.

harassment can have on their academic performance and emotional and physical well-being.[34]

## III. APPELLANTS' SPENDING CLAUSE ARGUMENTS ARE INCONSISTENT WITH AMICI STATES' EXPERIENCE.

Appellants also argue that the Final Rule likely violates the Spending Clause. Appellants' Opening Br. 27, 30-31. This complaint runs contrary to Amici States' actual experience.[35]

In Amici States' experience, the Final Rule does not require any state to establish any new programs; rather, it clarifies that established programs must protect students from discrimination on the basis of sex, using the Title IX framework that funding recipients already have in place. Many Amici States have already implemented these protections, and have incurred *de minimis* costs in doing so, while conferring significant benefits to students.[36] That is to say, the Final Rule

---

[34] 62 Fed. Reg. at 12,034 ("[S]exual harassment can interfere with a student's academic performance and emotional and physical well-being, and . . . preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.").

[35] None of Appellants' other constitutional claims fare any better, as Supreme Court precedent also forecloses their free speech and substantive due process challenges. *See, e.g.*, *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998) (Title VII can prohibit verbal harassment); *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (narrowly limiting parental rights in school context).

[36] School-based gender-affirming policies are linked to dramatic decreases in depression, anxiety, and suicidal ideation among transgender and nonbinary students. *See* Toomey et al., *Gender-Affirming Policies Support Transgender and*

requires funding recipients to do only what Title IX has always required: to refrain from discriminating against students on the basis of sex, and to remedy any discrimination that arises. No state should be surprised at the need to perform this longstanding duty.

## IV. THE FINAL RULE'S GRIEVANCE PROCEDURE SECTIONS DO NOT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

Appellants protest that the Final Rule runs afoul of the Administrative Procedure Act in modifying the 2020 Rule's quasi-judicial grievance procedures. *See* Appellants' Opening Br. 12 & n.1. But Amici States' experience shows that ED has met its burden to "display awareness that it is changing position" and to "provide a reasoned explanation" for reintroducing flexibility and context-sensitivity into the regulations governing schools' grievance processes. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Indeed, the Final Rule reflects thoughtful consideration of comments—including those submitted by Amici States—urging ED to curtail the 2020 Rule's inflexible mandates for schools.

For example, by restoring postsecondary institutions' discretion to hold live hearings with adversarial cross-examination, the Final Rule properly accounts for

---

*Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7.

significant burdens on smaller postsecondary institutions with limited resources,[37] while ensuring due process through cross-examination by a decisionmaker in all cases. *See* 89 Fed. Reg. at 33,746-47. The Final Rule also addresses the inequity and harm caused by the 2020 Rule's requirement that an "advisor of choice"—e.g., an untrained parent, an attorney, or even a college friend—conduct cross-examination. As Amici States highlighted during the rulemaking process, *see id.* at 33,732, 33,746, this requirement has chilled reporting and participation in the grievance system because both complainants and respondents are fearful of an unequal and harmful process where, for example, only one side is represented by counsel, and either side may be subjected to unprofessional and abusive questioning from an untrained advisor. In this regard, the Commission on Independent Colleges and Universities in New York told ED that the 2020 Rule's requirement for cross-examination by an advisor of choice "has proven to be adversarial and harmful to students participating in good faith in the process."[38] The Final Rule corrects this chilling effect, which is irreconcilable with Title IX's reliance on individual reporting as the key enforcement mechanism. *See Jackson*, 544 U.S. at 181.

---

[37] These smaller institutions may spend anywhere between $10,000 and $16,000 per hearing on hearing officers alone. See *Comment on Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* 19 (2022), https://tinyurl.com/y95bxrr2.

[38] *Id.* at 19.

Likewise, the Final Rule's allowance of the single-investigator model sensibly restores much-needed flexibility to schools struggling to comply with the 2020 Rule's rigid dictates concerning the number of distinct staff members—up to four—who must be involved in the investigation process. The 2020 Rule's prohibition of the single-investigator model has forced Amici States' smaller schools to either reassign administrative staff to participate in grievance processes or spend scarce resources recruiting, hiring, and training non-employees—thereby compromising schools' ability to resolve complaints in a "reasonably prompt" fashion, as the 2020 Rule also required. *See* 85 Fed. Reg. at 30,575. For example, Amici States' Comment on the Proposed Final Rule highlighted that a New Jersey school, which has long held Title IX hearings, estimated that before the 2020 Rule, it took roughly an average of 152 days to resolve one Title IX matter, but after the 2020 Rule, it took 287 days, an 89 percent increase.[39] Thus, the Final Rule reasonably restores to schools the discretion to tailor their grievance procedures with procedural safeguards that guarantee integrity and fairness, while also meeting specific needs, including budgetary and staffing realities. *See, e.g.*, 89 Fed. Reg. at 33,662-63.

## CONCLUSION

This Court should affirm the denial of the preliminary injunction.

---

[39] *Id.* at 18-19.

Dated: October 28, 2024

Respectfully submitted,

ROB BONTA
*Attorney General*
*State of California*

/s/ Laura L. Faer

LAURA L. FAER
Supervising Deputy Attorney General
EDWARD NUGENT
CHRISTINA RIEHL
Deputy Attorneys General
California Office of the Attorney General
1515 Clay Street, Suite 200
Oakland, CA 94612
(510) 879-3304
Laura.Faer@doj.ca.gov

*Attorneys for Amici Curiae States*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

MICHELLE HENRY
*Attorney General*
*Commonwealth of Pennsylvania*

**ADDITIONAL COUNSEL**

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333-0006

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W., Suite 8100
Washington, DC 20001

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,500 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

*/s/ Laura L. Faer*
LAURA L. FAER

## CERTIFICATE OF SERVICE

I certify that on October 28, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Laura L. Faer*
LAURA L. FAER